COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SCHEINDLIN

------------------------------------------------------------------x
CHRISTINE C. ANDERSON,

Plaintiff,

-against-

DOCKET NO. **07 CIV 9599**

RECEIVED
OCT 2 6 2007
U.S.D.C. S.D. N.Y.
CASHIERS

THE STATE OF NEW YORK, THE OFFICE OF COURT
ADMINISTRATION OF THE UNIFIED COURT SYSTEM,
HON. JOHN BUCKLEY, in his official and individual
capacity, THOMAS J. CAHILL, in his official and
individual capacity, SHERRY K. COHEN, in her official
and individual capacity, CATHERINE O'HAGEN WOLFE,
in her official and individual capacity, and DAVID SPOKONY,
in his official and individual capacity

Defendants.

*JURY TRIAL DEMANDED*

------------------------------------------------------------------x

**PLAINTIFF, CHRISTINE C. ANDERSON,** by and through her attorneys, THE LAW OFFICES OF FREDERICK K. BREWINGTON, as and for her Complaint against the above-captioned defendants, alleges upon knowledge as to her own facts and upon information and belief as to all other matters:

## PRELIMINARY STATEMENT

1.    This is a civil action seeking injunctive relief, monetary relief, including past and on going economic loss, compensatory and punitive damages, disbursements, costs and fees for violations of rights, brought pursuant to Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. 2000e; 42 U.S.C. §§ 1981, 1983, 1985; First, and Fourteenth Amendments to the United States Constitution; Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq* and New York State Human Rights Law, Executive Law §296, and State law claims

2.    Specifically, the Plaintiff alleges that the Defendants wantonly, recklessly, knowingly and purposefully, acting individually and in conspiracy with each other, sought to deprive Plaintiff of

employment, position, title and pay through a pattern of violation of constitutional rights, discrimination, retaliation, misrepresentation, misinformation, fraud, harassment, character assassination - a physical assault - abuse and manipulation of laws, rules and regulations because of Plaintiff's National Origin, race (African-American) , Age and because of her exercise of her free speech rights on her behalf and on behalf of the public which she represents.

3.      Said acts were done knowingly with the consent and condonation of THE STATE OF NEW YORK, THE OFFICE OF COURT ADMINISTRATION OF THE UNIFIED COURT SYSTEM, HON. JOHN BUCKLEY, in his official and individual capacity, THOMAS J. CAHILL, in his official and individual capacity, SHERRY K. COHEN, in her official and individual capacity, CATHERINE O'HAGEN WOLFE, in her official and individual capacity, and DAVID SPOKONY, in his official and individual capacity.

## JURISDICTION AND VENUE

4.      Jurisdiction of this Court is invoked under 28 U.S.C. §1331, 28 U.S.C. §§1343(3) and (4), 42 U.S.C. 2000e, Pendent jurisdiction over Plaintiff's state law claims is proper pursuant to 28 U.S.C. §1367.

5.      This Court has jurisdiction pursuant to 42 U.S.C. §1983, because Defendant the State of New York is a "state actor" within the meaning of §1983; and the Office of Court Administration of the Unified Court System, New York State Supreme Court, Appellate Division, First Judicial Department, is an arm of the State of New York and a "state actor" within the meaning of § 1983.

6.      Venue herein is proper under 28 U.S.C. § 1391(b); the cause of action arose in the Southern District of New York, all of the parties reside or are located in the State of New York, and because the events or omissions giving rise to Plaintiff's claims occurred in this District.

7.      Defendants have waived any protection or immunity they may have enjoyed under the

2

Eleventh Amendment to the Constitution of the United States of America because they knowingly and intentionally consented to lawsuits and legal claims arising from employee grievances filed in "outside agenc[ies] or court[s]." Such consent is set forth in the Appellate Division, First Judicial Department's Clerk's Manual § 17, which states: "The procedures outlined herein do not bar an employee from filing a claim of harassment or discrimination with an outside agency or court." Id. § 17, Clerk's Manual, "Employee Grievance and Disciplinary Procedures."

8.      Prior hereto on June 19, 2007 Plaintiff filed a Charge of Discrimination No. 10118524, with the New York State Division of Human Rights (hereinafter "SDHR") against Defendant NEW YORK STATE UNIFIED COURT SYSTEM, OFFICE OF COURT ADMINISTRATION, alleging discriminatory/retaliatory employment practices due to Plaintiffs age, race and color, and has satisfied all State Law prerequisites for providing a Notice of Claim. Plaintiff also cross filed a charge with the United States Equal Employment Opportunity Commission (hereinafter "EEOC"), under EEOC Charge No. 16GA703641

9.      On or about September 12, 2007 the SDHR issued a dismissal for administrative convenience.

10.      On or about October 9, 2007, Plaintiff received a Notice of Right to Sue Within 90 Days, issued by the U.S. Department of Justice with regard to EEOC Charge No. 16GA703641 (a copy is annexed hereto as Exhibit A). As of the filing date of this Complaint, ninety (90) days from the date of receipt of the Notice of Right to Sue has not yet passed.

## THE PARTIES

11.      At all times relevant in this Complaint, Plaintiff CHRISTINE C. ANDERSON (Plaintiff) is an individual and attorney, residing in the State of New York. At all times relevant hereto, Plaintiff was an employee of Defendants Plaintiff is currently 62 years of age and is a person born in Jamaica

3

who has Black, Asian and White ancestry. Plaintiff, for all purposes in this action has considered her self to be African-American.

12.     At all times relevant in this Complaint, Defendant STATE OF NEW YORK (hereinafter "STATE") is a sovereign state of the United States of America.  At all times relevant herein, Defendant State was an employer within the meaning of the Constitution of the State of New York and was a governmental entity acting under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York.

13.     At all times relevant in this Complaint,  Defendant OFFICE OF COURT ADMINISTRATION OF THE UNIFIED COURT SYSTEM, New York State Supreme Court, Appellate Division, First Judicial Department (hereinafter "OCA") is and was at all relevant times a governmental entity created by and authorized under the laws of the State of New York.  At all times relevant herein, Defendant OCA was an employer within the meaning of the Constitution of the State of New York. and was a governmental entity acting under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York.

14.     At all times relevant in this Complaint, Defendant the HON. JOHN BUCKLEY (hereinafter "BUCKLEY")(white male)sued here in his official  and individual capacity, was at all relevant times and upon information and belief, a citizen of the United States residing in the State of New York. At all times relevant herein, defendant Buckley was the Presiding Justice of the OCA; was a policy maker responsible for creating and implementing the policies carried out at the Appellate Division's Departmental Disciplinary Committee (hereinafter " DDC"); and was an employer within the meaning of the Constitution of the State of New York.

15.     At all times relevant in this Complaint, Defendant THOMAS J. CAHILL (hereinafter "CAHILL")(white male) sued here in his official and individual capacity,  is an attorney, who, under

4

information and belief, resides in the State of Connecticut. At all times relevant herein, Defendant CAHILL was employed as Chief Counsel for the DDC; was a policy maker for administrative and employment-related matters at the DDC; and was an employer within the meaning of the Constitution of the State of New York.

16.    At all times relevant in this Complaint, Defendant SHERRY K. COHEN (hereinafter COHEN)(white female) sued here in her official and individual capacity, is an attorney, who, under information and belief resides in the State of New York. At all times relevant herein, Defendant Cohen was employed as First Deputy Counsel for the DDC; was a policy maker for administrative and employment-related matters at the DDC; and was an employer within the meaning of the Constitution of the State of New York.

17.    At all times relevant in this Complaint, Defendant CATHERINE O'HAGEN WOLFE (hereinafter "WOLFE")(white female) sued here in her official and individual capacity, is an attorney, who, under information and belief resides in the State of New York. At all times relevant herein, Defendant WOLFE was employed as Clerk of the Court of the Appellate Division, First Judicial Department[OCA]; was a policy maker for administrative and employment-related matters at the DDC; and was an employer within the meaning of the Constitution of the State of New York.

18.    At all times relevant in this Complaint, Defendant DAVID SPOKONY (hereinafter "SPOKONY")(white male) sued here in his official and individual capacity, who, under information and belief resides in the State of New York. At all times relevant herein, Defendant SPOKONY was employed as Second Deputy to the Clerk of the Court of the [OCA];the Appellate Division, First Judicial Department; was a policy maker for administrative and employment-related matters at the DDC; and was an employer within the meaning of the Constitution of the State of New York.

## FACTUAL BACKGROUND

### *Introduction*

19.    For more than six years, Plaintiff was employed as a Principal Attorney at the DDC, which is responsible for investigating and disciplining attorneys found guilty of misconduct in representing the public.

20.    Upon learning of the DDC's pattern and practice of whitewashing and routinely dismissing complaints leveled against certain select attorneys – to the detriment of the very members of the public the DDC is duty-bound to serve – Plaintiff reported these wrongdoings. In response, rather than attempting to address and rectify the problem, the DDC embarked upon a campaign of abuse and harassment of Plaintiff – including a physical assault upon Plaintiff – purposefully impeding and obstructing her ability to fulfill and serve in her legitimate job functions, and ultimately culminating in her retaliatory dismissal. That retaliatory dismissal also came in the middle of Plaintiff's pending grievance and violated the Union procedural rules for due process.

21.    For example, the conduct complained of herein includes the following:

*    Plaintiff was assaulted on July 24, 2006 by defendant Cohen and unlawfully imprisoned in her office;

*    Plaintiff was subjected to retaliation by Cohen when Plaintiff complained of the assault;

*    Plaintiff was subjected to "counseling" without cause, without the presence of a Union Representative. Plaintiff attended that session and then was abruptly told that a follow-up "counseling" was cancelled;

*    Plaintiff was then fired during the pendency of a Union grievance against Cohen.

*    Plaintiff requests the appointment of a federal monitor to oversee the day-to-day operations of the DDC for an indefinite period.

### *Plaintiff's Employment with OCA*

22.    Plaintiff was hired as a Principal Attorney at the DDC on February 1, 2001.  Plaintiff

6

continued her employment in this capacity for more than six years, and, prior to reporting the misconduct complained of herein, she was consistently recognized by all as a superior, thorough and conscientious investigative and prosecuting attorney. Plaintiff's abilities in this regard were regularly confirmed by the high marks she received on her annual performance evaluations.

23.     In her position as Principal Attorney, Plaintiff was regarded as incisive, and thorough. In fact, in the first nine months of Plaintiff's employ with the DDC, Plaintiff uncovered a massive criminal conversion of well over a million dollars in a case which, prior to being assigned to Plaintiff, had not been pursued for months. Before the case was turned over to Plaintiff, it had been investigated by other attorneys at the DDC. However, their efforts had failed to uncover the criminal conversion. As a result of Plaintiff's intensive investigation and hard work, the malfeasant respondent was brought to justice, ultimately disbarred, and sent to prison for his criminal conduct. Plaintiff's hard work on the case was applauded not only by her colleagues at the DDC, but also publicly, in an article in The New York Law Journal, , which highlighted the massive criminal conversion and misconduct that Plaintiff had discovered. Plaintiff herself was satisfied only that justice had been served.

24.     In the course of her employment, Plaintiff was also recognized as an investigative attorney capable of courteous and compassionate treatment of respondents. On one occasion, one such respondent, accompanied by his counsel, stated on the record to Plaintiff that he was prepared to accept whatever level of discipline Plaintiff determined was appropriate, as a result of Plaintiff's "fair and even-handed" conduct of his deposition and the entire matter. This statement was a testament to the respect Plaintiff regularly enjoyed even from the respondents appearing before her.

25.     In these early years of her employment, Plaintiff thoroughly enjoyed her job, finding the investigative aspects intensely interesting, the independence of her exercise of judgment gratifying, and the pursuit of justice immensely rewarding.

7

26.    Plaintiff also enjoyed helping out in the office, as she was always proactively cooperative in matters of office administration. For example, Plaintiff accepted requests for proofreading and editing of the DDC's 2006 Annual Report for the year 2006; she also stepped in when Defendant COHEN did nothing to prepare a tribute to a deceased colleague, although she had previously agreed to handle the matter. Plaintiff undertook to, and satisfactorily performed, that task.

27.    Plaintiff also assisted support staff when help was needed. Plaintiff was extremely well-liked by her colleagues and support staff. In addition, Plaintiff also suggested ways to improve the administration of the office, by pointing out, for example, that opposing counsel (including counsel who were formerly employed by the DDC) should not be permitted to casually stroll through the office unattended, nor should they be permitted to wander into attorneys' offices unsupervised, to make phone calls, a practice which was accepted prior thereto. Plaintiff's advice in this regard was eventually heeded, and a new rule was put into place.

28.    Plaintiff learned, however, that her ethics and sense of fair play and her desire to adhere to the law were not appreciated by all. Plaintiff ultimately found that her attempts to fairly apply the law would soon become a source of resentment and hostility. Plaintiff also learned that, depending on the parties at issue, her legitimate attempts to adjudicate right and wrong would be obstructed and thwarted.

29.    For example, when Plaintiff learned of a complaint of misconduct against an attorney who was "favored" by her superiors, she witnessed that her fair and even-handed approach was not welcome in light of defendants desire to whitewash the pending complaint and contrive a quick dismissal of all charges.

### 4.    *Plaintiff Discovers Corruption At The DDC*

30.    From early 2001 through in or about early 2003, as a Principal Attorney, Plaintiff worked independently, investigating complaints of misconduct from the public and adjudicating the merits of

those complaints, as standard procedure. Plaintiff set forth her conclusions in memoranda, in the form a recommendation, which either argued in favor of bringing charges against the respondent or dismissing the complaint. Plaintiff's work was then reviewed by her "caseload supervisor," Judith Stein. Ms. Stein would review Plaintiff's recommendations, and once approved, the recommendation would be sent to Defendant CAHILL. Once Defendant CAHILL reviewed and signed off on the recommendation, it would be sent to the Policy Committee, a body commissioned with the final recommendations for discipline. After reviewing the entire file, the Policy Committee would decide the ultimate level of discipline to be imposed. Defendant CAHILL's First Deputy at the time was Sarah Jo Hamilton, who, while in that position, had not been involved in this review and approval process.

31.    In or about the Spring of 2003, Hamilton stepped down from her position of First Deputy to Cahill. She then assumed the position of Secretary of the Committee on Character and Fitness. She was replaced in the position of First Deputy by defendant Cohen.

32.    At first, Plaintiff's job remained unaffected, as the First Deputy had never played a role in the direct supervision or the review of her work, as a Principal Attorney. Plaintiff thus continued to report to Stein, her caseload supervisor, who in turn reported to Chief Counsel Cahill, who would sign off on the matter. Suddenly, Cohen inserted herself into Plaintiff's work product, to advance her own agenda.

33.    In 2005 Plaintiff began to discovered that Cahill and Cohen were apparently engaged in a "numbers game" and practice of selectively disposing of complaints -- dismissing complaints that involved certain parties. These actions were taken for their own personal or political reasons, and /or if they believed that a complaint would be burdensome or otherwise "unworthy" of prosecution for them.

34.    In addressing these dismissals to Cahill, Plaintiff stated that any such dismissal would constitute a fraud upon the public -- as well as a grave injustice to the complainant to whom the DDC

9

was duty-bound to serve. Plaintiff discovered that such complaints were being dismissed regardless of their merits – much to the detriment of the complainants.

35.    Plaintiff was highly disturbed, as she knew that any such pattern or practice of whitewashing certain complaints – in complete disregard of their merits – would plainly violate the rules and served to be completely inconsistent with the law, the mission of the DDC and constituted a grave and devastating fraud on the public.

36.    Plaintiff, was extremely concerned at this situation, and Plaintiff began to become increasingly uncomfortable in her job, as she observed the actions of Defendants.    Plaintiff also acknowledged and reminded Cahill that she had a duty, pursuant to DR 1-103(A), to report acts of misconduct.

37.    In or about 2003, Plaintiff observed one such instance of corruption . Following a highly sensitive investigation which uncovered overwhelming concrete evidence of misconduct on the part of the respondent, Plaintiff concluded her investigation with a recommendation that the respondent be brought up on charges.  Plaintiff received the approval of her caseload supervisor, who in turn referred Plaintiff's recommendations on to Defendant CAHILL.

38.    At some subsequent point, however, Plaintiff was informed that the complaint had been dismissed. Plaintiff was stunned. In light of the copious evidence of misconduct uncovered during her investigation, both she and her supervisor had readily and reasonably recommended charges. Plaintiff queried the final result. Upon information an belief, it was soon discovered that the Policy Committee had never received the recommendation that she authored and that Stein had approved.

39.    More shockingly, Plaintiff later discovered that the large file of evidence she had amassed during the course of her investigation had been gutted; the overstuffed file containing undisputable evidence of misconduct was suddenly paper-thin, lacking any of Plaintiff's significant

evidentiary investigative findings.

40.    Upon information and belief, the case file of the complainant in question had been gutted by Defendants CAHILL and COHEN, who conspired to cover-up the respondent's misconduct and Plaintiff's recommendation, for their own personal and/or political incentives.

41.    Upon information and belief, when Plaintiff inquired as to the final disposition of complaints –and discovered the cover-ups – Plaintiff's actions were closely observed by her superiors, Defendants CAHILL and COHEN. Shortly thereafter, upon information and belief, Plaintiff began to be regarded as a threat, as someone who was not a "team player" in the estimation of Defendants CAHILL and COHEN.

42.    Defendants CAHILL and COHEN's corrupt pattern and practice of fraudulently whitewashing certain complaints continued. In or about September 2005, Plaintiff completed an extremely complex investigation of a respondent.  Although Plaintiff believed that the conduct complained of argued strongly in favor of charges,  because of both a lack of actual proof of a conversion, and initial lack of cooperation from the client, Plaintiff and her caseload supervisor, Ms. Stein,  agreed that the matter be recommended for an admonition.

43.    Ms. Stein referred the recommendation to Defendant CAHILL. Both Ms. Stein and Defendant CAHILL approved the admonition. Defendant CAHILL simply requested an introductory paragraph, explaining to the Policy Committee the reasons that the DDC chose to recommend an admonition as opposed to charges. (The Policy Committee, after reviewing the entire file, decides the level of discipline to be imposed.)

44.    Plaintiff complied and inserted such an explanatory paragraph, however, Defendant COHEN intervened. Despite Defendant CAHILL's prior approval, Defendant COHEN stated that she intended to re-write the admonition because it was "too harsh" in its tone, and that she was afraid the

Committee might send the admonition back to the DDC for the imposition of charges. Defendant Cohen stated that she did not want to "tie up" an attorney "for six months" on a trial, if no charges were determined to be imposed.

45.    Plaintiff responded that Staff attorneys were tied up on trials all the time, and that it was improper to re-write a document in order to skew it to achieve a particular result. Over Plaintiff's objections, Defendant COHEN stepped in and re-wrote the admonition, deleting facts Plaintiff had uncovered during her investigation, and misrepresented the conclusions that Plaintiff had reached. Plaintiff was shocked, and such action was unprecedented.

46.    By the time Defendant COHEN had completed her re-write, the document no longer reflected the conclusions Plaintiff had reached. Plaintiff refused to have her name used on Defendant COHEN's new creation, as the document was no longer an honest and accurate representation of the facts uncovered and conclusions reached as a result of Plaintiff's investigation.

47.    Upon information and belief, Cohen intervened on this matter because she had a prior working relationship with the respondent's counsel. Upon information and belief, Cohen sought to prevent the respondent from being brought up on charges as a favor to this counsel.

48.    Nine months later, when Cohen had finally completed her re-write, she sent it to the Policy Committee. Lacking knowledge as to Cohen's manipulations, the Committee unwittingly signed off on the recommendation. Plaintiff was troubled that the Committee had never received an honest rendering of the facts; she believed that they had been deceived.

49.    Plaintiff was also concerned that Cahill and Cohen, actively and tacitly – were engaged in a corrupt, criminal pattern and practice of fraudulently obstructing and manipulating the disposition of certain complaints. Such behavior in which defendants were engaged was doing a disservice to the

public. Plaintiff was compelled to reported her concerns to Cahill, advising him that she believed Cohen's actions had been unethical and that he, also, had orchestrated and been a party to that unethical conduct.

## B.    Cohen's Campaign of Harassment and Micro-Management of Plaintiff

50.    Thereafter, Cohen embarked on a campaign of harassment of Plaintiff, in retaliation for Plaintiff's reporting of her conduct to Cahill. Surprisingly, Cahill did not reprimand Cohen; rather, he permitted the unjust campaign of retaliation to proceed against Plaintiff. Cohen became singularly focused upon Plaintiff; she interposed herself into Plaintiff's day-to-day work activities, seeking to bypass Stein as Plaintiff's caseload supervisor and insert herself as monitor of Plaintiff's every movement. Every investigation, every document, every deposition, now became subject to Cohen's micro-management. Even bank documents, previously obtained and analyzed by the Staff Accountant, were subjected to a new round of review, yielding the same findings.

51.    Plaintiff, a Principal Attorney, with experience was being subjected to extreme and unwarranted scrutiny, in retaliation for her having exercised her First Amendment rights and her duty to report misconduct.

52.    Defendants CAHILL and COHEN's campaign of oppressive harassment of Plaintiff continued for twenty-one months, until Plaintiff's abrupt discharge in June, 2007. Over this period, Defendant COHEN also became increasingly abusive and erratic. As Defendant COHEN's micro-management of Plaintiff escalated, so did COHEN'S own erratic behavior.

53.    In March of 2007, Defendant COHEN ordered Plaintiff to attend numerous last-minute, abruptly scheduled meetings in COHEN'S office, and to repeatedly report on matters Cohen had already demanded Plaintiff to report on only days earlier. Cohen's behavior was so blatantly unreasonable and bizarre that it was noticed and commented upon by numerous other attorneys in the office.

### C.  *Cohen's Erratic Behavior Culminates In a Physical Assault Upon Plaintiff*

54.    Cohen's behavior in other respects became increasingly unmanageable.  For example, other employees began to comment, that Cohen was visibly intoxicated during business hours.  On one occasion, during a visit by a Japanese delegation, who were the disciplinary counterparts of the DDC, in the conference room of the Offices of the DDC, it was widely reported that Cohen appeared to be drunk and not in control of her faculties.  During the event, observed by Plaintiff – -- and  the guests, -- Cohen – Cohen lost control of her body and fell heavily to the floor.  Cohen was thus a source of embarrassment and horror for the DDC.  The members of the Japanese delegation watched the event, their faces expressionless.

55.`    On another occasion, on May 9, 2007, Plaintiff received a report that the smell of alcohol was strongly identifiable on Cohen's breath – at only nine o'clock in the morning, when she was found, stumbling in the hall.  Office personnel also observed that Cohen routinely returned from lunch visibly intoxicated.  Plaintiff did not doubt these reports, as she herself, on at least one prior occasion, on Thursday, March 29, 2007, witnessed Cohen staggering in the hallway of the office, unsteady on her feet.

56.    On Thursday, March 15, 2007, at a 3:00 p.m. meeting with defendant Cohen and Second Deputy Andral Bratton, Cohen selectively  subjected  plaintiff to heightened criticism and claims of wrong doing by oppressively pushing the most trivial details, e.g., had Plaintiff spoken to the complainant?  Had Plaintiff ordered or reviewed bank records?  The responses  which were provided by Plaintiff were always in the affirmative. Such treatment was in direct contradiction of Plaintiff's work performance  as demonstrated by her consistently excellent performance evaluations.

57.    Plaintiff was more than capable of doing her job; these meetings called by Cohen were entirely pretextual and designed to discriminate, harass and cause a hostile work environment for

Plaintiff. Plaintiff was suddenly ordered to attend meetings to report on a matter reported on only the prior day. No other younger, non-Jamaican, white attorneys were treated in this fashion, especially once they had reported their matters at a trimester conference.

58.    In July 2006, Cohen's egregious behavior escalated, manifesting in took a horrifying turn for the worse. On July 24, at approximately 11:54 a.m., Cohen entered Plaintiff's office and closed the door behind her. Observing that Plaintiff was on her way out of the office, holding a file and a yellow pad, Cohen asked Plaintiff if she was in a hurry. Plaintiff replied in the affirmative, advising that a complainant was waiting for a 12:00 noon appointment and that, back to back, Plaintiff had a 2:00 p.m. deposition. Cohen ignored Plaintiff's response, grabbed Plaintiff by the hand, dug her nails into Plaintiff's skin, and snapped: "You're not leaving this office!" No other younger, non-Jamaican, white attorneys were treated in this fashion.

59.    While doing this Cohen was leaning her entire weight on the door of Plaintiff's office and preventing Plaintiff's exit. Plaintiff cried out and pulled away from Cohen, who appeared to be completely out of control. In her assault on Plaintiff, Cohen's nails left bloody scratches on Plaintiff's hand. Plaintiff instinctively backed away from Cohen, to the far side of Plaintiff's desk, shaking with shock at the nature of the attack.

60.    Plaintiff then asked Cohen, twice, if she intended to continue to keep Plaintiff a prisoner in her office. Receiving no response to her questions, Plaintiff told Cohen that it would be better for both of them if Cohen left Plaintiff's office. After a lengthy pause, Cohen stated: "Now, I am leaving your office!" and left, slamming the door behind her. Plaintiff then collapsed onto her chair, stunned and still shaking. No other younger, non-Jamaican, white attorneys were treated in this fashion. Consciously focusing on the events, Plaintiff then wrote a detailed account of the events.

61.    Now late for her appointment, Plaintiff then hurried to meet with the complainant. Still

15

traumatized by Cohen's out of control earlier actions,  Plaintiff later conducted her 2:00 p.m. deposition,  At the termination of the deposition, Plaintiff left a voice mail message for Cahill, who was on vacation, and for Second Deputy Counsel Andral Bratton, seeking a meeting the following day with Bratton. Still in a state of utter mental and physical exhaustion, and severe emotional distress, Plaintiff then utilized a car service to take herself home,

## D.    *Plaintiff Reports Cohen's Assault*

62.    Plaintiff reported Defendant COHEN's misconduct to Defendant CAHILL, who refused to address the matter and ignored the important issues presented by Cohen's lawless behavior.  After eight days of inaction by defendant Cahill,  Plaintiff met with him and informed him of her intent to report the matter to Catherine O'Hagen Wolfe, Clerk of the Court, in light of his own utter and willful refusal to act.

63.    At Plaintiff's meeting with Wolfe, Plaintiff requested that Cohen be prevented from making close contact with Plaintiff.  Plaintiff explained that, when she worked late, she was forced to lock herself in her office to avoid Cohen, as she feared for her safety around Cohen. Wolfe refused Plaintiff's request.

64.    Plaintiff also requested that her complaint receive complete confidentiality.  Wolfe replied that in an office "such as the DDC, that confidentiality would not be likely."

65.    Upon information and belief, WOLFE and all Defendants never intended to treat Plaintiff's complaint with confidentiality; to the contrary, Defendants actively sought to "make an example" of Plaintiff, i.e., using Plaintiff as an example of the consequences of reporting misconduct – which consequences (detailed below) were designed to intimidate Plaintiff's co-workers into silence and suppression of any similar complaints. No other younger, non-Jamaican, white attorneys were treated in this fashion

66.    After Plaintiff reported the matter to Wolfe, Wolfe sought to appoint Sarah Jo Hamilton (who was at the time Secretary of the Character and Fitness Committee) as one of the persons on a three-person panel to investigate Plaintiff's allegations. Inasmuch as Hamilton was former First Deputy for the DDC, and upon information and belief, a close personal friend of defendant Cohen, Plaintiff protested the proposal to have her serve in an investigation of Cohen's conduct. Plaintiff reasonably sought an investigation conducted by persons at least facially impartial.

67.    Following Plaintiff's objections, Hamilton was replaced by Susannah Rojas, an attorney with the Appellate Term and a former employee of the Appellate Division, First Judicial Department, who had been subject to both Wolfe and OCA.   The investigation was conducted by Rojas and two other individuals: Spokony, an attorney also subject to Wolfe and defendant OCA, and Pat Finnegan, a non-attorney, Chief of Administration, also subject to Wolfe, Spokony and defendant OCA. There was a clear, ethical conflict in the composition of such a panel.

68.    This three-person panel interviewed Plaintiff, who was represented by counsel.  The panel also interviewed Cohen concerning her behavior. Cohen admitted Plaintiff's allegations in their entirety. In the panel's report, Cohen stated that her abusive actions had been an "emotional response."

69.    Following this "investigation," the only stricture placed on Cohen by defendants Wolfe, Spokony and OCA, was that Cohen should apologize to Plaintiff and attend a "management skills course." As of the filing of this complaint, Plaintiff never received a response – despite requests for the same – as to whether Cohen ever attended such a course, its nature, its duration, or and any formal certification of attendance.

70.    Plaintiff also requested of Cahill on three separate occasions that – in light of Cohen's assault on her person – a "Chinese Wall" be erected between herself and Cohen. Plaintiff reasonably sought a separation from Cohen, as she was concerned for her own safety. Plaintiff feared that Cohen's

advances upon her would escalate, yet again, possibly resulting in a further, even more serious assault.

71.    Plaintiff's request was eminently reasonable, inasmuch as other individuals at the DDC had been separated and relieved of having to work with Cohen, under much less egregious circumstances: for example, Plaintiff was aware that, in the past, Cahill had removed at least two other attorneys from Cohen's supervision, placing them under the supervision of other caseload supervisors, on their request. No other younger, non-Jamaican, white attorneys were treated in this fashion. Nonetheless, Plaintiff's request to Cahill fell on deaf ears; he cruelly failed or refused to act. Cahill thus deliberately and maliciously subjected Plaintiff to yet further harassment by Cohen, callously ignoring Plaintiff's legitimate fear of bodily harm at Cohen's hands.

72.    Inasmuch as in any law firm or organization, such misconduct would have resulted in a termination or demotion, the DDC and OCA failed to act in this regard. On October 13, 2006, Plaintiff appealed the decision, which had amounted to less than a "slap on the wrist." In Plaintiff's appeal to Buckley, Plaintiff reiterated her request that, at a minimum, a "Chinese Wall" be erected between Cohen and herself. Once again, the Court, through Buckley, refused Plaintiff's legitimate request.

73.    On October 24, 2006, defendant Buckley denied Plaintiff's appeal, thus merely "rubber-stamping" Wolfe's panel's decision and Cahill's decision, to permit defendant to continue to harass Plaintiff under the guise of "supervision." At no time did defendant Buckley ever attempt to ascertain from Plaintiff the nature and the effect of Cohen's harassment of her, abdicating his most basic duty of care to Plaintiff: to provide her with a workplace free of hostility and abuse.

74.    Not surprisingly, Cohen was emboldened by Buckley's denial of Plaintiff's appeal, and stepped up her oppressive and egregious campaign of harassing Plaintiff anew, all of which was sanctioned by Cahill. At a meeting with Plaintiff, Defendant CAHILL leaned close to Plaintiff, placing his face mere inches from Plaintiff's and stating that Plaintiff had to "do whatever Sherry tells you." No

other younger, non-Jamaican, white attorneys were treated in this fashion

### E.    *Cohen Constructively Demotes Plaintiff To A Functional Position*

75.    Thereafter, Cohen formally removed Stein as Plaintiff's caseload supervisor, and inserted herself in that role. Cohen constantly harassed Plaintiff, by scheduling meetings with Plaintiff with no prior notice and repeatedly demanding routine information regarding Plaintiff's cases – even when Plaintiff had already done so days earlier. Defendant COHEN repeatedly left voice mail messages for Plaintiff and sent Plaintiff emails, demanding the same information again and again. No other younger, non-Jamaican, white attorneys were treated in this fashion.

76.    Defendant COHEN also began instructing Plaintiff, via email, as to how to conduct an investigation. For example, Cohen instructed Plaintiff to call a certain person, or look at certain records, even when Plaintiff advised Cohen that she had already performed such routine and customary tasks. Plaintiff had never before been subjected to such treatment by her previous supervisor, Ms. Stein, or even by Defendant CAHILL. No other younger, non-Jamaican, white attorneys were treated in this fashion.

77.    Upon information and belief, Defendants CAHILL's and COHEN's actions were undertaken solely for the purpose of discriminating, retaliating against and harassing Plaintiff, as Plaintiff plainly knew how to perform her job functions (indeed, Plaintiff had already performed all required tasks on her own). Moreover, Plaintiff's knowledge of and competence in performing her job functions had been repeatedly and consistently demonstrated by her excellent performance evaluations and by the commendations of both her colleagues and support staff.

78.    At a meeting in late 2006, regarding the liquidation of an insurance company, in the presence of Second Deputy Andral Bratton, Cohen told Plaintiff that she was "stupid" and "silly" and that she (Cohen) was "wasting her time trying to talk to [Plaintiff]." In that particular matter, however,

Defendant COHEN was failing to grasp the legal implications and relevance of a stay in the context of a liquidation of an insurance company. Defendant COHEN still did not grasp the effect of the stay in the investigation, even when Second Deputy Andral Bratton sought to explain it to her.

79.     Cohen then began to take over Plaintiff's work product, depriving Plaintiff of the autonomy and authority she previously enjoyed in her role as Principal Attorney. For example, with Cahill's agreement, Cohen would at times remove from Plaintiff's work product entire elements of charges. With Cahill's acquiescence, Cohen also began to contact opposing counsel on Plaintiff's cases – with whom Plaintiff had already been in contact – advising said counsel to thereafter respond directly to her (Cohen). No other younger, non-Jamaican, white attorneys were treated in this fashion.

80.     Upon information and belief, Cahill and Cohen took such actions in an attempt to humiliate Plaintiff, by showing opposing counsel that Cohen had superseded Plaintiff and that Plaintiff was no longer the attorney controlling the investigation. It was clear that Cahill and Cohen's actions were pre-designed to destroy Plaintiff's work and prevent any correction of respondent's malfeasance. No other younger, non-Jamaican, white attorneys were treated in this fashion.

81.     Defendant CAHILL and COHEN also sought to have Plaintiff perform paralegal and secretarial functions in Plaintiff's investigations, by, for example, revising Plaintiff's work product beyond recognition and then instructing Plaintiff to re-type the document, rather than assigning the document's revisions to a secretary. Cohen then sought to have Plaintiff's professional job functions reduced to that of an paralegal or investigator, directing Plaintiff to merely obtain the facts and perform associated tasks. Defendant COHEN would then re-create Plaintiff's work as her own work product, under her name, and send the re-created work to the Policy Committee, reserving for herself the credit for the results obtained by Plaintiff's diligent efforts.

82.     Cahill and Cohen also demoted Plaintiff's secretary, a Line 21 secretarial assistant, to

the role of a receptionist. Suddenly, Plaintiff had the services of a secretary for one-half a day, only, and further, sharing that half-day with another attorney; This resulted in Plaintiff and corresponding attorney each having the services of a secretary for only one-fourth of a day.

### F.    *Cohen's Evaluation of Plaintiff Was Improper*

83.    Following Cohen's physical assault on Plaintiff, Cahill inexplicably, permitted Cohen to write an evaluation of Plaintiff, and to make statements which were both biased and misleading. This was done in further discrimination, retaliation and in bad faith.

84.    On or about January 30, 2007, Cohen negatively evaluated Plaintiff, which constituted Plaintiff's first negative evaluation since her date of hire in 2001. After five years of consecutively excellent performance evaluations, Cohen issued a retaliatory, negative evaluation of Plaintiff. The evaluation was utterly bereft of merit, and was subjective, emotional and incorrect. In light of the contextual backdrop and Cohen's obvious bias, her evaluation lacked credibility and must be discarded. No other younger, non-Jamaican, white attorneys were treated in this fashion.

### G.    *Plaintiff is Further Harassed and Retaliated Against by All Defendants*

85.    On or about January 25, 2007, as written on that negative evaluation, Cohen wrote that she had requested, and Wolfe agreed, that Plaintiff be "counseled." Without seeking Plaintiff's input, Wolfe directed Spokony that Plaintiff be brought in for such "counseling" session. No reason was given to Plaintiff to explain any alleged need for such "counseling" session. In reality, the counseling session was pretextual and contrived to serve as a reprimand;   it even included a written reprimand of Plaintiff, albeit baseless. No other younger, non-Jamaican, white attorneys were treated in this fashion.

86.    News of Plaintiff's "counseling" session rapidly spread throughout the office. Upon information and belief, the "counseling" session was intentionally contrived, in an attempt to "make an example" of Plaintiff and thereby "chill" the environment with respect to other employees' exercise of

21

their First Amendment rights and their duty to follow the law.

87.     Plaintiff's "counseling" session was viewed by other employees as a reprimand.  In reality, it constituted further retaliation against Plaintiff for Plaintiff's prior inquiry to Spokony as to whether Cohen had, in fact, ever attended the "management skills" course that she had been instructed to take, following her confession to the assault on Plaintiff.  Upon information and belief, this pretextual "counseling" session was an attempt to further discriminate, retaliate and contrive an unjustified false negative record against Plaintiff by Cahill and Cohen.  Upon information and belief, the pretextual "counseling" session was aided and abetted by defendants Wolfe and Spokony and Buckley.  No other younger, non-Jamaican, white attorneys were treated in this fashion.

88.     At this bogus "counseling" session, Spokony's demeanor towards Plaintiff was hostile and abusive.  Plaintiff was compelled, on two occasions, to request a break, to sit outside of Spokony's office and drink a glass of water, and more importantly, to take her blood pressure medication because of severe tachycardia.  Spokony, who at all times was knowledgeable of Plaintiff's cancer history, also demanded that Plaintiff produce a doctor's note for an absence of less than three consecutive days.  In so doing, Spokony abused his discretion in demanding a doctor's note for a one-day medical absence.  Such action was in contravention of the DDC's own custom and habit because employees with good attendance records are never required to produce such a note.

89.     Defendant SPOKONY claimed that the alleged reason for the session was that Plaintiff was "refusing to acknowledge" Cohen as her supervisor.  Again, any such alleged reason for "counseling" Plaintiff was contrived and pretextual as Defendants presented no evidence of their allegations and was the lead-up to what amounted to an administrative lynching of Plaintiff. No other younger, non-Jamaican, white attorneys were treated in this fashion.

90.     Plaintiff thereafter complained and instituted a Union Grievance, acting through the

offices of the Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO, on account of Cohen's ongoing harassment and retaliatory actions. That grievance was filed and served, by personal service, on the Appellate Division, First Judicial Department, on May 16, 2007.

91.    Pursuant to provisions of the Union Bargaining Contract, the Court had twenty (20) working days within which to issue a decision on that grievance. Such twenty (20) working-day period would therefore expire on June 14, 2007.

## H.    Plaintiff's Summary Retaliatory Termination

92.    On June 8, 2007, at 11:10 a.m., Plaintiff received a voice mail message summoning Plaintiff to a 12:30 p.m. meeting, at the Courthouse. No reason was given for the meeting, or for the sudden summons. Plaintiff responded professionally, via email, to Spokony, explaining that such a meeting would need to be scheduled for another date, inasmuch as Plaintiff had a doctor's appointment, which really could not be missed. Nevertheless, Spokony maintained his egregious and oppressive campaign of abuse, discrimination, retaliation and harassment of Plaintiff, publicly pursuing her via her secretary – and former secretary – with persistent and repeated telephone calls, insisting that Plaintiff attend that summarily scheduled meeting at his Office, at the Courthouse for the Appellate Division, First Judicial Department.

93.    That wave of harassment led Plaintiff, from an examination table at a medical office, to be obliged to dictate an email to Spokony, through her secretary, advising him of her inability to return in time for the requested meeting by close of business at the Courthouse. Plaintiff also advised Spokony that, as soon as possible, Plaintiff would report to work, and would furnish Spokony, and her Office Manager, with medical proof of her inability to have attended such precipitate summons to a meeting. No other younger, non-Jamaican, white attorneys were treated in this fashion.

94.    Thereafter, Plaintiff was summarily terminated. Plaintiff was advised of such

23

termination by letter dated June 8, 2007, the same day of the "meeting", through United States mail, from Spokony, stating that her services as Principal Attorney with the DDC were no longer required. No other reason for Plaintiff's termination was enunciated. No other younger, non-Jamaican, white attorneys were treated in this fashion.

95.     Plaintiff was terminated six or seven days prior to the mandatory decision period for her grievance pursuant to the provisions of the Court's Union Bargaining Contract; i.e., Plaintiff was terminated while her union grievance was still pending. Defendants thereby knowingly and willfully violated the terms of the Court's and OCA's own contract with the Union and the Union's procedural rules for due process. Plaintiff should have been permitted to pursue her Union remedies, demand a hearing and receive due process. No other younger, non-Jamaican, white attorneys were treated in this fashion.

96.     Upon information and belief, Plaintiff's termination was unlawfully instituted to discriminate against her, retaliate against her and deprive Plaintiff of her rights under the Court's Union Bargaining Contract; these actions deprived Plaintiff of her right to due process of law. Upon information and belief, sources within the DDC stated that *Plaintiff posed a threat of further disclosures, since Cahill and Cohen knew that Plaintiff was aware of other misconduct on their part.*

97.     Upon information and belief, defendants also state that the timing of the Plaintiff's abrupt firing was connected to the newly circulated revelations concerning Cahill's status as an individually named defendant in a lawsuit entitled  In the Matter of Complaints Against Attorneys and Counselors-At-Law; Kenneth Rubenstein – Docket 2003.0531; Raymond Joao – Docket 2003.0532; Steven C. Krane – Docket Pending Review By Paul J. Curran, Esq. – Thomas J. Cahill J. Cahill – Docket Pending By Special Counsel Martin R. Gold On Advisement of Paul J. Curran (Separate Motion Attached); and the Law Firm of Proskauer Rose, LLP; Eliot I. Bernstein, Pro Se and P. Stephen Lamont Both Individually

and On Behalf of Shareholders of: Iviewit Corporation, et al, Petitioner. That lawsuit was filed in the Supreme Court of the State of New York, Appellate Division: First Department.

98.    As a direct and proximate result of the unlawful conduct of defendants, and each of them, as alleged herein, Plaintiff has suffered and will continue to suffer loss of seniority, earnings, CLE benefits, employment, union benefits, retirement benefits, Flex Spending Account benefits, and promotional opportunities in an amount as yet not specifically ascertained but subject to proof at trial.

99.    As a direct and proximate cause of the unlawful conduct of the defendants, and each of them, as alleged herein, Plaintiff has suffered and continues to suffer humiliation, mental anguish and emotional distress, including, but not limited to, anxiety, depression, fear, withdrawal, and loss of productive work time; and has incurred costs, all in an amount as yet not specifically ascertained, but subject to proof at trial.

100.    All of the actions of the defendants alleged herein, separately and collectively deprived Plaintiff of substantive due process rights by unlawfully depriving her liberty interest in pursuing her profession and advancement therein, maintaining her professional reputation, standing and ability to earn an income. Defendants' actions were actuated by virtue of Plaintiff's knowledge of specific occurrences of corruption within the DDC.

101.    As a result of the ongoing hostile work environment and acts of retaliation, Plaintiff has suffered physical and emotional distress requiring her to seek medical attention, due to serious concerns about her health. Plaintiff suffered severe tachycardia and anxiety, among other physical manifestations of ailments, associated with victims of a hostile work environment and retaliation in the workplace.

102.    Plaintiff charges all defendants with being the cause of the violations set forth in this Complaint. Defendants STATE and OCA allowed the creation of, and failed to protect Plaintiff from

25

an abusive work environment, to which she was subjected at the hands of Defendants WOLFE, SPOKONY, CAHILL and COHEN. Defendants STATE and OCA were willful and careless in their training of their employees to prevent and/or correct the violations set forth in this Complaint. Defendants STATE and OCA were willful and careless in their supervision of their employees to prevent and/or correct the violations set forth in this Complaint. Defendants STATE and OCA failed to prevent and aided and abetted in the violations set forth in this Complaint. Defendants STATE and OCA both negligently supervised their employees and negligently retained Defendant COHEN, after her physical assault on and unlawful imprisonment of Plaintiff, in her office, on July 24, 2006. Defendants retained Defendant COHEN although defendant Cohen's actions were well known to them. All defendants aided, abetted and conspired with each other in the violations set forth in this Complaint.

103.    As a result of her discharge from employment, Plaintiff lost substantial benefits from her New York State pension to which she would have been entitled, had she continued to work until age seventy.

104.    Plaintiff was rendered unable to pay her home mortgage, was unable to meet her bills and expenses, and was forced to cash in her individual retirement account and other investments to support herself.

105.    More shocking to the conscience of any person was the outrageous conduct of defendants. Plaintiff was purposefully and cruelly discharged four months prior to the completion of her tenth year of employment, thereby depriving her of her eligibility to purchase health insurance at the "employee rate." That decision to discharge Plaintiff on such a retaliatory basis was actuated by the active malice of all defendants, all of whom knew, or were privy to, Plaintiff's cancer health history. Plaintiff names all defendants as the willful instigators of that atrocity and seeks punitive damages on that charge.

106.    As a result of Plaintiff's reporting ethical misconduct, as required by the New York State Bar Association's Disciplinary Rule 1-103(A),  Plaintiff was subjected to unprecedented physical assault, unlawful imprisonment in her office, discrimination,  retaliatory harassment and finally, a summary retaliatory termination in the middle of a pending grievance against defendant Cohen.  That termination violated the Union procedural rules for due process.  Plaintiff should have been permitted to pursue Union remedies, demand a hearing and receive due process.  Nothing of that was done.  Instead, the First Department completely violated their own contract with the Union and summarily fired Plaintiff.

## COUNT ONE
### TITLE VII

107.    Plaintiff repeats and realleges each and every allegation contained in paragraph "1" through "106", as though fully set forth herein.

108.    The above discriminatory/retaliatory  practice is based on race, color and opposing unlawful discriminatory practices by Defendant STATE and OCA,  its agents and employees violates Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e as amended.

109.    Plaintiff opposed illegal discrimination on the basis of defendants' treatment of Plaintiff by subjecting her to disparate treatment to that accorded other white attorneys.  Defendants then further retaliated against Plaintiff, accusing her of refusing to follow instructions, giving her an unwarranted, negative performance evaluation, subjecting her to an unwarranted "counseling" session,  and finally, summarily discharging her from employment.

110.    Because of Plaintiff's race and color and opposing and reporting acts of misconduct and corruption, she has been subjected to abuse and mistreatment as detailed above and has been treated

differently than white individuals.

111.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of income, fear, anxiety, physical injury, severe humiliation, loss of professional standing in an area of the legal profession which is extremely narrow and interactive, shame, embarrassment, mental anguish, emotional distress, emotional pain and suffering, loss of income, loss of her usefulness to the public and loss of enjoyment of life.

112.    As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

## COUNT TWO
## 42 U.S.C. §1981

113.    Plaintiff repeats and re-alleges each and every allegation contained in paragraph "1" through "112", as though fully set forth herein.

114.    The above discriminatory and retaliatory acts, pattern, and practice are based on race and color by Defendants STATE, OCA, BUCKLEY, CAHILL, COHEN, WOLFE, and SPOKONY, through their agents and employees violates 42 U.S.C. §1981 as amended by the Civil Rights Restoration Act of 1991 (Publ. Law No, 102-406).

115.    Defendants STATE, OCA, BUCKLEY, CAHILL, COHEN, WOLFE, and SPOKONY have denied Plaintiff the same rights to full and equal benefit of the laws as enjoyed by white employees of Defendant STATE and OCA.

116.    Because of Plaintiff's national origin, race and color and opposing and reporting acts

28

of misconduct and corruption, she has been subjected to abuse and mistreatment as detailed above and has been treated differently than white individuals.

117.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of income, fear, anxiety, physical injury, severe humiliation, loss of professional standing in an area of the legal profession which is extremely narrow and interactive, shame, embarrassment, mental anguish, emotional distress, emotional pain and suffering, loss of income, loss of her usefulness to the public and loss of enjoyment of life.

118.    As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

### COUNT THREE
### 42 U.S.C. §1983
### DEPRIVATION OF RIGHTS UNDER
### THE FIRST and FOURTEENTH AMENDMENT and
### DISCIPLINARY RULE DR 1-103(A) of the NEW YORK STATE BAR ASSOCIATION

119.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "118", as though fully set forth herein.

120.    The conduct and actions of defendants in retaliating against Plaintiff and subjecting her to a hostile work environment, culminating in the constructive demotion and termination of her position, were unlawful, oppressive and a malicious attempt to retaliate against her for having exercised her Constitutional Right of Free Speech as a private citizen regarding matters of public concern, and to deprive her of that right in violation of the First Amendment of the United States Constitution and 42 U.S.C. § 1983; and in violation of Plaintiff's duty to report attorney misconduct, pursuant to Disciplinary

Rule DR 1-103(A) of the New York State Bar Association.

121.    The Defendants STATE, OCA, BUCKLEY, CAHILL, COHEN, WOLFE, and SPOKONY, collectively and each one of them individually, have engaged in actions and abuses which violate and deny Plaintiff her rights as provided under the Fourteenth Amendment of the United States Constitution violating her First and Fourteenth Amendment rights of equal protection and due process in discriminating against Plaintiff because of and account of her race and color, and his opposition to discrimination.

122.    Defendants' infringement upon and violation of Plaintiff's rights protected under the First and Fourteenth Amendment of the United States Constitution was and is intended to harm Plaintiff, because of her race and color, and to place a chilling effect upon the exercise of such rights by Plaintiff and other persons as is their right as provided by the U.S. Constitution and exercise such rights.

123.    Plaintiff, an African-American woman born in Jamaica , has been treated differently from similarly situated white employees and has been abused and violated because of her race/color, and her opposition to discrimination.

124.    Defendants' conduct and actions were intentional, malicious, taken with deliberate indifference and/or reckless disregard for the natural and probable consequences, and without lawful justification or reason.

125.    Defendants' conduct and actions constituted, and were in conformity with, the policies, practices and/or customs of defendants State and OCA, and were committed by individuals who were final policy makers and acting under the color of law.

126.    Defendants' conduct and actions created a hostile work environment commencing from in or about September, 2005, and continuing without interruption until Plaintiff's summary dismissal, and therefore created a continuing violation.

127.    Defendants STATE, OCA, BUCKLEY, CAHILL, COHEN, WOLFE, and SPOKONY failed to intervene, prevent or correct the conduct and actions that deprived Plaintiff of her Constitutional rights.

128.    Defendants STATE, OCA, BUCKLEY, CAHILL, COHEN, WOLFE, and SPOKONY failed to adhere to their obligation owed to Plaintiff not to engage in the conduct and actions that deprived Plaintiff of her Constitutional rights.

129.    Because of Plaintiff's country of origin, race and color and opposing and reporting acts of misconduct and corruption, she has been subjected to abuse and mistreatment as detailed above and has been treated differently than white individuals.

130.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of income, fear, anxiety, physical injury, severe humiliation, loss of professional standing in an area of the legal profession which is extremely narrow and interactive, shame, embarrassment, mental anguish, emotional distress, emotional pain and suffering, loss of income, loss of her usefulness to the public and loss of enjoyment of life.

131.    As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

## COUNT FOUR
### 42 U.S.C. §1983 - MUNICIPAL VIOLATIONS

132.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 131 inclusive, of this Complaint, with the same force and effect as though herein fully set forth.

133.    Defendants STATE, OCA, BUCKLEY, CAHILL, COHEN, WOLFE, and SPOKONY, acting under color of law, and through their employees servants, agents and designees, have engaged in a course of action and behavior rising to the level of a policy, custom, and condoned practice, which has deprived Plaintiff of rights, privileges and immunities secured by the Constitution and laws in violation of 42 U.S.C. §1983. These actions were condoned, adopted and fostered by policy makers including but not limited to Defendants BUCKLEY, CAHILL, COHEN, WOLFE, and SPOKONY.

134.    Because of Plaintiff's national origin, race and color, age and opposing and reporting acts of misconduct and corruption, she has been subjected to abuse and mistreatment as detailed above and has been treated differently than white individuals.

135.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of income, fear, anxiety, physical injury, severe humiliation, loss of professional standing in an area of the legal profession which is extremely narrow and interactive, shame, embarrassment, mental anguish, emotional distress, emotional pain and suffering, loss of income, loss of her usefulness to the public and loss of enjoyment of life.

136.    As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

**COUNT FIVE**
**42 U.S.C. § 1985**

137.    The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 136 of this complaint with the same force and effect as though fully set forth

herein.

138.    Defendants, and each of them conspired to deprive Plaintiff of her First and Fourteenth Amendment rights, and jointly caused such deprivation of rights by acting in concert to unlawfully terminate, assault, and silence Plaintiff as described above in this Complaint.

139.    Upon information and belief, the Defendants STATE, OCA,  CAHILL, COHEN, WOLFE and SPOKONY,  agreed to and, with the intent and purpose of further depriving the Plaintiff of her due process rights, specifically conspired to terminate Plaintiff's further denying the Plaintiff her First and Fourteenth Amendment rights via a conspiracy to cover the misconduct of Defendants.

140.    Said actions by Defendants denied Plaintiff equal protection under the law, based upon the Plaintiff's race and color.  All of these rights are guaranteed to the Plaintiff under U.S.C. §§ 's 1983, 1985, and the Fourteenth Amendments of the United States Constitution.

141.    Each of the Defendants separately and in concert acted outside the scope of their jurisdiction and without authorization of law, and each of the Defendants separately and in concert acted willfully, knowingly and purposefully with the specific intent to deny Plaintiff employment, and therefore conspired to harm Plaintiff.

142.    By denying Plaintiff the due process rights set forth by the union contact, and allowing same, the Defendants separately and in concert knew or should have known they were violating laws of the State of New York and those statutory and constitutional rights set forth herein and have failed to prevent the same and therefore conspired to harm Plaintiff.

143.    Because of Plaintiff's race and color and opposing and reporting acts of misconduct and corruption, she has been subjected to abuse and mistreatment as detailed above and has been treated differently than white individuals.

144.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer

loss of income, fear, anxiety, physical injury, severe humiliation, loss of professional standing in an area of the legal profession which is extremely narrow and interactive, shame, embarrassment, mental anguish, emotional distress, emotional pain and suffering, loss of income, loss of her usefulness to the public and loss of enjoyment of life.

145.    As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

## COUNT SIX
## NEW YORK STATE HUMAN RIGHTS LAW
### EXECUTIVE LAW §296

146.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 145 inclusive of this Complaint, with the same force and effect as though herein fully set forth.

147.    The above discriminatory/retaliatory practice is based on race, color and opposing unlawful discriminatory practices by Defendant STATE, OCA, BUCKLEY, CAHILL, COHEN, WOLFE, and SPOKONY its agents and employees violates New York's Human Rights Law, Executive Law §296.

148.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of income, fear, anxiety, physical injury, severe humiliation, loss of professional standing in an area of the legal profession which is extremely narrow and interactive, shame, embarrassment, mental anguish, emotional distress, emotional pain and suffering, loss of income, loss of her usefulness to the public and loss of enjoyment of life.

149.    As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will

continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

## COUNT SEVEN
## AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967
### 29 U.S.C. § 621 *et seq.* (as Amended)

150.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 149 inclusive of this complaint, with the same force and effect as though herein fully set forth herein.

151.    At the time of her termination, Plaintiff was 62 years old.

152.    Upon information and belief, Defendants  STATE, OCA,  BUCKLEY, CAHILL, COHEN, WOLFE, and SPOKONY, through their agents and employees, treated white individuals, who were substantially younger than Plaintiff differently including not, abusing, harassing,  retaliating and discriminating against the and not  wrongfully terminating them.

153.    Upon information and belief, these younger white employees did not possess greater skills or experience as those possessed by the Plaintiff.

154.    Defendants' treatment of Plaintiff was undeserved, unduly harsh and unfair when compared to the treatment given the other employees whose job skills and performance levels are inferior to the Plaintiff's.

155.    Defendants' actions and treatment of Plaintiff were wrongful, abusive and unconscionable and were based in part or whole upon Plaintiff's age.

156.    Plaintiff has been irreparably injured by said abusive treatment and has, by this cloud, been prevented for an unreasonable period from obtaining gainful employment in her field, has lost

wages, lost medical insurance, lost life insurance, suffers severe emotional distress, has lost job security and has incurred other injuries.

157.    Defendants violated public policy in discriminating against Plaintiff because of her age.

158.    Plaintiff has been irreparably denied the rights secured by the Age Discrimination in Employment Act.

159.    As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars, as well as punitive damages, costs and attorneys fees.

## COUNT EIGHT
## BREACH OF CONTRACT

160.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 159 inclusive of this complaint, with the same force and effect as though fully set forth herein.

161.    The Defendants, STATE, OCA, BUCKLEY, CAHILL, COHEN, WOLFE, and SPOKONY , extended an offer of employment to Plaintiff which carried with it, the expressed written and implied promises that Plaintiff would be protected under the terms of the contract, treated fairly and in good faith and not be discriminated against due to her national origin, race and age during the course of her employment with the Defendants, and would not be subjected to summary punishment and discipline.

162.    The terms and statements contained in The Collective Bargaining Agreement/Union Contract created an expressed and implied contract with the Plaintiff, that Defendants would not act unlawfully and contrary to said contract, would not  discriminate against the Plaintiff during the employment relationship with respect to its personnel decisions.

36

163.    Defendants' expressed and implied promises carried a duty to terminate the Plaintiff only with proper process and in good faith.

164.    The Plaintiff accepted the offer of employment and these expressed and implied promises.

165.    The Plaintiff performed in a satisfactory manner throughout the duration of her employment with the Defendants.

166.    The Defendants breached their duties to the Plaintiff under the expressed and contract terms when they failed to treat Plaintiff fairly and in accordance with the terms of the Contract, wrongfully, in discrimination and in retaliation terminated Plaintiff in a manner and when they misrepresented to the Plaintiff the reasons for her termination.

167.    As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees

## PRAYER FOR RELIEF

WHEREFORE,    Plaintiff respectfully requests that the Court enter judgment and an Order:

a.    First Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

b.    Second Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

c.    Third Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

d.    Fourth Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

e.      Fifth Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

f.      Sixth Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

g.      Seventh Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

h.      Eighth Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

I.      Attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k);

j.      A declaratory judgment stating that Defendants wilfully violated Plaintiff's rights secured by federal and state laws as alleged herein;

k.      Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to allow the Plaintiff to continue in the position from which Defendants' illegally terminated her; to enjoin the Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and

l.      Awarding Plaintiff damages in the amount of all wages, salary, employment benefits, including union benefits, health insurance, including both back and front pay, and/or, additional COBRA payments for health insurance and any and all other compensation denied or lost to Plaintiff by reason of the foregoing;

m.      Awarding Plaintiff's Reinstatement retroactive to the date of discharge, to Plaintiff's previous position with all rights, seniority and benefits accorded to the position of Principal Attorney, that would have been earned had she not been discharged; Awarding Plaintiff damages for her lost New York State pension benefits in an amount to be determined by the Court;

n.      Awarding Plaintiff the value of her lost life insurance policies, individual retirement account and other investments;

o.      Reimbursement of all expenses directly incurred as a result of the discharge, including, but not limited to medical bills;

p.      Interest and pre-judgment interest on the amount described above, calculated at the prevailing rate;

q.      Awarding Plaintiff punitive damages against all individual defendants;

r.      Appointing a federal monitor to oversee the day-to-day operations of the DDC for an indefinite period of time; and

s.      An Order granting such other legal and equitable relief as the court deems just and proper.

### JURY TRIAL IS DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: Hempstead, New York
       October 26, 2007

                              Respectfully submitted,

                              LAW OFFICES OF
                              FREDERICK K. BREWINGTON

                        By: _____
                              FREDERICK K. BREWINGTON (FB5295)
                              *Attorneys for Plaintiff*
                              50 Clinton Street, Suite 501
                              Hempstead, New York 11550
                              (516) 489-6959

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

CHRISTINE C. ANDERSON,

Plaintiff,

-against-

THE STATE OF NEW YORK, THE OFFICE OF COURT
ADMINISTRATION OF THE UNIFIED COURT SYSTEM,
HON. JOHN BUCKLEY, in his official and individual
capacity, THOMAS J. CAHILL, in his official and
individual capacity, SHERRY K. COHEN, in her official
and individual capacity, CATHERINE O'HAGEN WOLFE,
in her official and individual capacity, and DAVID SPOKONY,
in his official and individual capacity

Defendants.

---------------------------------------------------------x

DOCKET NO.:

SUMMONS AND COMPLAINT

---------------------------------------------------------x

LAW OFFICES OF
FREDERICK K. BREWINGTON
*Attorneys for Plaintiff*
50 Clinton Street, Suite 501
Hempstead, New York 11550
(516) 489-6959