UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

| | |
|---|---|
| | :     ELECTRONICALLY FILED |
| CHRISTINE C. ANDERSON, | : |
| | : |
|             Plaintiff, | : |
| | : |
|      -against- | :     07 Civ. 9599 (SAS) (DFE) |
| | : |
| | : |
| THE STATE OF NEW YORK, THE OFFICE OF | :         **SECOND** |
| COURT ADMINISTRATION OF THE UNIFIED | :    **AMENDED COMPLAINT** |
| COURT SYSTEM, THOMAS J. CAHILL, in his official | : |
| and individual capacity, SHERRY K. COHEN, in her | : |
| official and individual capacity, and DAVID SPOKONY, | : |
| in his official and individual capacity, | : |
| | : |
|             Defendants. | :     ***JURY TRIAL DEMANDED*** |
| | : |

----------------------------------------------------------------------x

      Plaintiff Christine C. Anderson, by and through her undersigned attorney, as and for her Second Amended Complaint against the above-captioned defendants, alleges upon knowledge as to her own facts and upon information and belief as to all other matters:

## PRELIMINARY STATEMENT

      1.     Plaintiff brings this action seeking relief from her former employer, the State of New York, Office of Court Administration of the Unified Court System, New York State Supreme Court, Appellate Division, First Judicial Department, *et al.*, for acts of discrimination and harassment, culminating in a retaliatory discharge, leveled against her as a result of her race, and because of her discovery and reporting of acts of misconduct and corruption constituting an abuse of power and a fraud upon the public.  For more than six years, Plaintiff was employed as a Principal Attorney at the Appellate Division's Departmental Disciplinary Committee (the "DDC"), which is responsible for investigating and disciplining attorneys found guilty of

misconduct in representing the public.  Upon learning of the DDC's pattern and practice of whitewashing and routinely dismissing complaints leveled against certain select attorneys – to the detriment of the members of the public the DDC is duty-bound to serve – Plaintiff reported this wrongdoing, pursuant to her rights under the First Amendment to the United States Constitution and her ethical obligations under the New York State Code of Professional Responsibility.  In response, rather than attempting to address and rectify the problem, the DDC embarked upon a campaign of abuse and harassment of Plaintiff – including a physical assault upon Plaintiff – purposefully impeding her ability to fulfill her legitimate job functions, and ultimately culminating in her retaliatory and discriminatory dismissal.

2.     Plaintiff brings this action seeking injunctive relief, monetary relief, including past and ongoing economic loss, compensatory and punitive damages, disbursements, costs and fees for violations of rights, brought pursuant to Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. §§ 1981, 1983; the First and Fourteenth Amendments to the United States Constitution; and pursuant to New York State law.

3.     Plaintiff alleges that the Defendants wantonly, recklessly, knowingly and purposefully, acting individually and in conspiracy with each other, sought to deprive Plaintiff of employment, position, title and pay through a pattern of violating her constitutional rights, discrimination, retaliation, misrepresentation, misinformation, fraud, harassment, character assassination, a physical assault, abuse and manipulation of laws, rules and regulations because of Plaintiff's National Origin, race (African-American), and because of her exercise of her free speech rights on matters of public concern, on her own behalf and on behalf of the public which

she represents, as well as her reporting of misconduct pursuant to her duties under the

Disciplinary Rules of the New York State Bar Association.

4.    Said acts were done knowingly with the consent and condonation of Defendants The

State of New York, The Office of Court Administration of the Unified Court System, Thomas J.

Cahill, in his official and individual capacity, Sherry K. Cohen, in her official and individual

capacity, and David Spokony, in his official and individual capacity.

## JURISDICTION AND VENUE

5.    Jurisdiction of this Court is invoked under 28 U.S.C. §1331, 28 U.S.C. §§1343(3)

and (4) and 42 U.S.C. § 2000e *et seq.*  Pendent jurisdiction over Plaintiff's state law claims is

proper pursuant to 28 U.S.C. §1367.

6.    This Court has jurisdiction pursuant to 42 U.S.C. §1983, because Defendant the

State of New York is a "state actor" within the meaning of §1983; and the Office of Court

Administration of the Unified Court System, New York State Supreme Court, Appellate

Division, First Judicial Department, is an arm of the State of New York and a "state actor"

within the meaning of § 1983.

7.    Venue herein is proper pursuant to 28 U.S.C. § 1391(b) because the cause of action

arose in the Southern District of New York, all of the parties reside or are located in the State of

New York, and because the events or omissions giving rise to Plaintiff's claims occurred in this

judicial district.

8.    Defendants have waived any protection or immunity they may have enjoyed under

the Eleventh Amendment to the Constitution of the United States of America because they

knowingly and intentionally consented to lawsuits and legal claims arising from employee

grievances filed in "outside agenc[ies] or court[s]."  Such consent is set forth in the Appellate

Division, First Judicial Department's Clerk's Manual § 17, which states:  "The procedures

outlined herein do not bar an employee from filing a claim of harassment or discrimination with

an outside agency or court."  Id. § 17, Clerk's Manual, "Employee Grievance and Disciplinary

Procedures."  That language is also reiterated in Article 15, Section 1(a)(3) of the Union

Agreement between the State of New York, Unified Court System, and The Civil Service

Employees Association, Inc., Local 1000, AFSCME (AFL-CIO) (hereinafter the "Union").

9.    Prior hereto, on June 19, 2007, Plaintiff filed a Charge of Discrimination,

No. 10118524, with the New York State Division of Human Rights (hereinafter "SDHR")

against Defendant New York State Unified Court System, Office of Court Administration,

alleging discriminatory/retaliatory employment practices as a result of Plaintiffs age, race and

color.  Plaintiff also cross-filed a charge with the United States Equal Employment Opportunity

Commission (hereinafter "EEOC"), under EEOC Charge No. 16GA703641.

10.    On or about September 12, 2007 the SDHR issued a dismissal for administrative

convenience.  On or about October 9, 2007, Plaintiff received a Notice of Right to Sue Letter,

issued by the U.S. Department of Justice with regard to EEOC Charge No. 16GA703641.

## JURISDICTION AND VENUE

11.    At all times relevant in this Complaint, Plaintiff Christine C. Anderson (hereinafter

"Plaintiff") is an individual and an attorney who resides in the State of New York.  At all times

relevant hereto, Plaintiff was an employee of Defendants.  Plaintiff is a person born in Jamaica

West Indies, who has Black, Asian and White ancestry.  Plaintiff, for all purposes in this action,

considers herself to be African-American.

12.    At all times relevant in this Complaint, Defendant State of New York (hereinafter "State") is a sovereign state of the United States of America.  At all times relevant herein, Defendant State was an employer within the meaning of the Constitution of the State of New York and was a governmental entity acting under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York.

13.    At all times relevant in this Complaint, Defendant Office of Court Administration of the Unified Court System, New York State Supreme Court, Appellate Division, First Judicial Department (hereinafter "OCA") is and was at all relevant times a governmental entity created by and authorized under the laws of the State of New York.  At all times relevant herein, Defendant OCA was an employer within the meaning of the Constitution of the State of New York, and a governmental entity acting under color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of New York.

14.    At all times relevant in this Complaint, Defendant Thomas J. Cahill (hereinafter "Cahill") (white male), sued here in his official and individual capacity, is an attorney who, upon information and belief, resides in the State of Connecticut.  At all times relevant herein, Defendant Cahill was employed as Chief Counsel of the DDC; a policy maker for administrative and employment-related matters at the DDC; and an employer within the meaning of the Constitution of the State of New York.

15.    At all times relevant in this Complaint, Defendant Sherry K. Cohen (hereinafter "Cohen") (white female), sued here in her official and individual capacity, is an attorney who, upon information and belief, resides in the State of New York.  At all times relevant herein, Defendant Cohen was employed as First Deputy Counsel for the DDC; was a policy maker for

administrative and employment-related matters at the DDC; and was an employer within the meaning of the Constitution of the State of New York.

16.    At all times relevant in this Complaint, Defendant David Spokony (hereinafter "Spokony") (white male), sued here in his official and individual capacity, is an attorney who, upon information and belief, resides in the State of New York.  At all times relevant herein, Defendant Spokony was employed as Second Deputy to the Clerk of the Court of the OCA, Appellate Division, First Judicial Department; a policy maker for administrative and employment-related matters at the DDC; and an employer within the meaning of the Constitution of the State of New York.

## **FACTUAL BACKGROUND**

### *The DDC*

17.    The DDC is a committee within the New York State Unified Court System, and is responsible for investigating complaints and grievances against attorneys for alleged misconduct in the course of their representation of members of the public.  The DDC maintains offices within the four departments of the New York State Supreme Court, Appellate Division, and as such, the DDC is part of the New York State judiciary.

18.    Once a complaint has been filed with the DDC, an investigation is conducted by staff attorneys and investigators within the DDC.  Once the investigation is completed, before the Court is notified, the DDC advises a "Policy Committee" (described further below) of the details of the complaint and investigation and recommends a course of action to be taken concerning the respondent.  When the Policy Committee determines that charges are necessary, it submits to the

Appellate Division a petition describing the prior proceedings, and requests a court order (for example, an order suspending or disbarring the respondent).

19.    The DDC's "mandate" may be described as protecting the public by investigating and adjudicating allegations of misconduct on the part of members of the legal profession.  The DDC is of course required to adhere to the laws of the State of New York, including the New York Bar State Association's Code of Professional Responsibility.  Lawyers admitted to practice in New York State are required to adhere to these laws as well.

**_Plaintiff's Employment with the DDC_**

20.    Plaintiff was hired as a Principal Attorney at the DDC on February 1, 2001. Plaintiff continued her employment in this capacity for more than six years, and, prior to reporting the misconduct complained of herein, she was consistently recognized by all as a superior, thorough and conscientious investigative and prosecuting attorney.  Plaintiff's abilities in this regard were regularly confirmed by the high marks she received on her annual performance evaluations.

21.    In her position as Principal Attorney, Plaintiff was regarded as incisive, hardworking and thorough.  For example, within the first nine months of Plaintiff's employ with the DDC, Plaintiff uncovered a massive criminal conversion of well over a million dollars in a case which, prior to being assigned to Plaintiff, had not been pursued for months.  Before the case was turned over to Plaintiff, it had been investigated by other attorneys at the DDC, whose efforts had failed to uncover the criminal conversion.  As a result of Plaintiff's intensive investigation and hard work, the malfeasant respondent was brought to justice, ultimately disbarred, and sent to prison for his criminal conduct.  Plaintiff's hard work on the case was

applauded not only by her colleagues at the DDC, but also publicly, in an article in *The New York Law Journal,* which highlighted the massive criminal conversion and misconduct that Plaintiff had discovered.  Plaintiff herself was satisfied only that justice had been served.

22.   In the course of her employment, Plaintiff was also recognized as an investigative attorney capable of courteous and compassionate treatment of respondents.  On one occasion, one such respondent, accompanied by his counsel, stated on the record to Plaintiff that he was prepared to accept whatever level of discipline Plaintiff determined was appropriate, as a result of Plaintiff's "fair and even-handed" conduct of his deposition and the entire matter.  This statement was a testament to the respect Plaintiff regularly enjoyed – even from the respondents appearing before her.

23.   In these early years of her employment, Plaintiff thoroughly enjoyed her job, finding the investigative aspects intensely interesting, the independence of her exercise of judgment gratifying, and the pursuit of justice immensely rewarding.

24.   Plaintiff also enjoyed helping out in the office on administrative matters, and assisting support staff when help was needed.  Plaintiff was extremely well-liked by her colleagues and support staff.  In addition, Plaintiff also suggested ways to improve the administration of the office, by pointing out, for example, that opposing counsel (including counsel formerly employed by the DDC) should not be permitted to casually stroll through the DDC's offices unattended, as they regularly did; plaintiff also pointed out that former employees should not be permitted to wander into the DDC's attorneys' offices unsupervised.  Plaintiff's advice in this regard was eventually heeded, and a new rule was put into place prohibiting such outside incursions.

25.   Plaintiff learned, however, that her ethics, sense of fair play, and her adherence to the law and disciplinary rules were not appreciated by all.  Plaintiff ultimately found that her attempts to fairly apply the law would soon become a source of resentment and hostility against her.  Plaintiff also learned that, depending on the parties at issue, her legitimate attempts to adjudicate right and wrong would be obstructed and actively thwarted.

### (A)    *Plaintiff Discovers Corruption and Suffers Racial Discrimination At The DDC*

26.   From early 2001 through in or about early 2003, as a Principal Attorney, Plaintiff worked independently, investigating complaints of misconduct from the public and adjudicating the merits of those complaints, as standard procedure.  Plaintiff's work was then reviewed and approved by her "caseload supervisor," Judith Stein, Esq. (hereinafter "Stein").  Stein regularly reviewed Plaintiff's investigative report and recommendations, made comments when necessary, and then approved Plaintiff's recommendations.  In fact, Stein consistently approved Plaintiff's thoroughly investigated recommendations; never once did Stein disagree with Plaintiff's professional judgments in this regard.  Significantly, neither did Cahill.

27.   Once approved by Ms. Stein, plaintiff's recommendations were sent to Chief Counsel Cahill for his own review and approval.  Once Cahill had signed off on the recommendation, it would be sent to the Policy Committee, a body commissioned with the final recommendations for discipline.  After reviewing the entire file, the Policy Committee would decide the ultimate level of discipline to be imposed, and refer the matter, as necessary, to the Court for appropriate adjudication.

28.   In or about the Spring of 2003, defendant Cohen assumed the position of First Deputy to Chief Counsel Cahill.  At first, Plaintiff's job remained unaffected; indeed, the First

Deputy had never previously played a role in the direct supervision or review of Plaintiff's work. Plaintiff thus continued to report to Stein, her caseload supervisor, who in turn reported to Cahill, who would sign off on Plaintiff's recommendations. After Cohen became First Deputy, however, this regular process radically changed.

29.   Suddenly, Cohen began to insert herself into the review process of Plaintiff's work. Cohen sought to manipulate the outcome of Plaintiff's recommendations, in order to advance her own personal and political agenda. Upon information and belief, Cohen's practice was to skew the results of investigations with a view toward currying favor with certain law firms and politically-connected individuals, in exchange for favors of one kind of another.

### (i)      *Cohen Discriminates Against Employees of Color*

30.   Cohen also discriminated against Plaintiff because of her race, and against other non-white employees in the office. Cohen's *modus operandi* was to harass and abuse employees of color persistently and relentlessly, until she obtained their constructive discharge or terminated their employment. Plaintiff was aware of a number of reports of racial discrimination and harassment by Cohen against other employees of color.

31.   Cohen frequently attempted to "supervise" attorneys and investigators of color, as a pretext for harassing and abusing such employees and racially discriminating against them. There are no supervisors of color at the DDC; although a Hispanic attorney previously held the position of a supervisor, that title was ultimately stripped from him, without explanation.

32.   Once Cohen became First Deputy Chief Counsel to Cahill, her practice of racial discrimination and abuse went virtually unchecked. For example, Plaintiff was aware that two other African-American employees, one investigator and one paralegal, had been victims of

Cohen's discriminatory harassment and abuse and that both of these employees were eventually forced out. Following Plaintiff's harassment by Cohen (discussed further below), Plaintiff's employment was also eventually terminated, without cause. Following Plaintiff's termination, of the nineteen attorneys on staff, there remained only one African-American attorney, who worked part-time.

33.    The above-mentioned African-American investigator was forced-out after accumulating sixteen years with the DDC. Cohen's campaign of persistent harassment of this investigator, motivated by racial animus, included telling the investigator that the intonation of his voice "bothered" her. Cohen also sought to demean this individual by telling him that he was overweight – even though, as she knew, this investigator had a number of medical conditions. Cohen also demanded that this investigator provide her with his medical records, which she did not request of white employees – even those with medical conditions.

34.    The above-mentioned African-American paralegal, who was also forced out, remarked publicly that Cohen's harassment of him, motivated by racial animus, had become "unbearable." He, too, was eventually forced-out as a result of Cohen's abuse.

35.    Cohen also racially harassed and derogated the only two Asian-American employees' use of English – and their accents – telling the Asian-American attorney that she "should take a course" in English, even though that attorney was born and grew up in the United States, speaking English. Cohen's intent was to demean and discriminate against such persons because of their race.

36.    Cohen also attempted to harass and discriminate against another African-American secretary, by forcing her to sign in and out each day. That secretary complained to the African-

American attorney with whom she worked, who in turn advised Cohen that such secretary might well take formal action against Cohen and the DDC as a result of Cohen's disparate treatment of her.  Cohen thereafter abandoned such discriminatory and pretextual "requirement."

37.    Cohen also attempted to launch a campaign of harassment against another African-American attorney who, at the time, was the only African-American attorney on staff.  When that attorney could suffer no more of Cohen's racially-based harassment, she complained to Cahill and threatened to quit as a result.  Cahill then assigned her to a different supervisor, leaving Cohen to seek out a new victim.  Cohen selected Plaintiff for that role.

### (ii)    *Cahill and Cohen's Whitewashing of Complaints*

38.    In 2005, Plaintiff began to discover that Cahill and Cohen were apparently engaged in a "numbers game" to dispose of a certain number of complaints by quarterly reporting deadlines, regardless of their merits.  She also discovered that they were engaged in a practice of selectively dismissing complaints that involved certain parties and select attorneys (or their clients).  These actions were taken for their own personal or political reasons, and/or if they decided (for non-merits-based reasons) that a complaint would be burdensome or otherwise "unworthy" of prosecution.

39.    Plaintiff complained about these non-merits-based dismissals to Cahill.  Plaintiff stated that any such dismissal would constitute a fraud upon the public – as well as a grave injustice to the complainants to whom the DDC was duty-bound to serve.  Plaintiff also reminded Cahill that she had a duty, pursuant to DR 1-103(A), to report acts of attorney-misconduct.

40.    As a result of her discoveries – and her complaint to Cahill – Plaintiff began to become increasingly uncomfortable in her job, and in her ability to fairly evaluate complaints without interference.  Plaintiff also believed that she was being discriminated against because she is African-American.

41.    In or about 2003, Plaintiff observed an egregious instance of corruption in the whitewashing of a complainant's complaint.  Following an investigation by Plaintiff in which she uncovered overwhelming concrete evidence of misconduct on the part of the respondent, Plaintiff concluded her investigation with a recommendation that the respondent be brought up on charges.1  Stein, Plaintiff's case load supervisor, reviewed and approved Plaintiff's recommendation for charges, and thereafter referred Plaintiff's recommendations on to Cahill, as per usual.

42.    Plaintiff later learned, however, that this complaint had been dismissed.  Plaintiff was stunned.  In light of the copious evidence of misconduct uncovered during her investigation, both she and her supervisor, Stein, had readily and reasonably recommended charges.  Plaintiff queried the final result.  Plaintiff soon discovered that the Policy Committee had never received the recommendation that she had authored, and that Stein had approved.

43.    Plaintiff also later discovered that the large file of evidence she had amassed during the course of that investigation had been gutted.  The overstuffed file containing indisputable evidence of misconduct was suddenly paper-thin, lacking any of Plaintiff's significant evidentiary investigative findings.

---

[1] Plaintiff is cognizant of and observes her obligations pursuant to N.Y. Judiciary Law § 90.10, which requires attorneys to maintain all documents as "sealed, private and confidential."  Accordingly, Plaintiff will not reveal the specifics of these allegations (and other applicable allegations set forth below) unless and until she is ordered to do so by the Court, or until her request for filing this information under seal is granted.

44.    Upon information and belief, the case file of the complainant in question had been gutted by or at the behest of Cahill and Cohen, who conspired to cover-up the respondent's misconduct and Plaintiff's recommendation for charges, for their own personal and/or political incentives.

45.    Upon information and belief, when Plaintiff inquired as to the final disposition of complaints –and discovered the cover-ups – Plaintiff's actions were closely observed by, *inter alia*, her superiors, Cahill and Cohen.  Shortly thereafter, upon information and belief, Plaintiff began to be regarded as a threat by individuals at the DDC, and as someone who was not a "team player" in the estimation of Cahill and Cohen.

46.    Cahill and Cohen's corrupt pattern and practice of fraudulently whitewashing certain complaints continued – with Cahill's approval and/or participation.  In or about September 2005, Plaintiff completed an investigation of a respondent.  Although Plaintiff believed that the conduct complained of argued strongly in favor of charges, because of both a lack of actual proof of a conversion, and initial lack of cooperation from the client, Plaintiff and her caseload supervisor, Stein, agreed that the matter be recommended for an admonition.

47.    As usual, Stein referred the recommendation to Cahill.  Cahill also approved the admonition; he simply requested an introductory paragraph, explaining to the Policy Committee the reasons that the DDC had chosen to recommend an admonition, as opposed to charges, which the evidence would also support.  Plaintiff complied with Cahill's request, and inserted such an explanatory paragraph.

48.    Upon hearing of the outcome of the investigation, however, Cohen suddenly intervened.  Despite Cahill's prior approval, Cohen stated to Plaintiff that she intended to re-

14

write the admonition, because it was "too harsh" in its tone, and that she was afraid the Policy Committee might send the admonition back to the DDC for the imposition of charges. Defendant Cohen stated that she did not want to "tie up" an attorney "for six months" on a trial, if charges were to be imposed.

49.    Plaintiff responded to Cohen that attorneys were tied up on trials all the time; moreover, Plaintiff stated that Cahill had already approved the recommendation, and that therefore, Cohen's objections were moot.  Plaintiff also remarked that even if the matter had not received final approval by Cahill, it would be improper to re-write a recommendation to skew it in an attempt to achieve a particular result.  Cohen ignored Plaintiff's objections.  Effectively overruling Cahill's approval, Cohen took back the recommendation from Plaintiff, and, after deleting certain incriminating facts that Plaintiff had uncovered during her investigation, Cohen re-wrote the admonition.  Upon information and belief, Cohen took these actions to advance her own personal and political reasons, without regard to the actual merits of the complaint, or to the recommendation which had previously been approved by Stein and Cahill.

50.    By the time Cohen had completed her re-write, the document no longer included much of the evidence Plaintiff had discovered, and it no longer reflected the conclusions Plaintiff had reached – which conclusions both Stein and Cahill had approved.  Plaintiff refused to have her name used on Defendant Cohen's new creation, as the document was no longer an honest and accurate representation of the facts uncovered and conclusions reached.  By her objections, however, Plaintiff had expressed herself, once again, as someone who would not acquiesce in illegal conduct and the whitewashing of complaints.

51.    Plaintiff was compelled – both by law and her own sense of ethics – to report to Cahill her concerns regarding Cohen's misconduct, advising him that she believed Cohen's actions had been unethical.  Plaintiff also suggested that Cahill himself could be responsible for Cohen's misconduct, by knowingly permitting such misconduct to persist unchecked (if not by participating directly himself).  By this point, again, Plaintiff had asserted herself as one who would not "look the other way" and permit Cohen's misconduct to continue without speaking up.

<u>**(B)**</u>        <u>***Cohen's Campaign of Harassment and Retaliation Against Plaintiff***</u>

52.    Thereafter, Cohen embarked on a campaign of harassment of Plaintiff, in retaliation for Plaintiff's reporting of Cohen's misconduct to Cahill and because of Plaintiff's race.  Surprisingly, Cahill did not reprimand Cohen; rather, he permitted her unjust campaign of harassment and retaliation against Plaintiff to proceed.  Cohen became singularly focused upon Plaintiff; she interposed herself into Plaintiff's day-to-day work activities, seeking to bypass Stein as Plaintiff's caseload supervisor, and to insert herself as an overseer of Plaintiff's every movement.

53.    Cohen's aggressive campaign of harassment of Plaintiff continued for twenty-one months, under Cahill's supervision and with his consent, until Plaintiff's abrupt retaliatory discharge in June 2007.  During this period, Cohen's behavior also became increasingly abusive and erratic – and harmful to Plaintiff's health and well-being.

54.    Cohen embarked upon a campaign of micro-management of Plaintiff, designed to harass, intimidate, and discriminate against Plaintiff by subjecting her to an intolerably hostile work environment.  For example, Cohen frequently ordered Plaintiff to attend meetings scheduled at the last minute, to report on matters that Plaintiff had previously reported on only

the prior day. Cohen also remarked to Plaintiff, in the presence of the Second Deputy Counsel, Andral Bratton, that Plaintiff was "silly" and "stupid" and that she [Cohen] was "wasting" her time talking to Plaintiff. Cohen also subjected Plaintiff to repeated, harassing telephone calls, requiring Plaintiff to perform tasks normally performed by paralegals or secretaries; and to otherwise demean and humiliate Plaintiff, by constructively demoting Plaintiff and treating her as a clerk. Given Plaintiff's years of experience with the DDC – as well as her consistently excellent annual reviews – Cohen's tactics were designed solely to harass and abuse Plaintiff, because of her race, and in retaliation for Plaintiff's reports to Cahill regarding Cohen's misconduct. No other similarly-situated white attorneys were treated in this fashion.

55.    Cohen's abusive tactics against Plaintiff escalated in July 2006. On July 24, 2006, Cohen entered Plaintiff's office without warning and closed the door behind her. Observing that Plaintiff was on her way out of the office, as she was holding a file and a yellow pad, Cohen asked Plaintiff if she was in a hurry. Plaintiff replied in the affirmative, advising that a complainant was waiting on her for a 12:00 noon appointment. Plaintiff further advised that she had a deposition following the appointment. Ignoring Plaintiff's response, Cohen grabbed Plaintiff by the hand, dug her nails into Plaintiff's skin, and snapped: "You're not leaving this office!"

56.    Cohen was simultaneously leaning her entire weight on the door of Plaintiff's office, preventing Plaintiff's exit. Plaintiff cried out and pulled away from Cohen, who appeared to be completely out of control. In her assault on Plaintiff, Cohen's nails left bloody scratches on Plaintiff's hand. Plaintiff instinctively backed away from Cohen, to the far side of Plaintiff's desk, shaking with shock at the nature of the attack.

57.    Plaintiff then asked Cohen, twice, if she intended to continue to keep Plaintiff a prisoner in her office.  Receiving no response to her questions, Plaintiff told Cohen that it would be better for both of them if Cohen left Plaintiff's office.  After a lengthy pause, Cohen stated: "Now, I am leaving your office!" and left, slamming the door behind her.  Plaintiff then collapsed onto her chair, stunned and still shaking.

58.    Plaintiff then attempted to compose herself, and hurried to meet with the complainant with whom she had the appointment.  Still traumatized by Cohen's assault, Plaintiff later conducted her deposition.  At the termination of the deposition, Plaintiff left a voice mail message for Cahill, who was on vacation, and for Second Deputy Counsel Andral Bratton, seeking a meeting the following day with Bratton.  Still in a state of mental and physical shock and exhaustion, and severe emotional distress, Plaintiff was then forced to utilize a car service to take herself home.

### (C)    *Plaintiff Reports Cohen's Assault*

59.    Plaintiff reported Cohen's assault to Bratton the following day.  Plaintiff also reported Cohen's misconduct to Cahill, who refused to address the matter and ignored the important issues presented by Cohen's lawless behavior.  After eight days of inaction by defendant Cahill, Plaintiff met with him and informed him of her intention to report the matter to Catherine O'Hagan Wolfe, Clerk of the Court, in light of his own willful refusal to take action. Cahill again failed to respond.

60.    Plaintiff then filed a formal complaint with Wolfe.  Plaintiff met with Wolfe, and requested that Cohen be prevented from working in close proximity with Plaintiff.  Plaintiff requested that she be supervised by a different supervising attorney – such as Stein, as before –

but without Cohen's interference.  Plaintiff further explained that, when she worked late, she was forced to lock herself in her office to avoid Cohen, as she now feared for her physical safety around Cohen.  Wolfe refused Plaintiff's request.  Finally, Plaintiff requested that her complaint receive complete confidentiality.  Wolfe replied that in an office "such as the DDC, that confidentiality would not be likely."

61.   Plaintiff was aware that previously, requests such as her own – namely requests from other staff attorneys to remove Cohen from their supervision – had been granted. Specifically, Plaintiff was aware that at least two other attorneys had complained about having Cohen supervise their work, and that those attorneys' requests were granted, and that Cohen was replaced by other supervising attorneys to supervise the complaining attorneys' work.  Therefore, there was no reasonable excuse for refusing Plaintiff's identical request, and for treating Plaintiff differently from other staff attorneys who had made similar requests.

62.   In addition, upon information and belief, Wolfe and the Defendants never intended to treat Plaintiff's complaint with confidentiality.  To the contrary, Defendants actively sought to "make an example" of Plaintiff – by refusing her reasonable request for a different supervisor, and by using their harassment and constructive demotion of Plaintiff as an example of the consequences of reporting misconduct and of objecting to Cahill's and Cohen's practice of whitewashing complaints.  Defendants' harassment and abuse of Plaintiff were designed to intimidate Plaintiff's co-workers into silence and submission, and to discourage and suppress any similar complaints.

63.   Following Plaintiff's complaint to Wolfe, an investigation took place, conducted by a three-person panel who interviewed both Plaintiff and Cohen concerning Cohen's behavior.

19

Cohen admitted Plaintiff's allegations in their entirety.  In the panel's report, Cohen stated that her abusive actions had been an "emotional response."

64.    Following this "investigation," however, the only stricture placed on Cohen by the Defendants was that Cohen should apologize to Plaintiff and attend a "management skills course."  Plaintiff later requested confirmation that Cohen had, in fact, completed the management skills course.  Plaintiff never received a response.

65.    Plaintiff appealed the panel's decision on October 13, 2006, requesting again that, at a minimum, an "Ethical Wall" be erected between Cohen and herself.  In her written appeal, Plaintiff also complained that she was a victim of racial discrimination at the hands of Cohen. On October 24, 2006, the Court, through Hon. John Buckley (hereinafter "Buckley") denied Plaintiff's appeal and refused Plaintiff's request for an "Ethical Wall."  At no time did Buckley ever attempt to ascertain from Plaintiff the nature and the effect of Cohen's racial harassment of her, abdicating the Court's most basic duty of care to Plaintiff, as her employer:  to provide her with a workplace free of racially-based hostility and physical abuse.

66.    Plaintiff also requested of Cahill, on three separate occasions, that Cohen be replaced as the supervising attorney over her.  Plaintiff again requested that – in light of Cohen's assault of her – an "Ethical Wall" be erected between herself and Cohen.  As noted above, Plaintiff was aware that, in the past, *Cahill himself* had removed at least two other attorneys from Cohen's supervision, placing them under the supervision of other caseload supervisors, at their request.  Plaintiff's request to Cahill fell on deaf ears, however; he too refused her request, callously stating:  "do whatever Sherry tells you."  Cahill thus deliberately subjected Plaintiff to further harassment by Cohen, treating her differently from other staff attorneys who had made

similar requests.  Upon information and belief, Cahill's refusal to act was part of a conspiracy on

the part of Cahill, Cohen, and the Defendants, to continue to subject Plaintiff to harassment by

Cohen – and to create an intolerably hostile work environment for Plaintiff – in an attempt to

eventually obtain Plaintiff's constructive discharge.

### *(D)    Cahill and Cohen Constructively Demote Plaintiff To A Clerical Position*

67.    Emboldened by the Court's failure to act upon Plaintiff's claim for a hostile-free

workplace, Cohen stepped-up her abusive campaign of racial discrimination and harassment of

Plaintiff anew, which was evidently (based on his own failure to supervise and restrain Cohen's

abusive behavior) sanctioned by Cahill.  Cohen formally removed Stein as Plaintiff's caseload

supervisor, and usurped that role for herself.  Cohen then, once again, began calling unscheduled

meetings with Plaintiff at the last minute, and repeatedly demanding routine information on

Plaintiff's cases – even when Plaintiff had already reported such information to Cohen just days

earlier.  Cohen also repeatedly left voice mail messages for Plaintiff and sent Plaintiff e-mails,

demanding the same information again and again.  No other similarly-situated white attorneys

were treated in this fashion.

68.    Cohen also began intruding upon Plaintiff's regular investigative functions, by

instructing Plaintiff, via e-mail, as to how to conduct an investigation.  For example, Cohen

instructed Plaintiff to call a certain person, or look at certain records, even when Plaintiff advised

Cohen that she had already performed such routine and customary tasks.  Plaintiff had never

before been subjected to such treatment by her previous supervisor, Stein – or even Cahill; and

because of Plaintiff's prior performance, demonstrated by her excellent reviews and reputation

for superior investigation and thorough pursuit of justice, such treatment by Cohen was

objectively not warranted, and was harassing and abusive. No other similarly-situated white attorneys were treated in this fashion.

69.     Cohen also began to take over Plaintiff's work product, depriving Plaintiff of the autonomy and authority she previously enjoyed in her role as Principal Attorney. For example, Cohen would at times remove from Plaintiff's work product entire recommendations for charges. Cohen also began to contact opposing counsel on Plaintiff's cases – with whom Plaintiff had already been in contact – advising said counsel to thereafter respond directly to her (Cohen). Cohen took such actions, with Cahill's implicit approval, in an attempt to humiliate and constructively demote Plaintiff, by demonstrating to opposing counsel that Cohen had superseded Plaintiff as the attorney handling the investigation, and that Plaintiff was no longer in control of the investigation. No other similarly-situated white attorneys were treated in this fashion.

70.     Cohen also constructively discharged Plaintiff by reducing Plaintiff's professional job functions to that of a paralegal or secretary. For example, Cohen would revise Plaintiff's work product extensively and then instruct Plaintiff to re-type the document, rather than assigning the typographical revisions to a secretary, as was the normal custom. Cohen would then re-create Plaintiff's work as her own work product, under her (Cohen's) name, and send the re-created work to the Policy Committee. Cohen thus arrogated to herself the credit for the results obtained by Plaintiff's diligent investigative efforts. These actions were sanctioned by Cahill, based on his own failure to supervise and restrain Cohen's abusive behavior. No other similarly-situated white attorneys were treated in this fashion.

71.   Cahill and Cohen also demoted Plaintiff's secretary, a Line 21 secretarial assistant, to the role of a receptionist.  Suddenly, Plaintiff had the services of a secretary for only half a day, while sharing that half-day with another attorney (the Asian-American attorney).  This resulted in Plaintiff and the Asian-American attorney each having the services of a secretary for only one-fourth of a day.

72.   Upon information and belief, the foregoing constructive demotion of Plaintiff, conducted by Cohen with Cahill's approval, was undertaken solely for the purpose of harassing and discriminating against Plaintiff because of her race, and in retaliation against Plaintiff, for her reporting misconduct and exercising her First Amendment rights on matters of public concern.

### (E)   *Cohen Conducts a Retaliatory Evaluation of Plaintiff*

73.   Following Cohen's physical assault on Plaintiff, Cahill improperly permitted Cohen to conduct an evaluation of Plaintiff, ignoring the unavoidable conflicts of interest inherent in the context of Plaintiff's complaints against Cohen, Cohen's assault upon Plaintiff, Cohen's admission to the assault, and Cohen's subsequent discipline therefor.  Cahill's action in permitting Cohen to evaluate Plaintiff following this history was improper, and was undertaken to create an unjustified false negative record against Plaintiff by Cahill and Cohen, in further discrimination, retaliation, and abuse of Plaintiff, and in an attempt to obtain Plaintiff's constructive discharge.

74.   Cohen negatively evaluated Plaintiff on or about January 30, 2007; such evaluation constituted Plaintiff's *first* negative evaluation since her date of hire in 2001.  The evaluation was emotional and inaccurate, and lacking in credibility.  Cohen also wrote in the evaluation that she

had requested that Plaintiff be "counseled."  Without permitting Plaintiff an opportunity to respond, Wolfe directed Spokony to bring Plaintiff in for "counseling."  In fact, the "counseling" session was pretextual and contrived to serve as a reprimand; indeed, Plaintiff was handed a form at the "counseling" session, which included a conclusory written reprimand of Plaintiff, albeit baseless.  This form also stated that Plaintiff's "progress" would be monitored, and that a further counseling session would be held, approximately one month later, to discuss the matter.  That follow-up session was later canceled, without explanation.

75.    At this "counseling" session, Spokony also demanded a doctor's note from Plaintiff for a one-day sick leave absence from work.  No other similarly situated white attorney was treated in this fashion.

76.    Upon information and belief, Defendants conspired to create a pretextual basis to take additional adverse job actions against Plaintiff, in further discrimination against Plaintiff because of her race, and in retaliation against Plaintiff for expressing her First Amendment rights on matters of public concern.

### (F)    *Plaintiff is Further Harassed and Retaliated Against by All Defendants*

77.    News of Plaintiff's "counseling" session rapidly spread throughout the office, as it was viewed by the employees as a reprimand.  Upon information and belief, the "counseling" session was intentionally contrived in an attempt to "make an example" of Plaintiff and thereby "chill" the environment with respect to other employees' exercise of their First Amendment rights to report misconduct, and to encourage other employees to "look the other way," and thereby, avoid similar harassment and persecution – and significantly, keep their jobs.

78.    Plaintiff thereafter instituted a Union Grievance, acting through the offices of the Civil Service Employees Association, Inc., Local 1000, AFSCME, AFL-CIO, complaining of Cohen's ongoing harassment of her, with Cahill's implicit approval, and of their retaliatory actions against her.  That grievance was filed and served, by personal service, on the Appellate Division, First Judicial Department, on May 16, 2007.

79.    Pursuant to provisions of the Union Bargaining Contract, the Court had twenty (20) working days within which to issue a decision on that grievance.  Such twenty (20) working-day period would therefore expire on June 14, 2007.

### *Plaintiff's Summary Discriminatory and Retaliatory Termination*

80.    On June 8, 2007, at 11:10 a.m., Plaintiff received a voice mail message from Spokony's office, summoning Plaintiff to a 12:30 p.m. meeting.  No reason was given for the suddenly scheduled, last-minute meeting.  Plaintiff responded that she had a doctor's appointment, and could not therefore attend a meeting scheduled without prior notice, on that day.  Spokony responded by persistently and repeatedly telephoning Plaintiff, insisting to Plaintiff's secretary that Plaintiff attend the meeting.

81.    Plaintiff was summarily terminated on that day.  Plaintiff received notice of her termination by letter dated June 8, 2007, sent via U.S. Mail, from Spokony, stating that Plaintiff's services as Principal Attorney with the DDC were no longer required.  No other reason for Plaintiff's termination was articulated.

82.    Plaintiff was discharged four months prior to the completion of her tenth year of employment, thereby depriving her of her eligibility to purchase health insurance at the "employee rate."  Thus, the timing of Plaintiff's discharge was malicious, as Defendants knew

that Plaintiff had a prior history of cancer.  Plaintiff also lost substantial benefits from her New York State pension to which she would have been entitled, had she continued to work until age seventy.

83.   Plaintiff was also terminated in the middle of her pending grievance with the Union – just six or seven days prior to the mandatory decision period for her grievance pursuant to the provisions of the Court's Union Bargaining Contract.  Defendants thus knowingly and willfully violated the terms of the Court's and OCA's own contract with the Union, and the Union's procedural rules for due process.  Indeed, Article 12.1 of the Union Agreement states that an attorney in Plaintiff's position "shall not be removed or otherwise subjected to any disciplinary penalty . . . except for incompetency or misconduct shown *after a hearing* upon stated charges . . . ." (emphasis added).  Plaintiff should have been permitted to pursue her Union remedies, and receive a hearing with due process of law.  Plaintiff was wrongfully and intentionally denied these rights.

## COUNT ONE
### (*Title VII of the Civil Rights Act of 1964, as against Defendants the State of New York, and Office of Court Administration of the Unified Court System*)

84.   Plaintiff repeats and re-alleges each and every allegation contained in paragraph "1" through "83," as though fully set forth herein.

85.   The above discriminatory and retaliatory practices are based on race, color and opposing unlawful discriminatory practices by Defendant State and OCA, its agents and employees, and violates Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e, *et seq.*.  The actions of Defendant-employees are imputed to their employer, Defendants State and OCA.

26

86.   As set forth above, Plaintiff was singled out for discriminatory and abusive treatment and subjected to a hostile work environment as a result of her race, color, and National Origin.  No similarly situated white employees were subjected to such treatment.  Plaintiff opposed the illegal discrimination and was subjected to harassment and retaliation, including but not limited to defendants' accusing her of refusing to follow instructions, giving her an unwarranted, negative performance evaluation, subjecting her to an unwarranted "counseling" session, and finally, summarily discharging her from employment without cause, and without due process of law.

87.   Plaintiff was discharged four months prior to the completion of her tenth year of employment, thereby depriving her of her eligibility to purchase health insurance at the "employee rate."  Plaintiff also lost substantial benefits from her New York State pension to which she would have been entitled, had she continued to work until age seventy.

88.   Because of Plaintiff's race, color, and National Origin and opposing and reporting acts of misconduct and corruption, she has been subjected to abuse and mistreatment as detailed above and has been treated differently than white individuals.

89.   As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of income, fear, anxiety, physical injury, severe humiliation, loss of professional standing in an area of the legal profession which is extremely narrow and interactive, shame, embarrassment, mental anguish, emotional distress, emotional pain and suffering, loss of her usefulness to the public and loss of enjoyment of life.

90.   As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental

anguish and humiliation, and that Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorneys' fees.

## COUNT TWO
### (Deprivation of Rights under 42 U.S.C. § 1981, as against all Defendants)

91.   Plaintiff repeats and re-alleges each and every allegation contained in paragraph "1" through "90," as though fully set forth herein.

92.   The above discriminatory and retaliatory acts, patterns and practices, based on race and color by Defendants State, OCA, Cahill, Cohen, and Spokony, through their agents and employees, violates 42 U.S.C. § 1981 as amended by the Civil Rights Restoration Act of 1991 (Publ. Law No, 102-406).

93.   Defendants have denied Plaintiff her rights to full and equal benefit of the laws as a result of her race with respect to the performance, modification, and termination of Plaintiff's contract and contractual employment relationship, and with respect to the enjoyment of all benefits, privileges, terms, and conditions of that contractual relationship.  Defendants State and OCA, acting under color of law, and through their employees servants, agents and designees, have engaged in a course of action and behavior rising to the level of a policy, custom, and condoned practice, which has deprived Plaintiff of rights, privileges and immunities secured by law in the performance, modification, and termination of Plaintiff's contract and contractual employment relationship.  These actions were condoned, adopted and fostered by policy makers including but not limited to Defendants Cahill, Cohen, and Spokony.

94.   Specifically, because of Plaintiff's race, color, and National Origin, she was subjected to intentional racial animus, a physical assault, harassment, discrimination, and

retaliation, as detailed above.  Plaintiff was also constructively demoted and summarily

discharged without a hearing and without explanation, in violation of the Union Agreement

between herself and Defendants State and OCA.  Defendants' actions were designed to

discriminate against Plaintiff as a result of her race and to unlawfully terminate, assault, and

silence Plaintiff as described above in this Complaint.

     95.    Plaintiff was also maliciously discharged four months prior to the completion of her

tenth year of employment, thereby depriving her of her eligibility to purchase health insurance at

the "employee rate."  Plaintiff lost substantial benefits from her New York State pension to

which she would have been entitled, had she continued to work until age seventy.

     96.    As a direct and proximate result of the unlawful conduct of defendants, and each of

them, as alleged herein, Plaintiff has suffered and will continue to suffer loss of seniority,

earnings, CLE benefits, employment, union benefits, retirement benefits, health benefits, and

promotional opportunities in an amount as yet not specifically ascertained but subject to proof at

trial.

     97.    All of the actions of the defendants alleged herein, separately and collectively

deprived Plaintiff of substantive due process rights by unlawfully depriving her liberty interest in

pursuing her profession and advancement therein, maintaining her professional reputation,

standing and ability to earn an income.  Defendants' actions were actuated by virtue of Plaintiff's

knowledge of specific occurrences of corruption within the DDC.

     98.    As a direct and proximate result of said acts, Plaintiff has suffered and continues to

suffer loss of income, fear, anxiety, physical injury, severe humiliation, loss of professional

standing in an area of the legal profession which is extremely narrow and interactive, shame,

embarrassment, mental anguish, emotional distress, emotional pain and suffering, loss of her

usefulness to the public and loss of enjoyment of life.

99.   As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will

continue to suffer irreparable injury and monetary damages, as well as damages for mental

anguish and humiliation.  Plaintiff is entitled to damages sustained to date and continuing in

excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs

and attorneys' fees.

**<u>COUNT THREE</u>**
*(Deprivation of Rights under 42 U.S.C. § 1983 and*
*The First Amendment to the United States Constitution, as against all Defendants)*

100. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

"1" through "99," as though fully set forth herein.

101. Plaintiff was targeted for harassment and abuse, and was retaliated against, after she

discovered and reported acts of misconduct and corruption within the DDC, which constituted an

abuse of the power and a fraud upon the public.  The conduct and actions of defendants in

retaliating against Plaintiff and subjecting her to a hostile work environment, culminating in the

constructive demotion and termination of her position and employment, were wrongful,

oppressive and unlawfully taken in retaliation against her for having exercised her Constitutional

Right of Free Speech as a private citizen regarding matters of public concern to the community.

Defendants' actions were intentionally taken to deprive Plaintiff of that right in violation of the

First Amendment to the United States Constitution and 42 U.S.C. § 1983.

102. Defendants' infringement upon and violation of Plaintiff's rights protected under the

First Amendment to the United States Constitution was and is intended to harm Plaintiff, and to

30

place a chilling effect upon the exercise of such rights by Plaintiff and other persons as is their

right, as provided by the U.S. Constitution and exercise of such rights.

103.  Defendants' conduct and actions were intentional, malicious, taken with deliberate

indifference and/or reckless disregard for the natural and probable consequences, and without

lawful justification or reason.

104.  Defendants' conduct and actions constituted, and were in conformity with the

policies, practices and/or customs of defendants State and OCA, and were committed by

individuals who were final policy makers and acting under the color of law.

105.  Defendants' conduct and actions created a hostile work environment commencing

from in or about September, 2005, and continuing without interruption until Plaintiff's summary

dismissal in June 2007, and therefore created a continuing violation.

106.  Defendants State, OCA, Cahill, Cohen, and Spokony failed to intervene, prevent or

correct the conduct and actions that deprived Plaintiff of her Constitutional rights.

107.  Defendants State, OCA, Cahill, Cohen, and Spokony failed to adhere to their

obligation owed to Plaintiff not to engage in the conduct and actions that deprived Plaintiff of her

Constitutional rights.

108.  As a direct and proximate result of said acts, Plaintiff has suffered and continues to

suffer loss of income, fear, anxiety, physical injury, severe humiliation, loss of professional

standing in an area of the legal profession which is extremely narrow and interactive, shame,

embarrassment, mental anguish, emotional distress, emotional pain and suffering, loss of her

usefulness to the public and loss of enjoyment of life.

109. Plaintiff was discharged four months prior to the completion of her tenth year of employment, thereby depriving her of her eligibility to purchase health insurance at the "employee rate." Plaintiff also lost substantial benefits from her New York State pension to which she would have been entitled, had she continued to work until age seventy.

110. As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation. Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorneys' fees.

## COUNT FOUR
### (Deprivation of Rights under 42 U.S.C. § 1983 and The Fourteenth Amendment to the United States Constitution, as against all Defendants)

111. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs "1" through "110," as though fully set forth herein.

112. The conduct and actions of defendants in discriminating against Plaintiff, an African-American woman born in Jamaica, W.I., and subjecting her to a hostile work environment, culminating in the constructive demotion and termination of her position and employment, were unlawful, oppressive and intentionally taken in violation of her rights under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

113. The Defendants State, OCA, Cahill, Cohen, and Spokony, collectively and each one of them individually, have engaged in actions and abuses which violate and deny Plaintiff of her Fourteenth Amendment rights of equal protection and due process in discriminating against

Plaintiff because of and account of her race, color, and National Origin, and her opposition to discrimination and acts of misconduct that she had witnessed.

114. Defendants' conduct and actions were intentional, malicious, taken with deliberate indifference and/or reckless disregard for the natural and probable consequences, and without lawful justification or reason.

115. Defendants State, OCA, acting under color of law, and through their employees servants, agents and designees, have engaged in a course of action and behavior rising to the level of a policy, custom, and condoned practice, which has deprived Plaintiff of rights, privileges and immunities secured by the Constitution and laws in violation of 42 U.S.C. §1983. These actions were condoned, adopted and fostered by policy makers including but not limited to Defendants Cahill, Cohen, and Spokony.

116. Defendants' conduct and actions constituted, and were in conformity with the policies, practices and/or customs of defendants State and OCA, and were committed by individuals who were final policy makers and acting under the color of law.

117. Defendants' conduct and actions created a hostile work environment commencing from in or about September, 2005, and continuing without interruption until Plaintiff's summary dismissal in June 2007, and therefore created a continuing violation.

118. Defendants State, OCA, Cahill, Cohen, and Spokony failed to intervene, prevent or correct the conduct and actions that deprived Plaintiff of her Constitutional rights.

119. Defendants State, OCA, Cahill, Cohen, and Spokony failed to adhere to their obligation owed to Plaintiff not to engage in the conduct and actions that deprived Plaintiff of her Constitutional rights.

120. As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of income, fear, anxiety, physical injury, severe humiliation, loss of professional standing in an area of the legal profession which is extremely narrow and interactive, shame, embarrassment, mental anguish, emotional distress, emotional pain and suffering, loss of her usefulness to the public and loss of enjoyment of life.

121. Plaintiff was discharged four months prior to the completion of her tenth year of employment, thereby depriving her of her eligibility to purchase health insurance at the "employee rate." Plaintiff also lost substantial benefits from her New York State pension to which she would have been entitled, had she continued to work until age seventy.

122. As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation. Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorneys' fees.

### COUNT FOUR
*(Unlawful Discrimination and Retaliation under New York State Executive Law § 296, as against all Defendants)*

123. Plaintiff repeats and re-alleges each and every allegation contained in paragraph "1" through "122," as though fully set forth herein.

124. The conduct and actions of all Defendants, as detailed above, in racially discriminating against Plaintiff, an African-American woman born in Jamaica, W.I., and subjecting her to a hostile work environment; and in retaliating against her for engaging in protected conduct, culminating in the constructive demotion and termination of her position and

employment, were unlawful, oppressive and intentionally taken in violation of her rights under New York State Executive Law §296.

125.  As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer loss of income, fear, anxiety, physical injury, severe humiliation, loss of professional standing in an area of the legal profession which is extremely narrow and interactive, shame, embarrassment, mental anguish, emotional distress, emotional pain and suffering, loss of her usefulness to the public and loss of enjoyment of life.

126.  Plaintiff was discharged four months prior to the completion of her tenth year of employment, thereby depriving her of her eligibility to purchase health insurance at the "employee rate."  Plaintiff also lost substantial benefits from her New York State pension to which she would have been entitled, had she continued to work until age seventy.

127.  As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation.  Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorneys' fees.

<u>COUNT FIVE</u>
*(Breach of Contract, as against Defendants State and OCA)*

128.  Plaintiff repeats and re-alleges each and every allegation contained in paragraph "1" through "127," as though fully set forth herein.

129. Defendants State and OCA entered into a contract of employment with Plaintiff which carried with it express and implied promises that Plaintiff would be protected under the terms of the contract, that these Defendants would honor the terms of the contract, and that they

would not discriminate against her because of her National Origin, race or color during the course of her employment with the Defendants State and OCA.

130. Defendants State and OCA breached the express and implied terms of their employment contract with Plaintiff in at least three respects.

131. First, Article 17 of the Union Agreement that governed Plaintiff's employment, entitled "No Discrimination," contains an express statement of a policy "against illegal discrimination" against employees on the basis of, *inter alia*, such employes' race, color, and National Origin.  (Id. 17.2.)  Defendants State and OCA willfully and intentionally breached their contract with Plaintiff by discriminating against Plaintiff because of her race, color, and National Origin through the actions of Defendants Cahill, Cohen, and Spokony, as detailed above.

132. Second, Article 12.1 of the Union Agreement states that an attorney in Plaintiff's position "shall not be removed or otherwise subjected to any disciplinary penalty . . . except for incompetency or misconduct shown *after a hearing* upon stated charges . . . ." (emphasis added). Defendants State and OCA willfully and intentionally breached their contract with Plaintiff by summarily discharging Plaintiff during the pendency of her Union grievance – just six or seven days prior to the mandatory decision period for her grievance pursuant to the provisions of the Court's Union Bargaining Contract.  Moreover, Plaintiff was summarily discharged without "a hearing upon stated charges," in plain violation of the terms of their contract.  Plaintiff should have been permitted to pursue her Union remedies, and receive a hearing with due process of law.  Plaintiff was wrongfully and intentionally denied these rights.

133. Third, in the legal employment context, implied in every employment relationship

among lawyers is an essential agreement that all lawyers shall conduct themselves in accordance with the prevailing legal codes of conduct and ethical standards applicable to all lawyers. Plaintiff adhered to these ethical standards by reporting misconduct under DR 1-103(A); she should not have been punished for so doing.  Indeed, implied in her employment relationship with Defendants State and OCA was the understanding that violating the prevailing rules and ethical standards of the legal profession would frustrate the very purpose of the employment relationship between the parties.  These implied terms apply with all the more force in an office such as the DDC.  Defendants State and OCA breached their contract with Plaintiff by subjecting her (through their agents and employees) to a campaign of harassment, culminating in her constructive demotion and retaliatory discharge for adhering to and upholding the ethical rules of the legal profession.

134.  As a result of the Defendants' discriminatory acts, Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages, as well as damages for mental anguish and humiliation.  Plaintiff is entitled to damages sustained to date and continuing in excess of the amount of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment and an Order as follows:

a.    First Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorneys' fees.

b.    Second Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorneys' fees.

c.  Third Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorneys' fees.

d.  Fourth Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorneys' fees.

e.  Fifth Cause of Action: in excess of ten million ($10,000,000.00) dollars as well as punitive damages, costs and attorneys' fees.

f.  Attorneys' fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k); and any other applicable statutes and provisions;

g.  A declaratory judgment stating that Defendants willfully violated Plaintiff's rights secured by federal and state laws as alleged herein.

h.  Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to allow the Plaintiff to continue in the position from which Defendants' illegally terminated her; to enjoin the Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and

i.  Awarding Plaintiff damages in the amount of all wages, salary, employment benefits, including union benefits, health insurance, including both back and front pay, and/or, additional COBRA payments for health insurance and any and all other compensation denied or lost to Plaintiff by reason of the foregoing;

j.  Awarding Plaintiff's Reinstatement retroactive to the date of discharge, to Plaintiff's previous position with all rights, seniority and benefits accorded to the position of Principal Attorney, that would have been earned had she not been discharged; and awarding Plaintiff damages for her lost New York State pension benefits in an amount to be determined by the Court;

k.  Awarding Plaintiff the value of her lost life insurance policies, individual retirement account and other investments;

l.  Reimbursement of all expenses directly incurred as a result of the discharge, including, but not limited to medical bills;

m.  Interest and pre-judgment interest on the amount described above, calculated at the prevailing rate;

n.  Awarding Plaintiff punitive damages against all individual defendants;

o.    Appointing a federal monitor to oversee the day-to-day operations of the DDC for an indefinite period of time, and enjoining the DDC from further conduct of its operations until such time as a federal monitor is appointed; and

p.    An Order granting such other legal and equitable relief as the court deems just and proper.

## JURY TRIAL IS DEMANDED

Plaintiff demands a trial by jury on all claims so triable.


Dated: New York, New York
        January 9, 2008

                                    Respectfully submitted,


                                    _____
                                    Tembani S. Xaba (TX-9242)
                                    Attorney at Law
                                    227 Riverside Drive
                                    New York, New York  10025
                                    (917) 432-9226

                                    *Attorney for Plaintiff*