UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CHRISTINE C. ANDERSON,

                 Plaintiff,                     07 Civ. 9599 (SAS)

       - against -

THE STATE OF NEW YORK, et al,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

BERANBAUM MENKEN
BEN-ASHER & BIERMAN LLP
Attorneys for Plaintiff
80 Pine Street, 32nd Floor
New York, New York 10005
Tel. (212) 509-1616

Of Counsel:

John A. Beranbaum (JB-7944)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      ANDERSON'S COMPLAINTS OF DDC  WHITEWASHING . . . . . . . . . . . . . . . . . . . 2

            (a)  "L.B.", "C", and "G" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

            (b)  "H" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            ( c) "D.N." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      THE JULY 2006 INCIDENTS AND THEIR AFTERMATH . . . . . . . . . . . . . . . . . . . . 6

      DEFENDANTS' REFUSAL TO TRANSFER ANDERSON . . . . . . . . . . . . . . . . . . . . . 7

      RETALIATION AGAINST ANDERSON . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      COHEN'S RACIAL ANIMUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      ANDERSON'S OPPOSITION TO THE HARASSMENT . . . . . . . . . . . . . . . . . . . . . . 12

      ANDERSON'S TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      POINT I        DEFENDANTS FIRED ANDERSON FOR HER
                        SPEECH ABOUT DDC WHITEWASHING . . . . . . . . . . . . . . . . . . . . . 13

             1.    Anderson Engaged in Protected Speech . . . . . . . . . . . . . . . . . . . . . . . . 14

             2.    Anderson Suffered Adverse Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

             3.    Anderson Has Established a Causal Connection . . . . . . . . . . . . . . . . . . 20

             4.    Motive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      POINT II     DEFENDANTS TERMINATED ANDERSON
                        BECAUSE OF HER RACE AND NATIONAL ORIGIN . . . . . . . . . . . 24

             1.    Inference of Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2.      Pretext . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

POINT III      DEFENDANTS SUBJECTED ANDERSON TO
               A HOSTILE WORK ENVIRONMENT . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Agostino v. Simpson*,
08-CV-5760 (CS), 2008 WL 4906140 7
(S.D.N.Y. Nov. 11, 2008).....................................................................20

*Ansell v. D'Alesio*, 485 F.Supp.2d 80 (D. Conn. 2007) . . . . . . . . . . . . . . . . . 22

*Barclay v. Michalsky*, 451 F.Supp.2d 386 (D. Conn. 2006) . . . . . . . . . . . . 16

*Beckwith v. Erie Cty. Water Authority*,
413 F. Supp.2d 214 (W.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Billue v. Praxair, Inc.*,
3:05-cv-00170 (JCH), 2007 WL 1231841 8
(D. Conn. Apr. 26, 2007), *aff'd*, 2008 WL 4950991
(2d Cir. Nov. 20, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Bolick v. Alea Group Holdings, Ltd.*,
278 F.Supp.2d 278 (D. Conn. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Casale v. Reo*, 522 F. Supp.2d 420 (N.D.N.Y. 2007) . . . . . . . . . . . . . . . . . 16

*Catletti v. Rampe*, 334 F.3d 225 (2d Cir. 2003 . . . . . . . . . . . . . . . . . . . . . . 14

*Chervoka v. Conn. General Life Insurance Co.*,
92 F.3d 81 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Coiffi v. Averill Park Central School District Board of Educ.*,
444 F.3d 158 (2d Cir.), *cert. denied*, 127 S.Ct. 382 (2006) . . . . . . . 17,18

*Connick v. Myers*, 461 U.S. 138 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

*Cotarelo v. Vill. of Sleepy Hollow Police Department*,
460 F.3d 247 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Crader v. Concordia Coll.*,
724 F. Supp. 558, 764 (N.D. Ill. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 26

*Drolett v. DeMarco*,
3-05 CV 1335(JCH), 2007 WL 1851102 5
(D. Conn., June 26, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Farrugia v. No. Shore Univ. Hosp.*,
  13 Misc.3d 740, 748-49, 820 N.Y.S.2d 718
  (Sup. Ct., N.Y. Co. 2006)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Feingold v. New York*,
  366 F.3d 138 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Fiero v. City of New York,*
  No. 07 Civ. 11214 (SAS), 2008 WL 2937790
  (S.D.N.Y. July 30, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Frank v. Relin,*
  *1 F.3d 1317 (2d Cir.), cert. denied*, 510 US 1012 (1993) . . . . . . . . . . . 22

*Fullard v. City of New York*,
  274 F.Supp.2d 347 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Garcetti v. Ceballos*, 547 U.S. 410 . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 16, 18

*Gordon v. New York City Board of Education,*
  232 F.3d 111 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Gorman-Bakos v. Cornell Cooperative,*
  252 F.3d 545 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

*Grant v. Bethlehem Steel Corp.*,
  622 F.2d 43 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Harris v. Forklift System, Inc.*, 510 U.S. 17 (1993) . . . . . . . . . . . . . . . . . . . 28

*Holcombe v. Iona College,*
  521 F.3d 130 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Hopkins v. Price Waterhouse*,
  920 F.2d 967 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Johnson v. Ganim*,
  342 F.3d 105 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

*Kantha v. Blue*,
  262 F. Supp.2d 90 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Marx v. Schnuck Markets, Inc.*,
  76 F.3d 324 (10ᵗʰ Cir.), *cert. denied*, 518 U.S. 1019 (1996) . . . . . . . . 22

*McDonnell Douglas Corp. v. Green*,
 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*McGuire v. Warren*,
 490 F. Supp.2d 331 (S.D.N.Y. 2007)... . . . . . . . . . . . . . . . . . . . . . . 16, 17

*McGuire v. Warren*,
 207 Fed. Appx. 34, 36 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Monterroso v. Sullivan & Cromwell, LLP*,
 No. 06 Civ. 3404(SAS), __ F. Supp.2d __
 2008 WL 4761922 (S.D.N.Y. Oct. 28, 2008) . . . . . . . . . . . . . . . . . . . . 20

*Morey v. Somers Cent. Sch. Dist.*,
 No. 06 Civ. 1877(WCC), 2007 WL 867203
 (S.D.N.Y. Mar. 21, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Morris v. Lindau*,
 196 F.3d 102 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22, 23

*Nanton v. City of New York*,
 No. 05 CIV. 8989(DLC),
 2007 WL 2319131 (S.D.N.Y. Aug. 10, 2007) . . . . . . . . . . . . . . . . . . . . 27

*Ostrowski v. Atlantic Mutual Insurance Cos.*,
 968 F.2d 171 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Paola v. Spada*,
 498 F. Supp.2d 502 (S.D.N.Y 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Parrish v. Sollecito*,
 258 F.Supp.2d 264 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Penta v. Sears Roebuck, Co.*,
 01-CV-2788 (SJ), 2003 WL 21143071 7
 (E.D.N.Y. May 12, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Phillips v. Bowen*,
 278 F.3d 103 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Pickering v. Board of Education*,
 391 U.S. 563 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Piesco v. City of New York*,
 933 F.2d 114 (2d Cir. 1995), *abrogation on other grounds*

*recognized by Jeffries v. Harlston*, 52 F.3d 9 (2d Cir. 1995) . . . . . . . . . 23

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Reuland v. Hynes*,
    460 F.3d 409 (2d Cir. 2006), *cert. denied*, 128 S.Ct. 119 (2007) . . . . . . 22

*Rolon v. Ward*, No. 05 Civ. 0168(WCC),
    2008 WL 4700705 (S.D.N.Y. Oct. 28, 2008) . . . . . . . . . . . . . . . . . . 19,24

*Salerno v. City Univ. of New York*,
    No. 99 Civ. 11151 (NRB),
    2003 WL 22170609 (S.D.N.Y. Sept. 18, 2003) . . . . . . . . . . . . . . . . . . . 22

*Selmanovic v. NYSE Group, Inc.*,
    No. 06 Civ. 3046(DAB),
    2007 WL 4563431 (S.D.N.Y. Dec. 21, 2007) . . . . . . . . . . . . . . . . . . . . 29

*Shub v. Westchester Committee Coll.*,
    556 F. Supp.2d 227 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Skehan v. Village of Mamaroneck*,
    465 F.3d 96 (2d Cir. 2006), *overruled on other grounds by*
    *Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (collecting cases) . 14, 18

*Sumner v. United States Postal Service*,
    899 F.2d 203 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27

*Tomassi v. Insignia Financial Group, Inc.*,
    478 F.3d 111 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ventura v. Town of Manchester*, 3:06 CV 630(EBB),
    2008 WL 4080099 16-17 (D. Conn., Sept. 2, 2008) . . . . . . . . . . . . . . . 15

*Zelnik v. Fashion Institute of Technology*,
    464 F.3d 217 (2d Cir. 2006), *cert. denied,* 127 S.Ct. 2062 (2007) . . . . . 18

## STATE CASES

*In the Matter of Wong*,
    710 N.Y.S.2d 57 (1st Dep't 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Williams v. NYC Housing Authority*,
    __ N.Y.S.2d __, 2009 WL 173522

(N.Y.A.D. 1ˢᵗ Dep't, Jan. 27, 2009)   . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

## STATE STATUTES

Judiciary Law § 90 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

New York City Human Rights Law,
Administrative Code § 8-502. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28, 29

## PRELIMINARY STATEMENT

Plaintiff Christine C. Anderson has brought this action challenging her dismissal as a principal attorney with the Departmental Disciplinary Committee of the First Department as retaliatory, in violation of the First Amendment, and motivated by discrimination on the basis of race and national origin.

## STATEMENT OF FACTS

Anderson worked for over six years as an attorney, five as Principal Attorney, for the First Department's Departmental Disciplinary Committee ("DDC"). In that position, she investigated complaints of attorney misconduct. There is no dispute that until the controversy during her last year, Anderson's work performance was very good. (Corrado 75-76; Cohen 8; Bratton 31-35; Cahill 80-84) With the exception of her last performance review – issued four months before her discharge – Anderson's yearly evaluations were exemplary. (Spokony Decl., Ex.D-7)

The head of the DDC was Chief Counsel Thomas Cahill. The DDC Policy Committee oversaw the functioning of the DDC. (Cahill 10-12) The Policy Committee reviewed the DDC docket each month. The Committee was "very concerned" with the age of the cases and "the time it took to dispose of them." (Cahill 14, 18-19) Cahill regularly spoke to staff attorneys of the need to reduce the back load of cases. (Id. 35)

During Anderson's last three years, the DDC had four supervising attorneys. Cahill directly supervised some of the office's approximately 20 staff attorneys, as did Sherry Cohen, First Deputy Chief Counsel, Andral Bratton, Deputy Chief Counsel, and Judith Stein. (Bratton 7-10; Cohen 9-10, 15; Cahill 53-60; DDC 1371)

1

Stein supervised the Resolutions Unit, where Anderson worked.  (Cahill 53, 59-64)  For

Anderson's first five years, she was directly supervised by Stein.  (DDC 1714)  At Resolutions,

Anderson investigated complaints, conducted depositions, interviewed complainants and

reviewed subpoenaed records.  (Anderson 57-58)  If Anderson determined the attorney

misconduct serious enough, she prepared a proposed letter of admonition for review by her direct

supervisor, Stein.  Once Stein signed off on the letter, it was forwarded to Cahill, and, if Cahill

approved, to the Policy Committee.  (Bratton 21-25)

## ANDERSON'S COMPLAINTS OF DDC WHITEWASHING

Starting in 2005, Anderson made repeated complaints to Cahill and Cohen about the

DDC's failure to vigorously prosecute the public's complaints against attorneys accused of

misconduct, particularly where the "respondents were either themselves politically connected or

they had attorneys who used to work for us."  (Anderson 75-76, 82)  Anderson expressed her

concern about improper DDC practices in connection with at least nine cases where she believed

the DDC treated malfeasant attorneys too leniently.[1]

(a)  **"L.B.", "C", and "G"**.  In 2005 Anderson investigated  complaints made against

L.B. by 11 former clients, mostly Russian immigrants, for fleecing their money.  (Anderson 85)

L.B. was represented before the DDC by the agency's former Chief Counsel.  (Cahill 5)  L.B.'s

counsel complained to Cohen about Anderson's handling of "L.B,." and asked that she be

removed from the case.  (Cohen 137-38; Cahill 156-57)  Although Cahill and Cohen did not take

Anderson off the case, after the complaint from L.B.'s counsel, Cohen requested to see

---

[1]    The specific cases were "H"; "L.M."; "M.S."; "L.B."; "M.B.", "C"; "G "; "J.S.";
and "Z.S." (Anderson 81, 83-85, 86-87, 102, 120-22, 128, 129).

"everything" Anderson produced, even if approved by her supervisor, Stein.  (DDC 1371)

At the completion of her investigation, Anderson recommended that the DDC take action against L.B.  Cahill, however, transferred "L.B." to another attorney and the DDC subsequently dismissed the case.  (Anderson 86-87)  After learning that L.B. had been arrested for mob activity, Anderson spoke with Cohen and Cahill:

> ... I said, Sherry, look at this, this is an outrage.  I said, we did nothing, now he is going to prison by the feds, and who is going to get them restitution?  Because when we take action we order restitution, and B. had a lot of money.  She said to me, and this is a quote, "Why do you care?"  I said, why do I care?  I care because we are not serving the public and all of these [involved] Russian people, one was even working as a home attendant making nothing and, I said, they will never get restitution.  From Ms. [Cohen's] office I marched into Tom [Cahill]....*I said, Tom, this is no good, this is not our mission here at the DDC*.  (Anderson 87) (emphasis added)

With respect to two other matters from 2005, "C" and "G," Anderson also told Cahill that the DDC was not fulfilling its statutory charge.  The complainant, C., complained that her former attorney -- a former DDC staff attorney -- had kept her check meant to pay off a judgment.  The DDC dismissed C's complaint, despite what Anderson called a "wealth of evidence."  (Anderson 99-100)  Anderson complained to Cahill, "[I]f nothing is done [about the matter], then, again, this is a case that we are not following our mission."  (Anderson 102-103)  As to the complainant G, after the DDC failed to act on his complaint, as Anderson testified, "I said the same thing again, it was becoming my mantra.  I said, Tom, this cannot be allowed to happen.  This should be re-opened.  I said this is how we screw the public."  (Anderson 122)

**(b)   "H"**   In September 2005, after a year-long investigation, Anderson completed a proposed report, recommending the admonishment of the attorney, H., for two counts of misrepresentation and commingling of client funds.  Stein approved Anderson's

recommendation, as did Cahill.  (Anderson 76-78; DDC 1368-69)

H. was represented before the DDC by the agency's former Deputy Counsel.  Cohen became involved when H.'s counsel objected to Anderson's denial of a lengthy adjournment. After Cohen spoke with Anderson, H's counsel was granted the adjournment. (Cohen 20-21) Cohen subsequently reviewed Anderson's admonition letter and decided that it was "too harsh." She told Anderson that the memo, as written, might lead the Policy Committee to bring charges against H., and she "didn't want to tie up an attorney on a six month trial."  When Anderson objected, Cohen announced, "I'm going to re-write it."  (Anderson 77)  Anderson said that it was improper to re-write the memo to skew the end result, and accused Cohen of trying to "whitewash" the case.  (Anderson 77-78; Cohen 64-66; DDC 1369)  Cohen was offended by Anderson's accusation (DDC 1402; Spokony 43), and told Cahill what Anderson said. (Cahill 106)  Cohen re-wrote the memo removing the most serious finding that H. made misrepresentations to the DDC and watering down allegations of commingling.  She submitted the revised memo to the Policy Committee in May 2006.  (Spokony Decl., Ex E-2; Anderson 77)

As discussed below, in July 2006, Cohen and Anderson had an altercation growing out of their dispute about "H."  On August 8, 2006, Anderson met with Clerk of Court, Catherine O'Hagen-Wolfe.  Wolfe had oversight responsibilities for the Court's non-judicial employees, but Anderson did not have a reporting relationship with her.  (DDC 1401; Spokony 42)

Anderson told Wolfe that Cohen's hostile actions were in "retaliation for [Anderson's] disagreement [with Cohen's] handling of some cases to the detriment of complainants."  (DDC 1457-58) She told Wolfe, "I have seen incidents of which I disapprove where the complainants are not being served."  (Anderson 93)  Anderson detailed that a former DDC attorney, in her role

4

as respondents' counsel, was trying to improperly influence the disposition of cases, acting as "one of the cogs in the wheel of trying to subvert the mission of our office..." (Id. 98)  Anderson stressed to Wolfe that "complainants were not being served."  (Id. 95)

( c)  "D.N."   In November-December 2006, Anderson again spoke out against DDC's practices.  Her complaint centered on D.N., who was represented by both a former DDC attorney and by D.N.'s brother, a member of a prominent New York law firm whose partner sat on the Policy Committee.  (Anderson 84; Cohen 194-95)

In 2005, D.N.'s counsel -- the former DDC attorney – had written Cahill, complaining about Anderson and requesting that he remove her from the case. (A968-69; Cohen 192)  Cahill did not do so.  (Id.)  The following year, however, in November and December 2006, Cohen and Cahill rejected Anderson's admonition of D.N. for intentional misrepresentation.  Instead, Cohen, with Cahill's concurrence, insisted that D.N. be admonished for a relatively minor violation of failing to pay a medical lien.  (Anderson 84, 98-99)  When Anderson objected to eliminating the more serious charge, Cohen removed her from the case and re-wrote the memo herself.  (Anderson 83-84; 98-99; DDC 1530, 1532;  DDC 1714; A817)

Anderson complained to Cohen and Cahill that "D.N." was symptomatic of the DDC "not fulfilling [its] mandate":

> Cohen said to me ... we don't see misrepresentation here.... I said, well, three other lawyers saw it.  That's when she told me to give her the file and I gave it to her. She said misrepresentation is very serious.  If we find they are lying to us they will be disbarred, they will get serious charges.  I said, I'm very much aware of that.  I said that there was a misrepresentation here.  I took the same oath that you took and I do not believe in letting people off.
>
> I went and I reported that to Cahill and I said to Cahill, I do not like the way selective respondents are treated, *we are not fulfilling our mandate, we are*

> *shortchanging the public. I said, think of the poor people, these complainants*
> *who are not getting justice. I said, we are not fulfilling our mandate.*

(Anderson 84-85) (emphasis added).

## THE JULY 2006 INCIDENTS AND THEIR AFTERMATH

After the dispute about "H," and Anderson's accusation that Cohen had "whitewashed"

the case, Cohen became increasingly hostile towards Anderson. (Spok. Decl. D-6)  In July 2006,

this hostility turned to rage.  In a telephone conversation, Cohen mistakenly believed that

Anderson was planning to buy a shredder for the office without prior approval. Cohen shouted at

Anderson, forbidding her to do so.  (DDC 1324-25)  The following Monday, July 24, 2006,

Cohen entered Anderson's office and sharply questioned whether she had shredded or was

planning to shred case file documents.  Anderson responded, "Neither," and got up from her desk

to meet a complainant waiting for her.  When Anderson reached for the door handle, Cohen

grabbed hold of her hand, dug her fingernails into Anderson's wrist, shut the door and said,

"You're not leaving this office."  Anderson retreated to the far side of her desk, and told Cohen it

would be better for both of them if she left.  After some hesitation, Cohen announced, "Now I am

leaving your office," and slammed the door behind her.  (Id.; Anderson 52, 53)

Anderson reported the July incidents to Cahill. When he did not take action, Anderson

met with Wolfe on August 8, 2006.  (Anderson 88-89; see above at 4-5)  Anderson gave Wolfe

reports she prepared recounting the incidents.  Anderson said she did not want anything to do

with Cohen, and since Stein was her direct supervisor, this would be feasible.  (Anderson 92;

Wolfe 93)  Wolfe instructed Deputy Clerk of Court, David Spokony, to set up a fact finding

meeting.  (Spokony 19-20)  On September 12, 2006, Spokony, along with two other court

6

officials, interviewed Anderson and Cohen.  At the conclusion of the meeting, one panelist,

Patrick Finnegan, recommended limiting Cohen's supervisory role over Anderson.  (DDC 1415)

On September 26, 2006, Spokony gave Wolfe a report in which he recommended that

Cohen apologize to Anderson and attend a management skills course, and that Cahill clarify with

Anderson Cohen's supervisory role.  (DDC 1319)  Wolfe accepted Spokony's recommendations.

(DDC 1296)  In a follow up meeting on October 11, 2006, Cohen apologized for her conduct,

and Anderson accepted the apology.  Cahill told Anderson that she did not make policy decisions

and that her function was limited to matters assigned to her.  Anderson said she was aware of her

responsibilities.  (DDC 1768-69)

Anderson appealed Spokony's report to Presiding Justice John Buckley, contending that

its remedial measures, for Cohen to take a management skills course and apologize, were not

commensurate with Cohen's offense of assaulting her.  Anderson asserted that Cohen's actions

were motivated by racial bias.  (Spokony Decl., Ex. B-9-11)  On October 24, 2006, Justice

Buckley accepted Spokony's report and recommendation.  (Spokony Decl., Ex. B- 12-13)

### DEFENDANTS' REFUSAL TO TRANSFER ANDERSON

In the fall of 2006, relations between Anderson and Cohen were extremely tense.  Bratton

told Cahill that the atmosphere at meetings he attended with Cohen and Anderson was like what

he felt when he served as an election monitor at Bosnia and Herzegovina polling stations.

(Bratton 95)  Anderson, having suffered a physical assault by Cohen, was scared to be alone with

her. (DDC 1714; Bratton 59-60)  Cahill, Wolfe, Bratton and co-workers all knew that.  (See

Wolfe 94; Bratton 59-61; Cahill 172-75; DDC 1518, 1525, 1758)  A colleague observed that

during this period, Anderson had lost weight, her hands shook, she looked "very unhealthy," and

7

whenever she left a meeting with Cohen she appeared "very shaken." (Corrado 89-91)[2]

Anderson repeatedly asked Cahill to remove Cohen as her supervisor.  (DDC 1714; DDC 1505-07; Bratton 60)  Bratton, like Finnegan before him, made the same suggestion.  On November 20, 2006, after a meeting with Anderson and Cohen, Bratton wrote:

> on at least several occasions, I suggested to Tom and Sherry that the situation could be resolved by having Christine transferred to my supervision, as people have transferred to others in the past due to personality conflicts (e.g. Naomi, La Trisha).  Tom declined on grounds that Christine needs to understand that Sherry is First Deputy Chief Counsel.  Sherry advised me that this would be impractical because it had gone past that stage.  (DDC 1715)

As Bratton noted, it was common DDC practice to change supervisors at a staff attorney's request.  In an office of about 20 staff attorneys, over a period of several years, at least five staff attorneys were allowed to change supervisors.  (Cohen 142-151; Bratton 63-69; 82, 81-82, 89-91)  The DDC permitted three attorneys to transfer away from Cohen.  (Id.)  In a space of two years, one attorney, citing personality conflicts, was permitted to transfer from Bratton to Cohen and then back again to Bratton.  (Corrado 7-11, 47-48)

In spring 2007, Bratton told Cahill that the situation with Anderson would be "eased up" if she were allowed to change supervisors.  Cahill again dismissed the suggestion, saying, "I can't do that because that is exactly what she wants."  (Bratton 92-93)  Wolfe gave an unfounded explanation for prohibiting Anderson's transfer to Bratton.  She claimed that Bratton was not a suitable supervisor for a senior attorney, when, in fact, the DDC re-assigned a senior attorney to

---

[2]      Between July 2006 and her termination in June 2007, Anderson's health deteriorated.  In February 2007, she was diagnosed as having acute panic attacks, depression/anxiety syndrome, and anorexia.  Her symptoms included extreme weight loss, insomnia, high blood pressure, hand tremors, shortness of breath, and heart palpitations. (Carrera, M.D., 27, 28, 33-33, 35)

8

him around the time of Anderson's requests. (Wolfe 71-72, Corrado 47-48)  Although Wolfe

kept Presiding Justice Buckley apprised of developments with Anderson (e.g. Wolfe 67), she

never discussed with him the possibility of transferring Anderson to another supervisor. (Wolfe

76)

## RETALIATION AGAINST ANDERSON

At Wolfe's direction, Cohen took to memorializing her observations of and interactions

with Anderson.  (Wolfe 135; Cohen 164)[3]   Cohen took notes of the most minor occurrences:

chance encounters with Anderson in the hallways (DDC 1553); Anderson's allegedly leaving

work early (DDC 1541),[4] or by a "side door," contrary to Cohen's newly implemented office

rules (DDC 1541); and even that Anderson had given flowers to the secretaries for Christmas.

(DDC 1526)

Cohen micro-managed Anderson's work. (DDC 1461) Before October 2006, Anderson

met with Cohen just four times a year to review cases and had substantial autonomy over

investigations.  (Bratton 22) Starting in October 2006, Anderson was made to meet with Cohen

approximately every other week.  (DDC 1517, 1525, 1563-64, 1714-15) At one such meeting

Cohen accused Anderson of being "silly" and "stupid."  (Anderson 153; DDC 1742)

Anderson was subjected to a series of negative job actions.  On November 1, 2006,

Cohen, with Wolfe's concurrence, issued Anderson a "counseling memorandum," allegedly for

---

[3]       Wolfe was disingenuous in explaining why she instructed Cohen to keep a log of her interactions with Anderson, testifying, "The purpose was to monitor her own behavior as a manager."  (Wolfe 136)  A truer reason was to make a record to use against Anderson.

[4]       Anderson learned from the office manager that Cahill and Cohen were asking when she was coming into work.  (A 98, Anderson 54-55)

having cancelled a meeting at the last minute. (Cohen 182; DDC 1550)  On January 25, 2007, Cohen requested Wolfe's permission to hold a "counseling session" with Anderson, specifically citing plaintiff's resistance to re-writing the "L.N." memo.  (DDC 1461; Cohen 215-16)[5]  On January 30, 2007, Cohen gave Anderson her first negative evaluation.  (DDC 1509-11)

At Wolfe's direction, Spokony scheduled a counseling session with Anderson for February 6, 2007.  (DDC 1462; Spokony 101-115)  The day before the scheduled meeting, Anderson notified Spokony that she could not attend for "health reasons."  (Id.)  Spokony wrote back that he was treating her failure to attend as "insubordinate default, an act which could lead to disciplinary action."  He made Anderson bring a note from her doctor  – which Anderson did, despite considering the request extraordinary and demeaning.  (Spok. Decl. D-6)

At the counseling session, held February 9, 2007, three days later than originally scheduled, Spokony admonished Anderson for resisting Cohen's supervision.  (DDC 1638)  The counseling session was disciplinary in nature, as reflected by the memorandum Anderson had to sign at its conclusion, acknowledging that the memo would be placed in her "permanent personnel file and may be used in any subsequent disciplinary action brought against me." (Spok. Decl. Ex. D-1)  Spokony later used the counseling memorandum to support his recommendation for firing Anderson.  (Id. E-1)

## COHEN'S RACIAL ANIMUS

Cohen's hostility toward Anderson also was motivated by Anderson's race, black, and national origin, Jamaican.  Cohen made denigrating remarks about black people and minorities to

---

[5]        Cohen's January 25, 2007 letter requesting the counseling session was written just one day after Anderson's attorney had requested confirmation from Spokony that Cohen had attended the management training course.  (DDC 1651-52)

Anderson and other employees.  Cohen told Anderson that she hates homeless people because they are smelly; that there are too many blacks in the subways; and that she was unhappy about black rappers, with their gold chains, buying property in East Hampton.  (Anderson 137-38)  Before other DDC employees, Cohen called her gardener "a little Mexican guy" (Corrado 62), and Guatemalans, "little people."  (Bratton 71)  Two co-workers told Bratton that they thought Cohen was a "racist," but he did not pass on their complaints to his superiors.  (Id. 75-77).

A former black DDC investigator, Kenneth Van Lew, attested that Cohen's hostile treatment forced him to quit.  He averred, "Ms. Cohen discriminates against employees of color by routinely harassing, demeaning, and micro-managing them, until they are eventually forced out of their jobs." (Affid. Van Lew)  Van Lew stated that unlike her treatment of white employees in similar situations, Cohen docked his time and refused to let him make it up when he came late to work; demanded that he produce his "medical records" after being out sick; and refused to give him a new computer.  Van Lew described that his work station was located outside Cohen's office, and one evening when working late, she told him, "I don't like you working late, because I can't stand your voice."  Another time, Cohen told Van Lew that she was surprised by his writing because it was "better than [she] expected."  Van Lew perceived the comments as reflecting bias: disliking the black intonation of his voice and stereotyping blacks as having poor literacy skills.  Van Lew stated that Cohen's harassment became so unbearable that he was forced to quit, even though it meant losing enhanced retirement benefits. (Id.)

A black secretary of seven years, Monique Hudson, testified that Cohen treated minorities differently, "like they were a piece of dirt." (Hudson 18). Cohen said to the secretaries, all but one of whom was a minority, "I need you all to start using your brains now." (Id. 44, 45)

11

## ANDERSON'S OPPOSITION TO THE HARASSMENT

Anderson, believed that the February 2007 counseling session was a form of harassment. She submitted an "Answer" to the Court, stating,

> In summary, I repeat my lack of culpability in any respect.  I have, for six years, had an exemplary reputation, and my work ethic, my [ ] work product and my deportment are beyond reproach.  Nothing has changed.
>
> I have questioned and disagreed with Ms. Cohen's handling of certain cases, such as the H matter, cited above.  *What is worrisome is that any dissent, however justified, is now labeled as insubordination*, under Ms. Cohen's role as First Deputy....This is a very disturbing direction at the Agency.

(DDC 1464) (emphasis added)

On May 16, 2007, Anderson submitted to Acting Presiding Justice Peter Tom a "Non-Contract Grievance."  (Spok. Decl. DDC 2603)  Anderson protested the "retaliatory harassment of Sherry Cohen" and being subjected to "discriminatory supervisory practices" and "disparate treatment."  (Id. DDC 339, 340)  Unbeknownst to Anderson, a month before she submitted the Grievance, Spokony already had asked the Justices to terminate her.  (DDC 2294, 2611)

## ANDERSON'S TERMINATION

From January 25, 2007 until two days before Anderson's termination, Cohen sent Wolfe and Spokony batches of  notes memorializing her contacts with Anderson in order to put plaintiff in a negative light.  (January 25, 2007 (Spok. Decl. C-5); April 11, 2007 (id. Ex. E-11); May 10, 2007 (DDC 2287); May 17, 2007 (DDC 1727); May 18, 2007 (DDC 2208); June 6, 2007 (DDC 2497-98)).   Cohen gave Wolfe and Spokony the information knowing that if things did not improve, Anderson would likely be terminated.  (Cohen 242)  Cohen also kept Cahill apprised of the situation with Anderson.  (Cohen 205)

12

The same day she received Cohen's April 11, 2007 fax, with the attached email communications, Wolfe directed Spokony to prepare a memo for the Justices recommending Anderson's termination.  (Spokony 131-32; Wolfe 165)  The very next day, Spokony sent the memo, recommending that Anderson be terminated for "resist[ing] appropriate supervision" and "insubordination."   (Id.; Spokony Decl., Ex. E -1) Before doing so, Spokony and Wolfe did not advise Anderson that her job was in jeopardy or that they intended to seek her dismissal. (Spokony 137; Wolfe 168)  Spokony subsequently met with the Justices advocating Anderson's discharge.  (Spokony 143-48)

Before accepting Spokony's recommendation, the Justices asked Spokony to find out whether Cohen had a personal relationship with the respondent, H.  (Spokony 148-49)  On May 24, 2007, Spokony wrote the Justices to assure them there was nothing untoward about Cohen's handling of "H."  (Spokony Decl., Ex. E-2)  Spokony and Wolfe met with the Justices, including newly appointed Presiding Justice Lippman.  They did not mention Anderson's charges about DDC whitewashing, and the Justices did not ask to speak with Anderson.  (Spokony 169-70) Justice Lippman gave Spokony authority to terminate Anderson (Spokony 165-68), and in a letter, dated June 8, 2006, defendants dismissed her.

## ARGUMENT

## I.        DEFENDANTS FIRED ANDERSON FOR
## SPEAKING OUT ABOUT DDC WHITEWASHING

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  To establish a First Amendment claim of retaliation,  a public employee must show that 1) the speech at issue was made as a

13

citizen on matters of public concern, rather than as an employee on matters of personal interest; 2) she suffered an adverse employment action; and 3) the speech was at least a substantial or motivating factor in the adverse employment action. Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003) (internal citations and quotations omitted). Anderson meets each of these tests, or at the least presents factual disputes concerning each of them.

### 1.  **Anderson Engaged in Protected Speech**

Speech by a public employee that relates "to any matter of political, social, or other concern to the community" is protected. Connick v. Myers, 461 U.S. 138, 146 (1983). Anderson's speech about the DDC's breach of its statutory mandate, bears on a matter of profound public concern: protecting the public from wrongdoing attorneys and maintaining the integrity of the courts. See Judiciary Law § 90(2) (authorizing the appellate division to discipline attorneys guilty of professional misconduct); In the Matter of Wong, 710 N.Y.S.2d 57, 61 (1st Dep't 2000) (disciplinary proceedings "protect the courts and the public from official ministration of persons unfit to practice") (internal quotations and citation omitted).

Courts consistently have held that speech about a government agency's activities, and abuses, relate to matters of public concern. See Skehan v. Village of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006), overruled on other grounds by Appel v. Spiridon, 531 F.3d 138 (2d Cir. 2008); Johnson, 342 F.3d at 112 ("[D]iscussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern") (quoting Harman v. City of New York, 140 F.3d 111, 118 (2d Cir. 1998)); Catletti v. Rampe, 334 F.3d 225, 230 (2d Cir. 2003); Beckwith v. Erie Cty. Water Auth., 413 F. Supp.2d 214, 222 (W.D.N.Y. 2006) (holding speech about "pervasive or systemic misconduct by a public agency or public officials," is protected).

14

Defendants cite <u>Garcetti v. Cebellos</u>, 547 U.S. 410 (2006), to argue that Anderson's speech was "calculated to redress personal grievances," and therefore unprotected. To the contrary, <u>Garcetti</u> in no way bars Anderson's First Amendment claim.

<u>Garcetti</u> involved a deputy district attorney who claimed that he was retaliated against for writing a disposition memorandum in which he recommended to his supervisors the dismissal of a case because of a flawed affidavit used to obtain a critical search warrant. The Court found that Ceballos' speech was not protected because it was "made pursuant to his duties as a calendar deputy." <u>Id.</u> at 421. In finding that he was acting as a public employee regarding an internal matter, the Court noted, "Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." <u>Id.</u>

Unlike Ceballos' disposition memo, Anderson's complaints about DDC whitewashing were not made pursuant to or in fulfillment of her job duties. Defendants' own job description for Principal Attorney makes that clear. Anderson's job duties as a Principal Attorney were to "research legal questions and issues, organize complex investigations, prepare and present complex cases before administrative tribunals and trial and appellate courts, and perform related duties." (DDC 78) Clearly, speaking out about DDC practices was not one of her responsibilities. Cahill made that very point when he chastised Anderson that "she did not make policy decisions, that her function was limited to the matters assigned to her." (DDC 1768-69)

Because Anderson was not required to speak out about DDC whitewashing, under <u>Garcetti</u>, she expressed her views as a citizen, not a public employee. <u>See</u> <u>Ventura v. Town of Manchester</u>, 3:06 CV 630(EBB), 2008 WL 4080099 **16-17 (D. Conn., Sept. 2, 2008) (denying summary judgment where there was a factual question whether police officer was compelled to

15

make complaints about supervisor's alleged theft of overtime or did so voluntarily, and likewise whether his cooperation in an investigation of fellow police officers was required by his position); Fiero v. City of New York, No. 07 Civ. 11214 (SAS), 2008 WL 2937790 *6 (S.D.N.Y. July 30, 2008) (denying motion to dismiss First Amendment claim where plaintiff did not engage in speech pursuant to his official duties when he refused his principal's instructions to commit wrongful acts); Casale v. Reo, 522 F. Supp.2d 420, 423-24 (N.D.N.Y. 2007) (denying summary judgment where there was not enough evidence to show that school aide was required to participate in the investigation of a teacher's allegedly inappropriate behavior); Paola v. Spada, 498 F. Supp.2d 502, 508-09 (D. Conn. 2007) (denying summary judgment where there were questions of fact whether State Trooper was expected to report all potential wrongdoing within the division); Drolett v. DeMarco, 3-05 CV 1335(JCH), 2007 WL 1851102 *5 (D. Conn., June 26, 2007) (denying summary judgment where "there is no evidence that Drolett's official duties included complaining about all kinds of workplace mismanagement, whatever the context in which these complaints were made"); Barclay v. Michalsky, 451 F. Supp.2d 386, 395-96 (D. Conn. 2006) (finding that material issues of fact exist as to whether nurse was required by her job duties to report co-employees sleeping on job and using excessive restraints on patients).

The fact that Anderson expressed her views about the DDC in the context of her job does not strip them of constitutional protection. Garcetti, 547 U.S. at 421 ("The [disposition] memo concerned the subject matter of Ceballos' employment, but this, too, is nondispositive. The First Amendment protects some expressions related to the speaker's job"); see also McGuire v. Warren, 490 F. Supp.2d 331, 340-41 (S.D.N.Y. 2007)(on remand from McGuire v. Warren, 207 Fed. Appx. 34, 36 (2d Cir. 2006))("The fact that [plaintiff] was speaking on the general subject

16

matter of her employment is inconsequential under the present circumstances"); Morey v. Somers Cent. Sch. Dist., No. 06 Civ. 1877(WCC), 2007 WL 867203 *10 (S.D.N.Y., Mar. 21, 2007) (holding that school custodian's concerns about presence of asbestos in school was protected even though he expressed them in the ordinary course of his duties).

Where the public employees' speech concerns a government agency's breach of the public trust, as it does here, it relates to more than a mere personal grievance and is outside of Garcetti's restrictions. See Shekan, 465 F.3d at 106 (police officer's speech about malfeasance within the department and allegations of cover-up is protected); Coiffi v. Averill Park Central Sch. Dist. Bd. of Educ., 444 F.3d 158, 167 n.3 (2d Cir. 2006), cert. denied, 127 S.Ct. 382 (2006) (public school teacher's expression of concern about a student's hazing was protected because his speech "was not made strictly pursuant to his duties as a public employee" and his "primary concern was the health and safety of the students involved"); Fiero, 2008 WL 2937790 *8 (plaintiff's refusal to participate in school principal's campaign to blackball teachers "addressed a matter of public concern because it addressed serious misconduct on the part of the head of a public school").

Whereas the prosecutor in Garcetti spoke out about a single case pending at his office, Anderson, in the context of discussing a number of pending cases, spoke out about systemic problems at the DDC, making her speech protected. See Cotarelo v. Vill. of Sleepy Hollow Police Dep't, 460 F.3d 247, 252 (2d Cir. 2006) (holding that a public employee's speech about alleged discrimination on the job is protected so long as the claim concerns general bias problems and are not limited to the individual); McGuire, 490 F. Supp.2d at 338 (denying motion to dismiss and finding that special educator's statements were not limited to particular children with

17

whom she worked, but included general concerns that the county office was not providing

adequate services for the autistic children); Kantha v. Blue, 262 F. Supp.2d 90, 100-101

(S.D.N.Y. 2003) (collecting cases).

Whatever personal interest, if any, that Anderson might have had in making her protests

does not make her speech any less protected. In Coiffi, the Second Circuit rejected defendants'

argument that the plaintiff's speech was unprotected because he had a personal interest in

speaking out about the student's hazing, that is, to protect his job. "Motive may inform our

inquiry ... but ... even an entirely personal motive in speaking is not dispositive." Id. at 166

(citing Connick, 461 U.S. at 148-49); see also Garcetti, 547 U.S. at 421; Johnson, 342 F.3d at

114 (in holding that plaintiff's personal interest in the subject matter of the speech did not

remove it from First Amendment protection, the court noted, "[M]ixed motivations are involved

in most actions we perform every day; we will not hold [plaintiffs] to herculean standards of

purity of thought and speech.")(internal citations omitted). Coiffi noted that public employees

are given First Amendment protection not only in furtherance of their interest in speaking, but to

further the public's interest in learning information about public matters. To deny First

Amendment protection to all those public employees having a personal interest in speaking out

would thwart this purpose. 444 F.3d at 166.

### 2.    Anderson Suffered Adverse Action

In a First Amendment retaliation claim, an adverse action is conduct "that would deter a

similarly situated individual of ordinary firmness from exercising his or her constitutional

rights." Zelnik v. Fashion Institute of Technology, 464 F.3d 217, 225 (2d Cir. 2006), cert. denied,

127 S.Ct. 2062 (2007) (internal quotations omitted). While adverse actions include discharge,

18

refusal to hire, refusal to promote, demotion, reduction in pay and reprimand, lesser actions such as a negative evaluation, may also be considered adverse employment actions. <u>Morris v. Lindau</u>, 196 F.3d 102, 110 (2d Cir.1999) (citing <u>Bernheim v. Litt</u>, 79 F.3d 318, 324-26 (2d Cir.1996)).

The Second Circuit has held that in a First Amendment retaliation case, "a combination of seemingly minor incidents" may form the basis for an adverse employment action once the incidents "reach a critical mass," so that "the total circumstances of [plaintiff's] working environment changed to become unreasonably inferior when compared to a typical or normal, not ideal or model, workplace." <u>Phillips v. Bowen</u>, 278 F.3d 103, 109 (2d Cir. 2002); <u>see also</u> <u>Rolon v. Ward</u>, No. 05 Civ. 0168(WCC), 2008 WL 4700705 *21-23 (S.D.N.Y. Oct. 24, 2008).

In <u>Phillips</u>, the court found that the following actions in combination rose to the level of adverse employment action: the police department gave the plaintiff, a police officer, an ill-fitting bullet-proof vest; denied her assistance to make an unusual warrant arrest that she had been ordered to do; chastised her for violating a directive of which she had been unaware; unfairly denied her overtime pay; called her "insubordinate" and "stupid"; and admonished her at a counseling session.

The combined negative actions and affronts suffered by Anderson were comparable to or more severe than those in <u>Phillips</u>: In July 2006, she was assaulted by Cohen; although her superiors knew that she suffered being in close contact with Cohen, and contrary to office practice and the recommendations of at least two DDC managers, Anderson's repeated requests to change supervisors were denied; although ordinarily given substantial autonomy, Anderson's work was micro-managed and she was closely monitored; in November 2006 she received a counseling memorandum; in December 2006 Cohen called her "silly" and "stupid"; in January

19

2007 she received her only negative evaluation; in February 2007, she was made to attend a counseling session and received a counseling memorandum which was placed in her personnel file; in February 2007, she also was found in "insubordinate default," and threatened with disciplinary action; as a senior attorney, she was made to bring in a doctor's note for a one-day absence; her communications with Cohen were surreptitiously read by Wolfe and Spokony; on April 12, 2007, Wolfe and Spokony, without first speaking to Anderson, recommended her termination.

Anderson thus suffered two adverse actions: 1) her discharge; and 2) the cumulative negative job actions taken against her which made her work environment "unreasonably inferior and adverse." Phillips v. Bowen, 278 F.3d at 109.

### 3. Anderson Has Established a Causal Connection

A plaintiff can establish the causal connection necessary for a First Amendment retaliation claim by showing that her protected activity was followed closely in time by the adverse employment action. Gorman-Bakos v. Cornell Coop., 252 F.3d 545, 554 (2d Cir. 2001). There is no "bright line" for how close in time the adverse action must follow the protected activity in order to raise an inference of causation. Id. There is, however, substantial authority for holding that a period between four and six months is sufficient. See, e.g., id., at 555 (five months); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (eight months); Monterroso v. Sullivan & Cromwell, LLP, No. 06 Civ. 3404(SAS), __ F. Supp.2d __, 2008 WL 4761922 *9 (S.D.N.Y. Oct. 28, 2008) (less than five months); Agostino v. Simpson, 08-CV-5760 (CS), 2008 WL 4906140 *7 (S.D.N.Y. Nov. 11, 2008) (six months); Parrish v. Sollecito, 258 F. Supp.2d 264, 268-69 (S.D.N.Y. 2003) (nine months); Bolick v. Alea Group Holdings, Ltd., 278

20

F. Supp.2d 278, 284 (D. Conn. 2003) (six months).

Anderson engaged in protected speech throughout her last two years at the DDC.  The last instance was when she complained of Cohen's "retaliatory harassment" in May 2007, just a few weeks before she was fired.  In February 2007, she filed an Answer to the counseling memorandum, charging that the DDC was treating "dissent" as "insubordination."  The time between her protected speech, whether it occurred in February or May 2007, and her discharge in June 2007, was short enough to support an inference of causation.

Even if one focuses on Anderson's earlier speech, in November-December 2006, the temporal proximity is sufficient to establish a causal connection.  Anderson's official discharge was only six to seven months later.  However, for purposes of showing causation, the relevant event is Wolfe's and Spokony's decision to initiate the termination process in April 2007 by recommending Anderson's termination.  That gap is just four-months.

The causal inference is stronger yet when consideration is given to defendants' creation of an "unreasonably inferior and adverse" workplace for Anderson.  Assuming that the negative incidents reached a "critical mass" in February 2007 – by which time Anderson had received a negative evaluation, a counseling session and memorandum, and charged with "insubordinate default" –  then the hiatus between the November and December 2006 protected speech and the February 2007 adverse action is a little more than two months.

Assuming, arguendo, that the cumulative negative incidents do not constitute an adverse employment action, they certainly show a pattern of hostile actions.  Where there may be a lengthy temporal relationship between the protected conduct and an adverse action, courts will nonetheless find a causal connection if, like here, "the pattern of retaliatory conduct begins soon

21

after the filing of the [ ] complaint and only culminates later in actual discharge." Billue v. Praxair, Inc., 3:05-cv-00170 (JCH), 2007 WL 1231841 *8 (D. Conn. Apr. 26, 2007), aff'd, 2008 WL 4950991 (2d Cic. Nov. 20, 2008) (citing Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir.), cert. denied, 518 U.S. 1019 (1996)); Shub v. Westchester Comm. Coll., 556 F. Supp.2d 227, 246-47 (S.D.N.Y. 2008) (collecting cases).[6] Thus, even if the relevant time period in this case is considered seven months – from November 2006 to June 2007 – a causal relationship exists because of the intervening pattern of hostile acts.

### 4. Motive[7]

Defendants make only a nominal argument that they would have fired Anderson even in the absence of her protected activity, see Def. Mem. at 24-25 (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 286 (1977)), perhaps because the issue turns on motive, which should not be decided on summary judgment. See Morris, 196 F.3d at 110 ("[s]ummary judgment is precluded where questions regarding an employer's motive predominate in the inquiry about how important a role the protected speech played in the adverse employment decision"); Frank v. Relin, 1 F.3d 1317, 1330 (2d Cir. 1993), cert. denied, 510 US 1012 (1993)

---

[6]    See also Gorman-Bakos, 252 F.3d at 554 (citing Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446-47 (2d Cir. 1999) (abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier); Salerno v. City Univ. of New York, No. 99 Civ. 11151 (NRB), 2003 WL 22170609 (S.D.N.Y. Sept. 18, 2003) (denying summary judgment even though arguably three years lapsed between the protected activity and the retaliation, where there was other evidence of retaliatory motive).

[7]    Defendants did not address the Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) balancing test. Therefore, for purposes of this motion, they have waived that potential defense . See Reuland v. Hynes, 460 F.3d 409, 418-19 (2d Cir. 2006), cert. denied, 128 S.Ct. 119 (2007); Ansell v. D'Alesio, 485 F. Supp.2d 80, 86 (D. Conn. 2007) (citing Schaefer v. Town of Victor, 457 F.3d 188, 210 (2d Cir. 2006)).

(reversing grant of summary judgment for defendants where motivation for firing "clearly involved disputed questions of fact"); Piesco v. City of New York, 933 F.2d 1149, 1155 (2d Cir. 1991), abrogation on other grounds recognized by Jeffries v. Harlston, 52 F.3d 9, 12 (2d Cir. 1995).

Even if the issue, necessarily dealing with motive, were appropriate for summary judgment, there are material issues of fact precluding dismissal. From the bare papers making up the motion, this Court cannot assess to what degree defendants were motivated to fire Anderson by her protected speech as opposed to other factors. Cf. Hopkins v. Price Waterhouse, 920 F.2d 967, 972-73 (D.C. Cir. 1990) (on remand from Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)) (on basis of original trial record, district court was unable to separate out employer's impermissible sex stereotyping from permissible reasons, such as employee's flawed interpersonal skills, for denying female accountant firm partnership).

Part and parcel of Anderson's alleged "resistance to supervision," was her opposition to DDC's whitewashing practices. For instance, in the January 2007 evaluation criticizing Anderson, Cohen cites as an example of plaintiff's resistance to supervision her refusal to re-work the "D.N." memo so as to eliminate the most serious charge. As the record makes clear, Anderson objected to re-working the "D.N." memo because she thought that defendants were shoving under the rug serious wrongdoing. It was in the context of her opposition to re-working the "D.N." memo that Anderson spoke more generally about DDC practices, i.e. such as, that complainants "are not getting justice," and the DDC is "not fulfilling our mandate." (See above at 5) Disentangling the permissible from the impermissible reasons for firing Anderson is a factual matter for the jury. See Morris, 196 F.3d at 110.

23

Another material issue of fact precluding summary judgment is whether defendants tried to induce Anderson's insubordination by refusing to remove her from Cohen's supervision in order to have a pretext for firing her.  If that is true, insubordination would not be the real reason for firing her.  "Where the employer provokes a reaction from an employee, that reaction should not justify a decision to impose a disproportionately severe sanction." Sumner v. United States Postal Service, 899 F.2d 203, 210 (2d Cir. 1990) (identifying provocation by the employer as a factor supporting finding of pretext) (citing Jahil v. Avdel Corp., 873 F.2d 701, 709 (3rd Cir. 1989), cert. denied, 493 U.S. 1023 (1990)); see also Rolon, 2008 WL 4700705 *22 ("A reasonable jury could determine that plaintiff was denied an alternative [i.e., transfer to a different police squad] and that this contributed to an aggregation of incidents constituting adverse employment action").

As noted, defendants denied Anderson's repeated requests for a transfer, although they readily gave them to other attorneys.  They allowed a dysfunctional situation to fester and one of their employees to visibly suffer.  Defendants did so to teach Anderson a lesson, or, in the words of Cahill,  "I can't do that because that is exactly what she wants."  (Bratton 92-93)  A reasonable jury could find that defendants forced Anderson to stay with Cohen, knowing they could count on her resisting Cohen's supervision, to the point where they would have a pretext for firing her and obscure their true illegitimate reason.

## II.          DEFENDANTS TERMINATED ANDERSON BECAUSE OF HER RACE AND NATIONAL ORIGIN

Anderson's race and national origin were contributing and motivating factors in defendants' hostile treatment toward Anderson that culminated in her discharge.

24

### 1.    Inference of Discrimination

Under the well-established <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973),

burden-shifting analysis, only the fourth prong of the <u>prima facie</u> test for proving discrimination

is in dispute, namely did defendants terminate Anderson's employment under circumstances

giving rise to an inference of discrimination.

Circumstances giving rise to an inference of discriminatory motive include actions or

remarks made by decisionmakers or non-decisionmakers that could be viewed as reflecting a

discriminatory animus.  See <u>Tomassi v. Insignia Financial Group, Inc.</u>, 478 F.3d 111, 115 (2d

Cir. 2007) (in reversing summary judgment, holding that supervisor's numerous age-based

remarks, along with other evidence, was sufficient to sustain reasonable finding that dismissal

motivated at least in part by age); <u>Chervoka v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 91 (2d

Cir.1996) ("[A]ctions or remarks made by decisionmakers that could be viewed as reflecting a

discriminatory animus" can give rise to an inference of discrimination); <u>Ostrowski v. Atlantic

Mut. Ins. Cos.</u>, 968 F.2d 171, 182 (2d Cir. 1992) ("'[S]tray' remarks in the workplace by persons

who are not involved in the pertinent decisionmaking process ... may suffice to present a prima

facie case ... and may indeed persuade the factfinder that the plaintiff has carried his or her

ultimate burden of persuasion.")

Cohen's numerous denigrating remarks about blacks and minority groups and her

disparate treatment of black employees (<u>see</u> above at 10-11) reflect a discriminatory animus.

Defendants try to minimize the significance of Cohen's remarks and conduct by pointing out that

she was not the decisionmaker with respect to Anderson's termination. (Def. Mem. at 18-19)

However, it is well-established that a Title VII plaintiff is entitled to succeed, "'even absent

25

evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the ... process.'" Holcombe v. Iona College, 521 F.3d 130, 143 (2d Cir. 2008) (quoting Bickerstaff v. Vassar College, 196 F.3d 435, 450 (2d Cir. 1999)).

Cohen certainly played a meaningful role in the decision to fire Anderson. Wolfe and Spokony relied on Cohen to inform them about Anderson's situation. Cohen's influence over the process is seen by the fact that only one day after Cohen's January 25, 2007 letter requesting a counseling session for Anderson, Wolfe ordered Spokony to set one up, and one day after receiving Cohen's April 11, 2007 fax, Wolfe and Spokony recommended Anderson's termination. When the Justices required more information about "H" before making a decision on Anderson's termination, Spokony spoke only to Cohen. (Spokony 163)

Defendants argue that no inference of discrimination can be drawn unless the biased statements of the subordinate involved in the employment decision are "link[ed] ... with the sued-upon employment decision." Def. Mem. at 18 (quoting Crader v. Concordia Coll., 724 F. Supp. 558, 764 (N.D. Ill. 1989)). However, Crader held that "linked with" proof was only necessary to show "direct evidence" of discrimination, not to raise an inference of discrimination under McDonnell Douglas. In fact, Crader denied summary judgment under a pretext analysis.

In Fullard v. City of New York, 274 F. Supp.2d 347, 357 (S.D.N.Y. 2003), also relied upon by defendants, the court stated that "[t]he discriminatory animus of intermediate supervisors who have input in the decisionmaking process will not give rise to liability if the supervisor with final authority bases an adverse employment action *exclusively on an*

26

*independent evaluation*." (Emphasis added). Defendants, here, did not conduct an independent evaluation. The Justices relied solely on the information Spokony and Wolfe provided them, which had been funneled to them by Cohen.[8]

### 2.      Pretext

In proving pretext, a plaintiff must show that an impermissible reason was a motivating factor in the decision, "whether or not it was the sole cause." Gordon v. New York City Board of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (citing Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993) (a violation occurs when ever there is a 'retaliatory animus, even if valid objective reasons for the discharge exist')). See also Penta v. Sears Roebuck, Co., 01-CV-2788 (SJ), 2003 WL 21143071 *7 (E.D.N.Y. May 12, 2003) (collecting cases).

As discussed above at 24, plaintiff has presented triable issues of fact that defendants induced Anderson's alleged insubordination. See Sumner, 899 F.2d at 210. Such evidence of pretext, along with the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom, is sufficient to create triable issues of fact that defendants' explanation for firing Anderson was pretextual. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000).

---

[8]Assuming that the "same actor inference" applies in Title VII actions, see Feingold v. New York, 366 F.3d 138, 155 n. 15 (2d Cir. 2004), it is inapplicable here because there is no evidence that Cahill and Spokony helped Anderson get a promotion in or about 2002. See Pl. 56.1, ¶ 8. Moreover the five year gap between Anderson's hiring in 2001 and the adverse actions in 2006 and 2007 is too great to support an inference of non-discrimination. See Nanton v. City of New York, No. 05 CIV. 8989(DLC), 2007 WL 2319131 (S.D.N.Y. Aug. 10, 2007).

III.                     **DEFENDANTS SUBJECTED ANDERSON TO
                         A HOSTILE WORK ENVIRONMENT**

Anderson was subjected to an unlawful hostile work environment on the basis of her race

and national origin, as well as her protected speech.  See Feingold, 366 F.3d at 151 (citing Cruz

v. Coach Stores, Inc., 202 F.3d 560, 572 (2d Cir. 2000) (stating one type of hostility can

exacerbate the effect of another, and such aggravating harm is legally cognizable)).

Assuming that under federal law the harassment that Anderson experienced did not rise to

a hostile work environment, under the New York City Human Rights Law ("HRL") it did.  The

HRL was amended in 2005 by the Local Civil Rights Restoration Act of 2005 (Local Law 85).

The Restoration Act amended the construction provision of the HRL to read:

> The provisions of this title shall be construed liberally for the accomplishment of
> the uniquely broad and remedial purposes thereof, regardless of whether federal or
> New York State civil and human rights laws, including those laws with provisions
> comparably-worded to provisions of this title, have been so construed.

Local Law 85, § 7.  See Williams v. NYC Housing Auth., __ N.Y.S.2d __, 2009 WL 173522

(N.Y.A.D 1ˢᵗ Dep't, Jan. 27, 2009) (discussing statutory changes made by Restoration Act).

Consistent with its broad remedial purpose, the Restoration Act has a more protective

standard for determining workplace harassment than federal and New York State law.  Federal

law requires that harassment be "severe or pervasive" to be actionable.  See Harris v. Forklift

Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations omitted).  Under the amended HRL,

however, the "severity" and "pervasiveness" of the harassment applies only to "consideration of

the scope of permissible damages, but not to the question of liability."  Williams, 2009 WL

173522 *7 (citing Farrugia v. No. Shore Univ. Hosp., 13 Misc.3d 740, 748-49, 820 N.Y.S.2d 718

(Sup. Ct., N.Y. Co. 2006)); accord Selmanovic v. NYSE Group, Inc., No. 06 Civ. 3046(DAB),

2007 WL 4563431 *4 (S.D.N.Y. Dec. 21, 2007).    As stated by the First Department,

> For HRL liability ... the primary issue for a trier of fact in harassment cases, as in
> other terms-and-conditions cases, is whether the plaintiff has proven by a
> preponderance of the evidence that she been treated less well than other
> employees because of her gender.

Williams, 2009 WL 173522 * 8.  Defendants can only avoid liability under the City HRL by

proving that "the conduct complained of consists of nothing more than what a reasonable victim

of discrimination would consider 'petty slights and trivial inconveniences.'" Id. *9.

In Williams, the court observed that the plaintiff's alleged harassment consisted of sex-

based remarks on one occasion not directed to her, and perceived by her as being in part

complementary to a co-worker.  The court held that the comments were nothing more than"petty

slights or "trivial inconveniences," and therefore, not actionable.  Id.

The negative actions, humiliating treatment, and threatened and realized disciplinary acts

to which Anderson was subjected are vastly more serious than the 'petty slights and trivial

inconveniences" described in Williams, and are actionable under the HRL.

29

## **<u>CONCLUSION</u>**

For the reasons set forth above, defendants' motion for summary judgment should be denied in its entirety.

Dated: February 4, 2009

Respectfully submitted,

Beranbaum Menken Ben-Asher & Bierman LLP

By: _____/s/_____

John A. Beranbaum   (JB-7944)
Attorney for Plaintiff
80 Pine Street, 32nd Floor
New York, New York 10005
(212) 509-1616

30