UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X

CHRISTINE C. ANDERSON,

          Plaintiff,

  - against -

THE STATE OF NEW YORK, THE
OFFICE OF COURT ADMINISTRATION
OF THE UNIFIED COURT SYSTEM,
THOMAS J. CAHILL, in his official and
individual capacity, SHERRY K. COHEN,
in her official and individual capacity, and
DAVID SPOKONY, in his official and
individual capacity,

          Defendants.

----------------------------------------------------X

**OPINION AND ORDER**

**07 Civ. 9599 (SAS)**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/27/09

SHIRA A. SCHEINDLIN, U.S.D.J.:

       Plaintiff Christine Anderson brings suit against defendants[1] pursuant

to Title VII of the Civil Rights Act of 1964 ("Title VII"),[2] 42 U.S.C. § 1981

("section 1981"), 42 U.S.C. § 1983 ("section 1983"), New York State Executive

Law § 296, and state common law.  Plaintiff claims, under both federal and state

---

    [1]    Defendants are two public entities – the State of New York ("NYS")
and the Office of Court Administration of the Unified Court System ("OCA") –
and three individuals – Thomas Cahill, Sherry Cohen and David Spokony.

    [2]    Codified at 42 U.S.C. § 2000e *et seq.*

law, that she was unlawfully terminated and subjected to a hostile work environment because of her race (African American), color (black), and national origin (Jamaican).[3]  Plaintiff further claims that defendants: deprived her of the right to make and enforce contracts; unlawfully retaliated against her for having exercised her constitutional right to free speech; violated her Fourteenth Amendment rights to due process and equal protection by discriminating against her; and that defendants NYS and OCA breached a state collective bargaining agreement.  In her request for relief, plaintiff seeks, *inter alia*, money damages and the appointment of a federal monitor to oversee the day-to-day operations of the Supreme Court of the State of New York, Appellate Division, First Judicial Department ("First Department"), Departmental Disciplinary Committee ("DDC"). Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking to dismiss this action in its entirety.  For the following reasons, defendants' motion is granted in part and denied in part.

## I.   BACKGROUND

### A.   The DDC

The DDC is a committee within the New York State Unified Court

---

[3]     Plaintiff was born in Jamaica, West Indies, and has black, Asian and white ancestry.  For the purposes of this action, she considers herself to be African-American.  *See* Second Amended Complaint ("Cmpl.") ¶ 11.

System responsible for investigating complaints and grievances against attorneys for alleged misconduct in the course of representing members of the public.[4]  On February 1, 2001, Anderson was hired as a Principal Attorney by the DDC to investigate claims of attorney misconduct.[5]  Defendant Thomas Cahill was Chief Counsel of the DDC while Anderson worked there.[6]  As head of the DDC, Cahill oversaw the work of the DDC and set policy in close coordination with the DDC Policy Committee, the governing body responsible for the overall functioning of the DDC.[7]  Defendant Sherry Cohen has worked at the DDC since 1993 and became First Deputy Chief Counsel in 2003.[8]  Cohen supervises the day-to-day operations of the DDC and reviews its legal work.[9]  Defendant David Spokony is the Deputy Clerk of the First Department Clerk's Office and is responsible for managing the day-to-day operations of the First Department's Clerk's Office.[10]

---

[4]     *See id.* ¶ 17.

[5]     *See id.* ¶ 20.

[6]     *See* Defendants' Statement Pursuant to Local Rule 56.1 ("Def. 56.1") ¶ 6.

[7]     *See id.*

[8]     *See id.* ¶ 4.

[9]     *See id.*

[10]    *See id.* ¶ 7.

## B.  Plaintiff's Employment at the DDC

From early 2001 through early 2003, plaintiff's work was reviewed and supervised by her caseload supervisor, Judith Stein.[11]  Once Stein approved a recommendation made by plaintiff, it was sent to Cahill for his review and approval.[12]  After Cahill approved the recommendation, it was sent to the Policy Committee which would decide on the discipline to be imposed.[13]  In the Spring of 2003, Cohen assumed the position of First Deputy to Chief Counsel Cahill.[14]  Shortly thereafter, Cohen became Anderson's supervisor.[15]

Starting in 2005, Anderson made repeated complaints to Cahill and Cohen about the DDC's failure to vigorously prosecute complaints against attorneys accused of misconduct, particularly where the "respondents were either themselves politically connected or they had attorneys who used to work for us."[16]  Anderson expressed her concern about improper DDC practices in connection

---

[11]    *See* Cmpl. ¶ 26.

[12]    *See id.* ¶ 27.

[13]    *See id.*

[14]    *See id.* ¶ 28.

[15]    *See id.* ¶ 29.

[16]    Deposition of Christine Anderson ("Anderson Dep."), Ex. 1 to the Affirmation of John A. Beranbaum ("Beranbaum Aff."), plaintiff's counsel, at 82.

4

with at least nine cases in which she believed the DDC treated attorneys too leniently.[17] It was one case in particular, the case of "H.," that permanently soured the relationship between Anderson and Cohen.

In September 2005, after a year-long investigation, Anderson completed a proposed report, recommending the admonition of H. for misrepresentation and commingling of client funds.[18] Stein had approved Anderson's recommendation, as had Cahill after a paragraph was inserted at Cahill's request.[19] H. was represented by a former staff attorney at the DDC. After reviewing Anderson's admonition memorandum, Cohen decided that it was too harsh and re-wrote it.[20] Anderson told Cohen that it was improper to revise the memorandum to skew the end result and accused Cohen of trying to "whitewash" the case.[21] Cohen, who was offended by Anderson's accusation, reported what

---

[17]   *See id.* at 81, 83-85, 86-87, 102, 120-22, 128, 129.

[18]   *See id.* at 76-77.

[19]   *See id.* at 77.

[20]   *See id.*

[21]   *See id.* at 77-78; Deposition of Sherry Cohen ("Cohen Dep."), Ex. 5 to the Beranbaum Aff., at 64-66.

Anderson said to Cahill.[22]  Cohen then re-wrote the memorandum, removing the most serious finding that H. made misrepresentations to the DDC and diluting the allegations of commingling.[23]  Cohen submitted the revised memorandum to the Policy Committee in May 2006.[24]

## C.     The July 2006 Incident

After the matter of H. concluded, issues continued to arise between Anderson and Cohen.[25]  One such incident involved the purchase of a paper shredder.  Cohen thought that Anderson was planning to buy a paper shredder for the office without prior approval.[26]  Cohen raised her voice during a telephone conversation in which she forbade Anderson from making this purchase.[27]  The following Monday, July 24, 2006, Cohen entered Anderson's office and closed the door.[28]  Cohen resurrected the shredder issue and asked Anderson whether she had

---

[22]     *See* Deposition of Thomas Cahill ("Cahill Dep."), Ex. 3 to the Beranbaum Aff., at 106.

[23]     *See* Anderson Dep. at 77.

[24]     *See* Declaration of David Spokony ("Spokony Decl."), Ex. E, at 2.

[25]     *See* Def. 56.1 ¶ 12.

[26]     *See id.*

[27]     *See id.*

[28]     *See id.* ¶ 13.

destroyed, or was planning to destroy, case documents.[29] Anderson then got up and moved past Cohen toward the door so she could leave to meet with a complainant.[30] Anderson claims that when she reached for the door handle, Cohen grabbed her hand, dug her nails into Anderson's wrist, and said: "You're not leaving this office."[31] Anderson retreated to the far side of her desk and told Cohen that it would be best, for both of them, if Cohen left Anderson's office.[32] After some hesitation, Cohen stated, "Now I am leaving your office," and slammed the door behind her.[33] At her deposition, Cohen did not specifically recall whether there was any physical contact between them but conceded that their hands may have touched.[34]

---

[29]     *See* Plaintiff's Response to Defendants' Statement Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶ 13.

[30]     *See id.*

[31]     *Id.* Anderson claims that although the wound was not deep, there was some bleeding, which Anderson washed and bandaged by herself. *See* Anderson Dep. at 56. Defendants note that Anderson was able to go about her business the rest of the day. *See* Incident Report, Ex. B to the Spokony Decl., at 2.

[32]     *See* Def. 56.1 ¶ 13.

[33]     *Id.*

[34]     *See id.*

After the July 2006 incident, Anderson asked Cahill to take disciplinary action against Cohen.[35]  When he failed to do so, Anderson met with former First Department Court Clerk Catherine O'Hagan Wolfe on August 8, 2006.[36]  At that meeting, Anderson gave Wolfe two written reports recounting the July incidents.[37]  Anderson told Wolfe that she did not want Cohen to continue as her supervisor, which she believed to be a reasonable request given the availability of Stein as a supervisor.[38]  Anderson informed Wolfe that Cohen's hostility stemmed from disagreements between Anderson and Cohen over the handling of some cases to the perceived detriment to complainants.[39]

At their meeting, Anderson verbally advised Wolfe that the DDC favored certain well-connected respondents and attorneys through lenient treatment otherwise known as "whitewashing," and that such whitewashing tarnished the mission of the DDC.  Anderson told Wolfe that she previously

---

[35]   *See* Anderson Dep. at 88.

[36]   *See id.* at 89.

[37]   *See id.* at 92.   The two incidents include the telephone call in which Cohen raised her voice and the office incident.

[38]   *See* Deposition of Catherine O'Hagan Wolfe ("Wolfe Dep."), Ex. 9 to the Beranbaum Aff., at 93.

[39]   *See* Anderson Dep. at 93 ("I have seen incidents of which I disapprove where the complainants are not being served.").

8

complained to Cohen and Cahill about whitewashing in some cases.[40]  In

particular, Anderson reported that a former DDC attorney, in her role as

respondents' counsel, was trying to improperly influence the disposition of cases,

acting as "one of the cogs in the wheel of trying to subvert the mission of our

office . . . ."[41]  In sum, Anderson stressed to Wolfe that "complainants were not

being served."[42]

　　　　　Wolfe instructed Spokony to set up a fact-finding mediation panel

consisting of Spokony and two other court managers, Sara Jo Hamilton and Pat

---

[40]　　　For example, Anderson spoke out once again against DDC practices
in the course of working on the case of "D.N."  In November and December 2006,
Cohen and Cahill rejected Anderson's admonition of D.N. for intentional
misrepresentation.  With Cahill's concurrence, Cohen insisted that D.N. be
admonished for a lesser violation.  *See* Anderson Dep. at 84, 98-99.  When
Anderson objected to eliminating the more serious charge, Cohen removed her
from the case and re-wrote the memorandum herself.  *See id.*  Anderson
complained to Cohen and Cahill that the case of D.N. was symptomatic of the
DDC not fulfilling its mandate.

> I went and I reported that to Cahill and I said to Cahill, I do
> not like the way selective respondents are treated, we are
> not fulfilling our mandate, we are shortchanging the public.
> I said, think of these poor people, these complainants who
> are not getting justice.  I said, we are not fulfilling our
> mandate.

*Id.* at 85.

[41]　　　*Id.*  at 98.

[42]　　　*Id.*  at 95.

Finnegan.[43] On September 12, 2006, the panel interviewed Anderson and Cohen

separately.[44] Anderson told the panel of the July 2006 incident, complained about

Cohen's temperament, and requested a different supervisor.[45] Cohen also gave her

account of the July 2006 incident and acknowledged that she was responsible for

the unfortunate incident.[46] After the interviews were conducted, and written input

was submitted by the panel members, Spokony recommended that Cohen: (1)

apologize to Anderson for raising her voice and for the physical contact in

Anderson's office, and (2) attend a management skills course.[47] Because Spokony

found that the supervisor/subordinate relationship could be reestablished, he

rejected Anderson's request to have Cohen removed as her supervisor.[48] Finally,

Spokony concluded that Anderson's complaint did not raise an issue of class

---

[43]     *See* Deposition of David Spokony ("Spokony Dep."), Ex. 8 to the Beranbaum Aff., at 20.

[44]     *See* 9/26/06 Memorandum from Spokony to Wolfe ("Spokony Report"), Ex. B to the Spokony Decl., at 3.

[45]     *See id.* at 4.

[46]     *See id.* at 5.

[47]     *See id.* at 3.

[48]     *See id.* at 5-6. Although one of the panel members suggested that Anderson could be supervised by a different attorney, Wolfe believed that the attorney lacked the appropriate supervisory skills. *See* Wolfe Dep. at 71.

bias.[49] In a letter to Anderson's former counsel, Wolfe stated that she accepted

Spokony's findings and recommendations on September 28, 2006.[50]

Anderson appealed the Spokony Report to Presiding Justice John

Buckley on the ground that the remedial measures suggested by Spokony – a

mandated management skills course for Cohen and an apology to Anderson – were

not commensurate with the gravity of Cohen's misconduct.[51] In her Appeal,

Anderson alleged that Cohen acted "out of bias toward [her] as a person of color

and this is reflected in her dealings with persons of color, or those whom she

regards as objectionable, for example, persons she regards as overweight."[52] In a

letter dated October 24, 2006, Justice Buckley affirmed the Spokony Report,[53]

finding "that the recommendations set forth in the report are proportionate to the

---

[49]    *See* Spokony Report at 6 ("None of the words or actions used by Ms. Cohen were motivated by bias. Nothing in Ms. Anderson's account reflected that she was singled out unlawfully.").

[50]    *See* 9/29/06 Letter from Wolfe to Gary Phelan, plaintiff's former counsel, Ex. B to the Spokony Decl., at 7.

[51]    *See* 10/13/06 Appeal From Decision of the Appellate Division, First Department Matter of Christine C. Anderson, Esq. Re: Sherry K. Cohen ("Appeal"), Ex. B to the Spokony Decl., at 9.

[52]    *Id.* at 11.

[53]    *See* 10/24/06 Letter from Presiding Justice Buckley to Phelan, Ex. B to the Spokony Decl., at 13 ("The Clerk of the Court's acceptance of the Deputy Clerk of the Court's report is affirmed.").

complaint and appropriate to restore a professional relationship between Ms.

Anderson, the subordinate, and Ms. Cohen, the supervisor."[54]  With regard to race

discrimination, Justice Buckley found "no evidence in either Ms. Anderson's

account of Ms. Cohen's conduct or the investigation that supports a claim of racial

bias."[55]

### D.    Subsequent Retaliation Against Anderson

After the issuance of the Spokony Report, Anderson alleges that she

was subjected to a series of negative job actions.  First and foremost, Anderson's

requests to have Cohen removed as her supervisor were repeatedly rejected by

Cahill without explanation.[56]  Furthermore, at Wolfe's direction, Cohen began

taking notes of her observations of and interactions with Anderson, *e.g.*,

documenting when Anderson left work early.[57]  Cohen also began to micro-

manage Anderson's work and assigned her ministerial duties typically performed

---

[54]     *Id.* at 12.

[55]     *Id.* at 13.

[56]     *See* 10/20/06 E-mail from Anderson to Cahill, Ex. C to the Spokony
Decl., at 1.

[57]     *See* Wolfe Dep. at 135.

by paralegals.[58]  Starting in October 2006, Anderson was required to meet with

Cohen approximately every other week.  At one such meeting, Cohen allegedly

referred to Anderson as "silly" and "stupid."[59]

On November 1, 2006, after conferring with Wolfe, Cohen sent a

"counseling memorandum" to Anderson for canceling a meeting at the last

minute.[60]  On January 25, 2007, Cohen requested Wolfe's permission to hold a

"counseling session" with Anderson for "her demonstrated refusal to take steps to

restore the supervisor's subordinate relationship in accordance with David

Spokony's report . . . ."[61]  This request came one day after Anderson's attorney

sought confirmation as to whether Cohen attended the management skills course

---

[58]    *See* 2/19/07 Answer to Statement Set Forth in Counseling Meeting
and Memorandum ("Answer"), Ex. D to the Spokony Decl., at 7 ("Among
numerous examples [of harassment] was Ms. Cohen's new practice of asking for
information as to an investigation, by voice mail, repeating that precise question
via email and, again, at a meeting in her office.  After six years working as a
principal attorney and conducting investigations, Ms. Cohen has now recently
begun to instruct me, via email, on how to conduct an investigation.  Such conduct
amounts to a virtual stalking of myself, by Ms. Cohen, and is plainly harassment
of me.").

[59]    Anderson Dep. at 153.

[60]    Cohen Dep. at 182; 11/1/06 Memorandum from Cohen to Anderson,
Ex. 12 to the Beranbaum Aff., at DDC 1550 ("Your failure to keep yesterday's
appointment in accordance with my October 17, 2006 email and to otherwise
request an alternative appointment is not acceptable office practice.").

[61]    Cohen Dep. at 215.

mandated in the Spokony Report.[62]  On January 30, 2007, Cohen gave Anderson

her first partially negative evaluation.[63]  Anderson received an "Unsatisfactory" in

the category "Responsive to supervision and direction from superiors."[64]  In the

Comments section of the Evaluation, Cohen wrote that Anderson "needs to take

steps to restore supervisor-subordinate relationship" and that she "must stop

communicating hostility."[65]  This was the first negative evaluation Anderson

received after five years of consecutively excellent performance evaluations.[66]

At Wolfe's direction, Spokony scheduled a counseling session with

Anderson for February 6, 2007.[67]  The day before the scheduled meeting,

Anderson notified Spokony that she would not be able to attend for "health

reasons."[68]  Spokony informed Anderson that he was treating her failure to attend

---

[62]     *See* Answer at 3.

[63]     *See* Performance Evaluation, Ex. 12 to the Beranbaum Aff., at DDC
1509-11.

[64]     *Id.* at DDC 1509.

[65]     *Id.* at DDC 1510.

[66]     *See* Answer at 3.

[67]     *See* Spokony Dep. at 101.

[68]     *Id.*

14

as "insubordinate default, an act which can lead to disciplinary action."[69]  At the counseling session, held on February 9, 2007, Spokony admonished Anderson for resisting Cohen's supervision.[70]  Spokony's Counseling Memorandum, which was placed in Anderson's permanent personnel folder, stated that it could be used in any subsequent disciplinary action against her.[71]  Spokony did, in fact, use his Counseling Memorandum to support his recommendation for Anderson's termination.[72]

## E.    The Court's Decision to Terminate Anderson

Following the First Department's instructions to Anderson, as conveyed in the Spokony Report, Anderson's hostility toward Cohen became apparent.  In an e-mail dated October 30, 2006, Anderson made the following remarks to Cohen:

---

[69]     *Id.* at 102.

[70]     *See* 2/9/07 Memorandum from Spokony to Anderson, Ex. D to the Spokony Decl. ("Counseling Memorandum"), at 1.

[71]     *See id.*

[72]     *See* 4/12/07 Memorandum from Spokony to Acting Presiding Justice Peter Tom and the other Justices of the DDC Liaison Committee ("4/12/07 Memorandum"), Ex. E to the Spokony Decl., at 1 (attaching his Counseling Memorandum as an example of "the fruitless effort to restore what was once a proper professional relationship" between Anderson and Cohen).

1.  You expressed "disappointment" with what you have characterized as my failure to honor a "mutual agreement" to be collegial.  Speaking for myself, I made no such agreement . . . .

2.  I regret that there was no instruction that you be removed from contact with me, inasmuch as your e-mail constitutes a continuation of the same misconduct for which you were admonished. . . .

3.  I shall not address your remarks, of a highly subjective nature, with respect to my demeanor. You have exhibited an "emotional response" of a physical nature, which you have admitted.  It is not surprising, therefore, that I would not be comfortable to sit, alone in a room with you, in close physical proximity, thereby risking the possibility of a repetition of that behavior.[73]

There are a host of other e-mails in which Anderson's hostility toward, and refusal to cooperate with, Cohen are evident.  For example, on November 13, 2006, Anderson refused to get a file for Cohen, informing Cohen that she "may retrieve the respondent's original file from that office."[74]  On November 20, 2006, Anderson refused to provide Cohen with a translation of her shorthand notes,

[73]  10/30/06 E-mail from Anderson to Cohen, Ex. C to the Spokony Decl., at 6.

[74]  11/13/06 E-Mail from Anderson to Cohen, Ex. C to the Spokony Decl., at 7.

offering her only a "summary transcription."[75]  In an e-mail dated December 28,

2006, regarding an attorney disciplinary matter, Anderson stated:

> With respect to N, you have now taken on to yourself to re-
> write an admonition, which was previously signed off on.
> . . . In light of the foregoing, I do not believe it will be
> helpful to sit down for a meeting. . . . Naturally, I shall not
> refuse to sit down with Andral Bratton and yourself, but I
> see very little value to the expenditure of this time.[76]

In that same e-mail, Anderson criticized Cohen for approaching her in the

hallway.[77]  On March 15, 2007, Anderson described a deposition recommended by

Cohen as a "waste of time and money."[78]  Finally, on May 9, 2007, Anderson sent

an e-mail "to express, in the clearest possible terms, [her] distaste and professional

disappointment with [Cohen's] performance at a meeting at 12:28 p.m. today . . .

."[79]  In that e-mail, Anderson states: "I will not be spoken to in the manner in

which you did and be subjected to the type of conduct with which you deported

---

[75]     11/20/06 E-mail from Anderson to Cohen, Ex. C to the Spokony
Decl., at 7.

[76]     12/28/06 E-mail from Anderson to Cohen, Ex. C to the Spokony
Decl., at 9.

[77]     *See id.*

[78]     3/15/07 E-mail from Anderson to Cohen, Ex. C to the Spokony Decl.,
at 12.

[79]     5/9/07 E-mail from Anderson to Cohen, Ex. C to the Spokony Decl.,
at 15.

yourself in that meeting."[80]  Anderson then chides Cohen when she states that she

cannot prevent Cohen from pursuing a "dead end."[81]  Anderson concludes the e-

mail: "I, however, will not be subjected to the sort of treatment in which you

indulged today and I am putting you on notice accordingly."[82]

　　　　　Anderson's hostility toward Cohen continued after the February 9,

2007 counseling session, as documented by e-mails forwarded by Cohen to Wolfe

on April 11, 2007.[83]  At Wolfe's direction, Spokony provided these e-mails and

other relevant correspondence to the Acting Presiding Justice and the other

Justices of the Court's Liaison Committee.[84]  In his April 12, 2007 Memorandum,

Spokony states that Anderson is "subject to termination" because she "continues

to resist appropriate supervision, despite counseling and other efforts to restore a

proper supervisor/subordinate relationship."[85]

---

[80]　　*Id.*

[81]　　*Id.*

[82]　　*Id.*

[83]　　*See* Spokony Decl., Ex. C, at 11 (enclosing e-mails dated 1/18/07, 2/26/07, 2/28/07, 2/29/07, 3/15/07, 3/29/07, 4/4/07 and 4/10/07).

[84]　　*See* 4/12/07 Memorandum.

[85]　　*Id.*

18

On May 18, 2007, Anderson postponed a counseling session with Spokony scheduled for May 23, because she was allegedly interviewing new counsel.[86] On that same day, Anderson submitted a Non-Contract Grievance Form to the First Department, which included her allegations of whitewashing and Cohen's assault and also mentioned unspecified instances of "disparate treatment."[87] Anderson's grievance was never addressed because she was terminated shortly after its filing.

The final decision to terminate Anderson was made with the approval of Presiding Justice Jonathan Lippman.[88] Shortly after Justice Lippman commenced his duties as Presiding Justice in May 2007, Wolfe apprised him of the employment situation with Anderson and the DDC.[89] Justice Lippman acknowledged receipt of the documents appended to Spokony's April 12, 2007 Memorandum and discussed the Anderson matter with Spokony in some detail.[90]

---

[86] *See* 5/18/07 E-mail from Anderson to Spokony, Ex. D to the Spokony Decl., at 11.

[87] *See* Non-Contract Grievance Form, Ex. F to the Spokony Decl., at 4.

[88] *See* Declaration of Presiding Justice Jonathan Lippman ("Lippman Decl.") ¶ 4.

[89] *See id.*

[90] *See id.* ¶ 5.

Justice Lippman noted that no objection to Anderson's proposed termination had

been raised by any of the Justices of the DDC Liaison Committee (the

"Justices").[91] Justice Lippman also discussed the matter with former Presiding

Justice Peter Tom.[92] Based on Spokony's recommendation and discussions with

his fellow Justices, Justice Lippman concluded that Anderson's ongoing resistance

to the instructions contained in the Spokony Report constituted insubordination

warranting her dismissal.[93] However, before Anderson was terminated, the

Justices of the Liaison Committee asked Spokony to check into Cohen's handling

of the H. matter given Anderson's allegations.[94] Spokony did so – by reading the

H. file and discussing the matter with Cohen – and reported to the Justices that

Cohen had acted properly.[95] The Justices then approved the final decision and

---

[91]     *See id.*

[92]     *See id.* ¶ 6.

[93]     *See id.* ¶ 7.

[94]     *See* Def. 56.1 ¶ 39.

[95]     *See* 5/24/07 Memorandum from Spokony to Justices, Ex. E to the Spokony Decl., at 2 ("The file in the 'H' reflects that this matter was properly investigated and evaluated. The final 20-page recommendation to the Disciplinary Committee was made on the basis of discretion, experience and considered professional prosecutorial judgment.").

Justice Lippman authorized Spokony to terminate Anderson's employment.[96]

Anderson was terminated effective June 8, 2007.[97]

### F.  Plaintiff's Evidence of Racial Animus [98]

At her deposition, Anderson acknowledged that she has no evidence

of racial bias on the part of Spokony and Cahill.[99]  Plaintiff attempts to show racial

bias on Cohen's part by referencing several racist comments she allegedly made.

For example, Anderson testified that in 2005, in her presence and that of two other

DDC employees, Cohen remarked that she hated homeless people because they are

---

[96]     *See* Lippman Decl. ¶ 8.

[97]     *See* Def. 56.1 ¶ 35.  Although Cohen was aware that Anderson might be terminated, she was not notified of her actual termination until it occurred. *See id.* ¶ 36.

[98]     In the Factual Background section of her Second Amended Complaint, Anderson alleges that she was discriminated against on account of her race, not her national origin. *See* Cmpl.¶ 30 ("Cohen also discriminated against Plaintiff because of her race, and against other non-white employees in the office. . . . Plaintiff was aware of a number of reports of racial discrimination and harassment by Cohen against other employees of color."). Thus, plaintiff's claims of national origin discrimination are subsumed by her claims of race and color discrimination.

[99]     *See* Anderson Dep. at 136, 139.  Anderson now attempts to qualify that concession by stating that Spokony, Cahill and Wolfe, in taking action against her, relied upon information received from Cohen, who is allegedly prejudiced against blacks and other minorities. *See* Pl. 56.1 ¶ 41.

"smelly" and that she does not like to see so many blacks in the subways.[100] In addition, Cohen allegedly told Anderson in 2006 that she wasn't happy that so many "black rappers" were moving near her vacation home, "buying property with their gold chains, with all those gold chains."[101] Plaintiff does not link these comments with the decision to terminate her employment in June 2007.

Plaintiff also attempts to show racial animus on Cohen's part by recounting the experiences of other DDC employees of color. In particular, Anderson deposed two present and one former DDC employees: Nicole Corrado, Monique Hudson, and Kenneth Van Lew. Corrado testified as to her subjective belief that Cohen was racist, citing an incident where Cohen referred to her vacation home gardener as "this little Mexican guy."[102] Corrado reported her belief that Cohen was a racist to Second Deputy Counsel Bratton who, according to Corrado, did not disagree with her "at all."[103] Hudson recounted her subjective belief that Cohen discriminated against people of color including Joseph Wiggly,

---

[100]    *See* Anderson Dep. at 136-37.

[101]    *Id.* at 138, 139.

[102]    Deposition of Nicole Corrado, Ex. F to the Declaration of Wesley E. Bauman, Assistant Attorney General ("Bauman Decl."), at 61-62.

[103]    *Id.* at 71, 74.

Grace Jacobs, Nina Windfield, Marcy Sterling, and Patricia Wilson.[104]  Hudson

testified that she believed Cohen was harassing Anderson in an effort to get rid of

her.[105]  Hudson also believed that Cohen was discriminating against her by

arbitrarily enforcing DDC's time and attendance requirements.[106]

Van Lew submitted an affidavit to support his allegation that DDC

employees of color were being singled out and treated negatively by Cohen.[107]

Van Lew reportedly witnessed Cohen discriminate against employees of color "by

routinely harassing, demeaning, and micro-managing them, until they are

eventually forced out of their jobs."[108]  Van Lew also claims that Cohen treated

him differently than similarly situated Caucasian employees with regard to

schedule flexibility, sick day documentation, docking of pay, and a new computer

request.[109]  In sum, Van Lew claims that Cohen's "harassment of [him] as an

---

[104]     *See* Deposition of Monique Hudson, Ex. G to the Bauman Decl., at
22-32.

[105]     *See id.* at 49.

[106]     *See id.* at 34, 72.

[107]     *See* Deposition of Kenneth Van Lew, Ex. H to the Bauman Decl., at
64.  *See also* Affidavit of Kenneth Van Lew ("Van Lew Aff."), Ex. 10 to the
Beranbaum Aff.

[108]     Van Lew Aff. ¶ 4.

[109]     *See id.* ¶¶ 5, 6, 9, and 10.

23

African-American unquestionably forced [his] constructive discharge from the DDC."[110]

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[111] An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[112] A fact is material when it "'might affect the outcome of the suit under the governing law.'"[113] "It is the movant's burden to show that no genuine factual dispute exists."[114]

---

[110]    *Id.* ¶ 14.

[111]    Fed. R. Civ. P. 56(c).

[112]    *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[113]    *Ricci v. DeStefano*, 530 F.3d 88, 109 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

[114]    *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

24

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"[115] To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[116] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[117] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[118]

---

[115]     *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). *Accord In re September 11 Litig.*, No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

[116]     *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[117]     *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[118]     *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248-49).

25

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[119] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[120] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law."[121]

"'It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'"[122] "Courts within the Second Circuit have not hesitated to grant defendants summary judgment in such

---

[119]    *See Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir.2005)).

[120]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

[121]    *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007) (citing *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 486-87 (2d Cir. 2006)).

[122]    *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)). *Accord Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("the salutary purposes of summary judgment– avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation.").

cases where . . . plaintiff has offered little or no evidence of discrimination."[123] Indeed, "'[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'"[124]

However, greater caution must be exercised in granting summary judgment in employment discrimination cases where the employer's intent is genuinely at issue and circumstantial evidence may reveal an inference of discrimination.[125] This is so because "'[e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law.'"[126] But "'[e]ven in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment.'"[127]  "'[M]ere conclusory allegations, speculation or

---

[123]    *Alphonse v. State of Connecticut Dep't of Admin. Servs.*, No. Civ.3:02CV1195, 2004 WL 904076, at *7 (D. Conn. Apr. 21, 2004) (quotation marks and citation omitted).

[124]    *Feingold v. New* York, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu-Brisson*, 239 F.3d at 466) (alteration in original).

[125]    *See id.*

[126]    *Sadki v. SUNY Coll. at Brockport*, 310 F. Supp. 2d 506, 515 (W.D.N.Y. 2004) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (quotation marks and citation omitted, alteration in original)).

[127]    *Flakowicz v. Raffi Custom Photo Lab, Inc.*, No. 02 Civ. 9558, 2004 WL 2049220, at *8 (S.D.N.Y. Sept. 13, 2004) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).

conjecture will not avail a party resisting summary judgment.'"[128]

## B.    Discrimination Under Title VII

### 1.    Unlawful Termination

"To withstand a motion for summary judgment, a discrimination

plaintiff must withstand the three-part burden-shifting laid out by *McDonnell*

*Douglas Corp. v. Green*."[129]   "[T]he initial burden rests with the plaintiff to

establish a prima facie case of discrimination."[130]   A plaintiff meets this burden by

showing that: (1) she falls within a protected group; (2) she was qualified for the

position she held; (3) she was subject to an adverse employment action; and (4)

the adverse employment action was taken under circumstances giving rise to an

---

[128]    *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d
Cir. 2003) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)
(alteration in original)).  *Accord Cameron v. Community Aid for Retarded
Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) ("'[P]urely conclusory allegations
of discrimination, absent any concrete particulars,' are insufficient" to satisfy an
employee's burden on a motion for summary judgment.) (quoting *Meiri*, 759 F.2d
at 998) (alteration in original).

[129]    *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d
Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and
*Woodman v. WWOR-TV*, 411 F.3d 69, 76 (2d Cir. 2005) (applying *McDonnell
Douglas* framework to age discrimination claim)).

[130]    *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir.
2005).

inference of unlawful discrimination.[131]  The Second Circuit has "characterized the evidence necessary to satisfy this initial burden as 'minimal' and 'de minimis.'"[132]

Once a plaintiff establishes a prima facie case, a rebuttable presumption of unlawful discrimination arises and the burden of production shifts to the employer to proffer a "legitimate, nondiscriminatory reason" for the challenged employment action.[133]  "If the defendant articulates such a reason, 'the presumption of discrimination drops out,' and the plaintiff must 'prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'"[134]  At this final stage of analysis, courts must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"[135]  In other words, plaintiff is left with the

---

[131]     *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003); *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001).

[132]     *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).  *Accord Woodman*, 411 F.3d at 76.

[133]     *Woodman*, 411 F.3d at 76.

[134]     *Id.* (quoting *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001)).

[135]     *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000)).

final burden of proving that her race "'was the real reason' for any adverse

employment action."[136] Direct evidence is not required; circumstantial evidence

will suffice.[137]

## 2.    Hostile Work Environment

Hostile work environment claims brought under New York state law

are governed by the same standards applicable to claims brought under Title

VII.[138]  To prevail on a hostile work environment claim, a plaintiff must show:

> (1) that her workplace was permeated with discriminatory
> intimidation that was sufficiently severe or pervasive to
> alter the conditions of her work environment, and (2) that
> a specific basis exists for imputing the conduct that created
> the hostile environment to the employer.[139]

"This test has objective and subjective elements: the misconduct shown must be

'severe or pervasive enough to create an objectively hostile or abusive work

environment,' and the victim must also subjectively perceive that environment to

---

[136]    *Cross*, 417 F.3d at 248 (quoting *Schnabel*, 232 F.3d at 87).

[137]    *See Norton v. Sam's Club*, 145 F3d 114, 119 (2d Cir. 1998).

[138]    *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) ("Hostile work environment and retaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII.")

[139]    *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996) (quotation marks and citation omitted). *Accord Mack v. Otis Elevator Corp.*, 326 F.3d 116, 122-23 (2d Cir. 2003); *Alfano v. Costello*, 294 F.3d 365, 373-74 (2d Cir. 2002).

30

be abusive."[140]  Of course, the conduct creating the hostile work environment must

have been motivated by the protected  characteristic, *e.g.,* race.[141]

"As a general rule, incidents must be more than 'episodic; they must

be sufficiently continuous and concerted in order to be deemed pervasive.'"[142]

Isolated acts do not generally meet the threshold of severity or pervasiveness.[143]  In

determining whether there is a hostile work environment, courts must look at the

following factors:

> (1) the frequency of the discriminatory conduct; (2) its
> severity;  (3) whether the conduct was physically
> threatening or humiliating, or a mere offensive utterance;
> (4) whether the conduct unreasonably interfered with
> plaintiff's work; and (5) what psychological harm, if any,

---

[140]    *Id.* at 374 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21
(1993)).

[141]    *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is
axiomatic that mistreatment at work, whether through subjection to a hostile
environment or through such concrete deprivations as being fired or being denied
a promotion, is actionable under Title VII only when it occurs because of an
employee's sex, or other protected characteristic.") (citing *Oncale v. Sundowner
Offshore Servs., Inc.*, 523 U.S. 75, 79-80 (1998)).

[142]    *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Perry v.
Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

[143]    *See Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318
(2d Cir. 1999).

resulted.[144]

In sum, "a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment."[145] In considering the above factors, however, courts must keep in mind that Title VII is not a workplace "civility code."[146]

## C.    Section 1983 First Amendment Retaliation Claim

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[147]

_____

[144]    *Richards v. NYC Dep't of Homeless Servs.*, No. 05 CV 5986, 2009 WL 700695, at *7 (E.D.N.Y. Mar. 15, 2009) (quoting *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) (quotation marks and citations omitted)).

[145]    *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

[146]    *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988). *See also Ricks v. Conde Nast Publ'g, Inc.*, 92 F. Supp. 2d 338, 345 (S.D.N.Y. 2000) (conduct that is "merely offensive, unprofessional or childish is not discriminatory conduct proscribed by Title VII"); *Curtis v. Airborne Freight Co.*, 87 F. Supp. 2d 234, 250 (S.D.N.Y. 2000) (Title VII does not "protect plaintiffs from undiscriminating intimidation by bullish and abusive supervisors"); *Forts v. City of New York Dep't of Corr.*, No. 00 Civ. 1716, 2003 WL 21279439, at *4 (S.D.N.Y. June 4, 2003).

[147]    *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.[148]

      To establish a retaliation claim in violation of the First Amendment right to free speech, a plaintiff must show *first*, that the speech at issue was protected; *second*, that she suffered an adverse employment action; and *third*, that there exists a causal connection between the speech and the adverse employment action.[149] With respect to the first prong, the Supreme Court has made clear that "public employees do not surrender all of their First Amendment rights by reason of their employment."[150] "Whether public employee speech is protected from retaliation under the First Amendment entails two inquiries: (1) 'whether the

---

[148]    *See Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004).

[149]    *See Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008) (citing *Cioffi v. Averill Park Cent. School Dist.*, 444 F.3d 158, 162 (2d Cir. 2006)). *See also Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006) (rephrasing the test for a First Amendment retaliation claim as three-pronged, requiring a plaintiff to prove: "(1) [she] engaged in constitutionally protected speech because [she] spoke as [a] citizen[] on a matter of public concern; (2) [she] suffered an adverse employment action; and (3) the speech was a motivating factor in the adverse employment decision") (quotation marks and citation omitted).

[150]    *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'"[151]

The Supreme Court has stated that when a public employee makes statements pursuant to her official duties, she does not speak as a citizen for First Amendment purposes.[152]  Accordingly, "the Constitution does not insulate her communications from employer discipline" based on the employer's reaction to the speech.[153]  Thus, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."[154]  The Supreme Court has rejected the "notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties."[155]

---

[151]     *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti*, 547 U.S. at 417).

[152]     *Garcetti*, 547 U.S. at 421 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

[153]     *Id.*

[154]     *Id.* at 421-22.

[155]     *Id.* at 426 (stating that "[o]ur precedents do not support the existence of a constitutional cause of action behind every statement a public employee

"Employee expression is not a matter of public concern when it 'cannot be fairly considered as relating to any matter of political, social, or other concern to the community.'"[156] "'[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision.'"[157] "In making its determination, the court should focus on the motive of the speaker, and attempt to discern whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."[158]

If an employee spoke as a citizen on a matter of public concern, a First Amendment claim may, but does not automatically, arise. The next question is "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."[159]

_____

makes in the course of doing his or her job").

[156]   *Singh*, 524 F.3d at 372 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

[157]   *Id.* (quoting *Connick*, 461 U.S. at 147).

[158]   *Hanig v. Yorktown Cent. School Dist.*, 384 F. Supp. 2d 710, 722 (S.D.N.Y. 2005) (citation omitted).

[159]   *Garcetti*, 547 U.S. at 418 (citing *Pickering v. Board of Ed. of Township High Sch. Dist. 205, Will County*, 391 U.S. 563, 568 (1968)).

35

"This consideration reflects the importance of the relationship between the
speaker's expressions and employment. A government entity has broader
discretion to restrict speech when it acts in its role as employer, but the restrictions
it imposes must be directed at speech that has some potential to affect the entity's
operations."[160] "So long as employees are speaking as citizens about matters of
public concern, they must face only those speech restrictions that are necessary for
their employers to operate efficiently and effectively."[161] Thus, a balance has been
sought "both to promote the individual and societal interests that are served when
employees speak as citizens on matters of public concern and to respect the needs
of government employers attempting to perform their important public
functions."[162]

## III.   DISCUSSION

### A.   Discrimination Claims

#### 1.   Unlawful Termination

Plaintiff claims that she was "singled out for discriminatory and
abusive treatment," which included being summarily discharged from employment

---

[160]   *Id.*

[161]   *Id.* at 419.

[162]   *Id.* at 420.

"without cause" because of her race, color, and/or national origin.[163]  Plaintiff's unlawful termination claim fails, however, because the circumstances surrounding her discharge do not give "rise to an inference of" discrimination.[164]  Given the absence of any evidence of discrimination on the part of Spokony and Cahill, Anderson must show that Cohen tainted the First Department's termination decision with discriminatory animus.  To do this, Anderson must show that: (1) Cohen had a role in the decision-making process; (2) Cohen discriminated against Anderson because of her race, color and/or national origin; and (3) the Justices' decision-making process was influenced by Cohen's discriminatory animus.

As for the first requirement, Cohen may have influenced the termination decision, albeit indirectly, by supplying the ultimate decision makers with information about Anderson.  Both Wolfe and Spokony relied on Cohen to inform them about Anderson's employment situation.  Their reliance is evidenced by the fact that Spokony's recommendation to terminate Anderson came one day after Cohen forwarded to Wolfe numerous e-mails she received from Anderson.

---

[163]     Cmpl. ¶ 86. *See also* Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment ("Pl. Mem.") at 24 ("Anderson's race and national origin were contributing and motivating factors in defendants' hostile treatment toward Anderson that culminated in her discharge.").

[164]     *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001).

In addition, the Justices relied on information funneled to Spokony and Wolfe from Cohen. For example, when the Justices asked Spokony to investigate the matter of "H." before terminating Anderson, Spokony spoke only to Cohen. Given the significance of Cohen's input, plaintiff's unlawful termination claim is not foreclosed by the absence of "'evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process.'"[165]

With regard to the second requirement, Anderson's evidence of Cohen's discriminatory animus consists, in part, of the three statements allegedly made by Cohen in Anderson's presence. One of those statements, the statement about "smelly" homeless people, does not relate to race, color or national origin and can therefore be completely discounted. The other two remarks – about too many blacks in the subway and black rappers moving near Cohen's vacation home – are not particularly probative of discrimination for several reasons, whether or not they are categorized as "stray comments."[166]  *First*, because the comments

---

[165]  *Holcombe v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999)).

[166]  The Second Circuit has counseled against reflexively ignoring comments labeled as "stray." *See Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115-16 (2d Cir. 2007) ("Where we described remarks as 'stray,' the purpose of doing so was to recognize that all comments pertaining to a protected class are

were not made by a decision-maker, they may be considered stray comments.[167]

*Second*, the comments were temporally remote to plaintiff's termination, having allegedly been uttered in 2005 and 2006.[168] Finally, the comments were not directed toward plaintiff, and were unrelated to her discharge.[169] In sum, the race-related comments allegedly made by Cohen are insufficient to establish race discrimination with respect to Anderson's termination.

In addition to Cohen's comments, plaintiff attempts to show bias through the deposition testimony of two DDC employees, Corrado and Hudson, and an affidavit from a former DDC employee, Van Lew. Corrado and Hudson stated their subjective belief that Cohen discriminated against DDC employees of

not equally probative of discrimination and to explain in generalized terms why the evidence in the particular case was not sufficient. We did not mean to suggest that remarks should first be categorized either as stray or not stray and then disregarded if they fall into the stray category.").

[167]    *See Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992) (describing remarks as "stray" when made "in the workplace by persons who are not involved in the pertinent decisionmaking process").

[168]    *See Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 162-63 (2d Cir. 1998) (rejecting the label "stray" where decision-makers uttered age-related remarks near the time of plaintiff's discharge).

[169]    *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 n. 2 (2d Cir. 2001) (characterizing remarks as "stray" where they were "unrelated to [the plaintiff's] discharge"); *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (explaining that the label "stray" is inappropriate where "other indicia of discrimination" tie the remarks to an adverse employment action).

39

color. However, their statements are conclusory and devoid of any factual
circumstances linking Cohen to any discriminatory conduct.[170]  Van Lew, on the
other hand, provides concrete instances in which he believes he was treated less
favorably by Cohen than similarly situated Caucasian employees.[171]  The specific
instances of discrimination described by Van Lew provide some credible evidence
that Cohen's conduct toward employees of color, including Anderson, was
motivated, at least in part, by racial animus.

Assuming, then, that Anderson has shown that Cohen's conduct
toward her was racially motivated, there simply is no evidence that Cohen's racial
bias tainted the Justices' ultimate decision to terminate her.  The Justices
established a mediation panel in September 2006 in order to assess and resolve the
conflict between Anderson and Cohen stemming, in part, from the July 2006
incident.  The mediation panel interviewed Anderson separately from Cohen to
give her ample opportunity to express her point of view.  In addition to the panel's

---

[170]     *See Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000) ("[I]n an
employment discrimination action, Rule 701(b) [of the Federal Rules of Evidence]
bars lay opinion testimony that amounts to a naked speculation concerning the
motivation for a defendant's adverse employment decision."); *Minus v. West*, No.
99-CV-7229, 2003 WL 21295122, at *4 (E.D.N.Y. May 30, 2003) (holding that a
co-worker's conclusory allegation that an employer "did not want blacks in his
office" was insufficient to withstand summary judgment).

[171]     *See* Van Lew Aff. ¶¶ 5, 6, 9, and 10.

40

interviews, the Justices had a host of documents detailing Anderson's persistent campaign to avoid and discredit Cohen.[172]  While some of the information conveyed to the Justices did, in fact, come from Cohen, there is no evidence that Cohen editorialized or filtered the information she submitted in such a way as to advance any discriminatory motives.  To the contrary, Anderson's verbal and written communications, along with the attachments appended to the April 12, 2007 Memorandum, gave the Justices more than enough objective information in which to conduct an "independent evaluation" of Anderson's situation.  The Justices' final decision in favor of termination is thus not vulnerable to attack.[173]  Because plaintiff has failed to establish a prima facie case with regard to her discharge, her unlawful termination claim must be dismissed.[174]

---

[172]   *See* 4/12/07 Memorandum, Attachments 1 - 11.

[173]   *See Fullard v. City of New York*, 274 F. Supp. 2d 347, 357 (S.D.N.Y. 2003) ("The discriminatory animus of intermediate supervisors who have input in the decisionmaking process will not give rise to liability if the supervisor with final authority bases an adverse employment action exclusively on an independent evaluation.").

[174]   For purposes of this motion, the term "racial bias" includes bias based on color and/or national origin.  Similarly, the term "racial discrimination" includes discrimination based on color and/or national origin.  Even if plaintiff could establish a prima facie case of discrimination with regard to her termination, defendants have proffered a legitimate, nondiscriminatory reason for her discharge, namely, her insubordination toward Cohen.  Plaintiff attempts to rebut this explanation by arguing that "defendants induced Anderson's alleged

41

## 2. Hostile Work Environment

Anderson claims, under federal and state law, that she was subjected to a hostile work environment because of her race, color and national origin.[175] In creating a hostile work environment, Anderson alleges that defendants: accused her of refusing to follow instructions; gave her a negative performance evaluation; and subjected her to an unwarranted counseling session.[176] In addition, Cohen is alleged to have made racist remarks.[177] Negative job evaluations and increased scrutiny, without any attendant consequences such as demotion or diminution of wages, are not considered adverse employment actions which can support a hostile work environment claim.[178] Furthermore, Cohen's alleged racist remarks, which plaintiff heard over the course of several years, do not constitute pervasive

---

insubordination." Pl. Mem. at 27. The source of plaintiff's insubordination is irrelevant to the question of whether her behavior justified her termination. Plaintiff has thus failed to rebut defendants' proffered reason as a pretext for racial discrimination.

[175] *See* Cmpl. ¶ 86 (Title VII), ¶ 124 (New York State Executive Law § 296).

[176] *See id.* ¶ 86.

[177] *See supra* Part I.F.

[178] *See Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001); *Salerno v. Town of Bedford*, No. 05 Civ. 7293, 2008 WL 5101185, at *2 (S.D.N.Y. Dec. 3, 2008) ("But the mere filing of disciplinary charges against an employee, without more, does not constitute an adverse employment action.").

conduct amounting to a hostile work environment.[179]  Accordingly, plaintiff's

hostile work environment claim must be dismissed because: (1) when viewed

objectively, the conduct in issue was not sufficiently severe or pervasive to alter

the conditions of her employment;[180] and (2) there is no evidence that the conduct

occurred because of plaintiff's race, color or national origin.[181]

Anderson appears to concede the futility of her hostile work

environment claim when she states: "Assuming that under federal law the

harassment that Anderson experienced did not rise to a hostile work environment,

under the New York City Human Rights Law ("NYC HRL") it did."[182]  Plaintiff

notes that the Local Civil Rights Restoration Act of 2005 amended the HRL to

---

[179]    *See Danzer*, 151 F.3d at 56 (holding that stray remarks, without more,
cannot get a Title VII discrimination case to a jury); *Tomka v. Seiler Corp.*, 66
F.3d 1295, 1306 n.5 (2d Cir. 1995) ("It is true that isolated remarks or occasional
episodes of harassment will not merit relief under Title VII; in order to be
actionable, the incidents of harassment must occur in concert or with a regularity
that can reasonably be termed pervasive.").

[180]    In order to survive summary judgment on a claim of hostile work
environment, a plaintiff must produce evidence that "the workplace is permeated
with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe
or pervasive to alter the conditions of the victim's employment.'" *Harris v.
Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v.
Vinson*, 477 U.S. 57, 65 (1986)).

[181]    *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

[182]    Pl. Mem. at 28.

43

provide for "a more protective standard for determining workplace harassment than federal and New York State law."[183] However, because plaintiff's Second Amended Complaint alleges hostile work environment claims under federal and state law only, this new claim premised on the NYC HRL is precluded.[184] Accordingly, plaintiff's hostile work environment claims are dismissed.

In sum, Anderson's unlawful termination claim is dismissed because she has failed to establish a prima facie case and, even if she had, she has failed to rebut defendants' legitimate, nondiscriminatory reason as a pretext for unlawful discrimination. In addition, Anderson's hostile work environment claims are dismissed because the conduct of which she complains was not sufficiently severe to alter the conditions of her employment.

### 3. Section 1981

Plaintiff has brought a claim under section 1981 against all defendants, alleging that they have denied her the "rights to full and equal benefit of the laws as a result of her race with respect to the performance, modification,

---

[183]  *Id.*

[184]  *See Shaw v. Helen Hayes Hosp.*, 252 Fed. App'x 364, 366 (2d Cir. 2007) ("A party may not use his or her opposition to a dispositive motion as a means to amend the complaint."); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).

44

and termination of Plaintiff's contract and contractual employment relationship,
and with respect to the enjoyment of all benefits, privileges, terms, and conditions
of that contractual relationship."[185]  To establish a claim under section 1981,
plaintiff must show that: (1) she is a member of a racial minority group; (2)
defendants intended to discriminate against her on the basis of race; and (3) the
discrimination concerned one of the activities enumerated in section 1981[186] which
includes the right to make and enforce contracts, the right to sue, and the right "to
the full and equal benefit of all laws and proceedings for the security of persons
and property."[187]

      Plaintiff's efforts to establish the second element of a section 1981
claim – intentional discrimination on the basis of race – are subject to the same
burden-shifting analysis as intentional discrimination claims brought under Title
VII.[188]  Intentional discrimination is a necessary element of an employment

---

[185]    Cmpl. ¶ 93.

[186]    *See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085,
1087 (2d Cir. 1993).

[187]    42 U.S.C. § 1981(a).

[188]    *See Jenkins v. NYC Transit Auth.*, 201 Fed. App'x 44, 45-46 (2d Cir.
2006) (citing *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 146 (2d
Cir. 1999)).

discrimination claim under both section 1981 and Title VII.[189] Thus, "a failure to

establish sufficient evidence of discriminatory intent to survive summary judgment

on a Title VII claim is fatal to a similar claim of racial discrimination under §

1981."[190] Because plaintiff has failed to show intentional discrimination by any of

the defendants, her section 1981 claim must be dismissed in its entirety.[191]

## 4.      Section 1983

Plaintiff has brought a claim against all defendants pursuant to

section 1983 for the alleged violation of her rights under the Fourteenth

---

[189]      *See Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)
("[A] plaintiff pursuing a claimed violation of § 1981 . . . must show that the
discrimination was intentional."); *Choudhury v. Polytechnic Inst. of N.Y.*, 735 F.2d
38, 44 (2d Cir. 1984) ("We have previously indicated that the same elements
constitute a claim for employment discrimination under § 1981 as under Title
VII.") .

[190]      *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 367-68 (S.D.N.Y.
2006). *Accord Ani v. IMI Sys., Inc.*, No. 98 Civ. 8430, 2002 WL 1888873, at *20
(S.D.N.Y. Aug. 15, 2002) ("Since plaintiff's Title VII claims for disparate
treatment, hostile environment and discriminatory discharge fail as a matter of
law, necessarily his section 1981 claim and the mirror-image state-law . . . claims
are equally subject to summary judgment.").

[191]      Even if Anderson had met the second element of her section 1981
claim, she has not demonstrated that the alleged discrimination concerned one or
more of the activities enumerated in the statute (*i.e.*, make and enforce contracts,
sue and be sued, give evidence). As a result, her section 1981 claim fails as a
matter of law for this independent reason.

Amendment to the United States Constitution.[192] In particular, plaintiff claims that

her rights to equal protection and due process were violated when defendants

discriminated against her on account of her race, color, and national origin.[193]

However, Anderson's section 1983 claim must be dismissed against the

governmental entity defendants (NYS and OCA) and the individual defendants in

their official capacities on the basis of sovereign immunity under the Eleventh

Amendment.[194]

Plaintiff's only remaining claims under section 1983 are against the

individual defendants acting in their individual capacities.

> To state a prima facie case under the Equal Protection
> Clause of the Fourteenth Amendment, a plaintiff must
> demonstrate that she: (1) is a member of a protected class;
> (2) is otherwise similarly situated to members of the
> unprotected class; (3) suffered an adverse employment
> action; (4) was treated differently from members of the
> unprotected class; and (5) the defendant acted with

---

[192]    *See* Cmpl. ¶¶ 111- 119.

[193]    *See id.* ¶ 113. Plaintiff's due process claim is presumed to be a
procedural due process claim.

[194]    *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 67, 71
(1989) ("We hold that neither a State nor its officials acting in their official
capacities are 'persons' under § 1983."). For purposes of this motion, it will be
assumed that the individual defendants acted under color of state law.

47

discriminatory intent.[195]

Here, Anderson clearly fails to satisfy the second and fourth prongs as her Second
Amended Complaint is devoid of any comparison to similarly situated Caucasian
Principal Attorneys accused of insubordination who were treated more favorably
than Anderson. Accordingly, because plaintiff's equal protection claim cannot
withstand summary judgment, it must be dismissed.

With regard to her due process claim, Anderson must show the
following three elements to support a claim of an unconstitutional taking in
violation of the Fourteenth Amendment and section 1983: (1) a property interest;
(2) that has been taken under the color of state law; (3) without due process or just
compensation.[196]  With regard to the first requirement – a property interest –
plaintiff has not shown that she had tenure or any other specific guarantee of
employment. Thus, her employment at DDC can be described as "at-will."
Consequently, plaintiff's procedural due process claims fails "because at-will

---

[195]     *McPhaul v. Board of Comm'rs of Madison County*, 226 F.3d 558, 564
(7th Cir. 2000) (citing *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000);
*Jackson v. City of Columbus*, 194 F.3d 737, 751-52 (6th Cir. 1999)).

[196]     *See Parratt v. Taylor*, 451 U.S. 527, 535-37 (1981).

employment is not a constitutionally protected property interest."[197]  As a result,

her due process claim must also be dismissed.

## B.    Plaintiff's First Amendment Retaliation Claim

### 1.    Plaintiff Engaged in Protected Speech

In her Second Amended Complaint, Anderson alleges that she

> was targeted for harassment and abuse, and was retaliated
> against, after she discovered and reported acts of
> misconduct and corruption within the DDC, which
> constituted an abuse of the power and a fraud upon the
> public.    The conduct and actions of defendants in
> retaliating against Plaintiff and subjecting her to a hostile
> work environment, culminating in the constructive
> demotion and termination of her position and employment,
> were wrongful, oppressive and unlawfully taken in
> retaliation against her for having exercised her
> Constitutional Right of Free Speech as a private citizen
> regarding matters of public concern to the community.[198]

"Whether an employee's speech addresses a matter of public concern is a question

of law for the court to decide, taking into account the content, form, and context of

---

[197]     *Baron v. Port Authority of New York and New Jersey*, 271 F.3d 81, 89
(2d Cir. 2001).  *Accord Luck v. Mazzone*, 52 F.3d 475, 477 (2d Cir. 1995)
(employee "lacked state civil-service tenure or any other formal employment
guarantee that would have given her a cognizable property interest in her job");
*White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1062 (2d Cir. 1993) ("An
interest that state law permits to be terminated at the whim of another person is not
a property right that is protected by the Due Process Clause.").

[198]     Cmpl. ¶ 101.

a given statement as revealed by the whole record."[199] At issue is whether the

employee's speech was "calculated to redress personal grievances or whether it

had a broader public purpose."[200] Accordingly, this Court must evaluate whether

Anderson's alleged whistle-blowing comments were made in her role as a

Principal Attorney fulfilling her professional responsibilities or as a private citizen

concerning matters of public concern.

Defendants argue that plaintiff was not speaking as a citizen on

matters of public concern when she criticized the DDC for alleged whitewashing

because plaintiff: (1) did not speak out in public, nor did she express an intention

to do so, before filing the instant action; and (2) did not make any statements

about *quid pro quo* corruption on the part of any DDC personnel. Defendants

further argue that Anderson's "disputes with how the DDC was handling certain

cases were limited to disagreement with the prosecutorial discretion exercised by

her superiors."[201]

> Anderson's deposition testimony acknowledged that DDC
> operates in a manner analogous to a prosecutor's office,

---

[199]     *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999) (citing *Connick v. Myers*, 461 U.S. 138, 147-48 & n.7 (1983)).

[200]     *Id.* at 163-64.

[201]     Def. Mem. at 24.

that prosecutorial discretion needs to be applied as part of DDC's work, and that reasonable attorneys can differ on application of prosecutorial discretion. The comments Anderson claims to have made merely reflect differences in approach concerning specific case handling in a few instances and differences in how hard the office should press on charges in prosecutions. Discussion with colleagues about the use of prosecutorial discretion is a necessary and expected part of a DDC attorney's work. The comments plaintiff claims she made about the use of discretion in specific cases simply cannot be transformed into speech on systemic claims of corruption.[202]

*Garcetti* and its progeny dictate that speech made by a public employee pursuant to her professional duties does not fall under the purview of the First Amendment because it is not spoken as a private citizen. *Garcetti* involved a deputy district attorney who claimed that he was retaliated against for recommending the dismissal of a case because of a flawed affidavit used to obtain a critical search warrant.[203] The Court found that the plaintiff's speech was not protected because it was "made pursuant to his duties as a calendar deputy."[204] In finding that the plaintiff was acting as a public employee with regard to an internal matter, the Court noted that "[plaintiff] spoke as a prosecutor fulfilling a

---

[202]    Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment ("Reply") at 6.

[203]    *Garcetti*, 547 U.S. at 421.

[204]    *Id.*

responsibility to advise his supervisor about how best to proceed with a pending case."[205] Exercising similar reasoning, district courts in the Second Circuit have dismissed First Amendment retaliation claims where plaintiffs have alleged that their protected speech resulted from the fulfillment of job duties.[206]

This case is patently distinguishable from *Garcetti*. Whereas the prosecutor in *Garcetti* spoke out about a single case pending in his office, Anderson spoke out about systemic problems at the DDC, thereby making her speech protected.[207] Where a public employee's speech concerns a government agency's breach of the public trust, as it does here, the speech relates to more than

---

[205]    *Id.*

[206]    *See, e.g.*, *Ruotolo v. City of New York*, No. 03 Civ. 5045, 2006 WL 2033662, at *3-6 (S.D.N.Y. July 19, 2006) (dismissing First Amendment retaliation claim where plaintiff's alleged protected speech consisted of a report prepared pursuant to his professional duties as a police sergeant), *aff'd*, 514 F.3d 184 (2d Cir. 2008); *Healy v. City of New York*, No. 04 Civ. 7344, 2006 WL 3457702, at *5 (S.D.N.Y. Nov. 22, 2006) (granting defendant's motion for summary judgment on plaintiff's First Amendment retaliation claim where plaintiff stated that his speech was made as part of his duties as defendant's employee), *aff'd*, No. 06-5865-CV, 2008 WL 2599154, at *1 (2d Cir. June 30, 2008).

[207]    *See Cotarelo v. Village of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006) (holding that a public employee's speech about alleged job discrimination is protected so long as the claim concerns general bias problems and is not limited to instances affecting only the plaintiff).

a mere personal grievance and therefore falls outside *Garcetti's* restrictions.[208]

Furthermore, plaintiff did not engage in speech pursuant to her official duties as a Principal Attorney for the DDC when she complained about whitewashing. Anderson's job duties as a Principal Attorney were to "research legal questions and issues, organize complex investigations, prepare and present complex cases before administrative tribunals and trial and appellate courts, and perform related duties."[209] Speaking out about improper DDC practices was clearly not one of Anderson's job duties. Cahill reinforced this point at a meeting held on October 11, 2006, where he told Anderson that "she did not make policy decisions [and] that her function was limited to matters assigned to her."[210] Because Anderson was not required to speak out about DDC whitewashing cases, she expressed her views as a private citizen, not as a public employee, under

---

[208]     *See Skehan v. Village of Mamaroneck*, 465 F.3d 96 (2d Cir. 2006) ("Plaintiffs' speech plainly concerned issues of public concern: misfeasance within the police department and allegations of an ongoing cover-up and an attempt to silence those who spoke out against it."), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

[209]     Principal Attorney Job Description, Ex. 12 to the Beranbaum Aff., at DDC 78.

[210]     10/12/06 Memorandum from Spokony to the Record, Ex. 12 to the Beranbaum Aff., at DDC 1768.

*Garcetti*.[211]

Moreover, the fact that Anderson expressed her views about the DDC within the workplace does not strip them of constitutional protection.[212] Although a statement made at work, and in private, may militate against a finding of public concern, it is not dispositive.[213] Indeed, the Supreme Court in *Garcetti* expressly noted that the fact that an employee engages in speech "inside his office, rather than publicly" is not dispositive because "[m]any citizens do much of their talking

[211]   *See, e.g., Ventura v. Town of Manchester*, 3:06 CV 630(EBB), 2008 WL 4080099, at *17 (D. Conn. Sept. 2, 2008) (denying summary judgment where there was a factual question as to whether police officer was compelled to make complaints about his supervisor's alleged theft of overtime or did so voluntarily); *Casale v. Reo*, 522 F. Supp. 2d 420, 423-24 (N.D.N.Y. 2007) (denying summary judgment where there was insufficient evidence to show that school aide was required to participate in the investigation of a teacher's allegedly inappropriate behavior); *Paola v. Spada*, 498 F. Supp. 2d 502, 508-09 (D. Conn. 2007) (denying summary judgment where there were questions of fact as to whether State Trooper was expected to report all wrongdoing within his division); *Barclay v. Michalsky*, 451 F. Supp. 2d 386, 395-96 (D. Conn. 2006) (finding material issues of fact regarding whether nurse was required by her job duties to report misbehavior by colleagues, such as sleeping on the job and using excessive restraints on patients).

[212]   *See Garcetti*, 547 U.S. at 421 ("The First Amendment protects some expressions related to the speaker's job."); *Morey v. Somers Cent. Sch. Dist.*, No. 06 Civ. 1877, 2007 WL 867203, at *10 (S.D.N.Y. Mar. 21, 2007) (holding that a school custodian's concerns about the presence of asbestos in the school were protected even though he expressed them in the ordinary course of his duties).

[213]   *See De Los Santos v. City of New York*, 482 F. Supp. 2d 346, 353 (S.D.N.Y. 2007).

inside their respective workplaces[.]"[214]   As such, it would undermine the goal of

"treating public employees like any member of the general public to hold that all

speech within the office is automatically exposed to restriction."[215]   Here,

Anderson engaged in speech in the workplace, but that does not preclude this

Court from finding that her speech addressed a matter of public concern.

## 2.    Plaintiff Suffered an Adverse Employment Action

Plaintiff has offered sufficient facts to support her allegation that she

suffered an adverse employment action.  For purposes of a First Amendment

retaliation claim, an employment action is adverse if it "would deter a similarly

situated individual of ordinary firmness from exercising his or her constitutional

rights . . . ."[216]  Anderson claims that she suffered two adverse employment

actions: "1) her discharge; and 2) the cumulative negative job actions taken

against her which made her work environment 'unreasonably inferior and

adverse.'"[217]   Because it is beyond dispute that Anderson's discharge constituted

an adverse employment action, she has satisfied this element.

---

[214]    *Garcetti*, 547 U.S. at 420.

[215]    *Id.* at 420-21 (quotation marks omitted).

[216]    *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225-26 (2d Cir. 2006).

[217]    Pl. Mem. at 20 (quoting *Phillips v. Bowen,* 278 F.3d 103, 109 (2d Cir. 2002)).

### 3.   There Is a Material Question of Fact Regarding Causation

A plaintiff can establish the causal connection necessary for a First Amendment retaliation claim by showing that her protected activity was followed closely in time by the adverse employment action.[218]   Temporal proximity is strong circumstantial evidence of improper intent.[219]   While it is not the sole factor to be considered in establishing causation, nor is it dispositive, it creates a strong inference of causation, particularly where plaintiff does not allege that she engaged in numerous acts of speech over a long period of time.[220]   There is no bright line for how close in time the adverse employment action must follow the protected activity in order to sustain the causation element.[221]   There is, however,

---

[218]     *See Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001).

[219]     *See Anemone v. Metropolitan Transp. Auth.*, No. 05 Civ. 3170, 2008 WL 1956284, at *10 (S.D.N.Y. May 2, 2008) (citations omitted). *See also Gorman-Bakos*, 252 F.3d at 554 ("In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action. This court has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.") (quotation marks omitted).

[220]     *See McAllan v. Von Essen*, 517 F. Supp. 2d 672, 683 (S.D.N.Y. 2007).

[221]     *See id.*

substantial authority holding that a period between five and six months is
sufficient.[222]

Defendants argue that plaintiff's retaliation claim should be dismissed
because she cannot show a causal connection between her protected speech and
her eventual discharge.[223]  In particular, defendants argue that plaintiff has no
direct evidence of retaliatory motive and that she fails to show sufficient temporal
proximity between the alleged whitewashing statements she made to Wolfe in
August 2006 and her termination in June 2007.

Although defendants focus on the period between Anderson's
conversation with Wolfe in August 2006 and her subsequent discharge in June
2007, there is evidence that Anderson complained about DDC whitewashing in
November-December 2006, in connection with the case of "D.N."[224]  And

---

[222]    *See, e.g., Gorman-Bakos*, 252 F.3d at 555 (five months); *Grant v.
Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight month gap
between EEOC complaint and retaliatory act suggested causal relationship);
*Agostino v. Simpson*, No. 08 Civ. 5760, 2008 WL 4906140, at *7 (S.D.N.Y. Nov.
11, 2008) (six months); *Bolick v. Alea Group Holdings, Ltd.*, 278 F. Supp. 2d 278,
284 (D. Conn. 2003) (six months).

[223]    Def. Mem. at 24. "The inadequacy of plaintiff's temporal showing is
patent, where a period of eight months or more elapsed between arguably
articulated complaints about case management and her termination." Reply at 2.

[224]    *See supra* n.40.

57

although Anderson's official discharge was in June of 2007, the decision initiating

the termination process was made by Spokony in April 2007. Thus, using these

alternative dates, the gap between the protected activity and the adverse

employment action is approximately four months. There is, therefore, a material

question of fact as to whether plaintiff has shown a causal connection between her

protected speech and her discharge. Defendants' motion for summary judgment

on Anderson's First Amendment retaliation claim is denied.

### 4. Motive

Defendants argue, in conclusory terms, that they would have fired

Anderson, even in the absence of her protected activity, because of her

insubordination.[225] Whether defendants would have done so turns on motive,

which ordinarily should not be decided on summary judgment.[226] This Court

cannot assess whether defendants were motivated to fire Anderson because of her

---

[225]    *See* Def. Mem. at 24-25 (citing *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 163 (2d Cir. 2006) (on First Amendment claim, "employer may avoid liability by demonstrating that it would have taken the same adverse employment action 'even in the absence of the protected conduct'") (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286 (1977)).

[226]    *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) ("Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision.").

protected speech as opposed to other factors.  Disentangling the permissible from the impermissible reasons for Anderson's termination is a matter for the jury, not this Court.  Furthermore, there is a question of fact as to whether defendants tried to induce Anderson's insubordination by refusing to remove Cohen as her supervisor, in order to have a pretext for firing her.  If so, Anderson's alleged insubordination is not the real reason for her discharge.  "Where the employer provokes a reaction from an employee, that reaction should not justify a decision to impose a disproportionately severe sanction."[227]  A reasonable jury could find that defendants refused to remove Cohen as Anderson's supervisor so they could use Anderson's inevitable resistance to Cohen's continuing supervision as a pretext for firing her, thereby obscuring their illegitimate and retaliatory discharge of plaintiff.

### C.    Plaintiff's Breach of Contract Claim

Plaintiff brings a state law breach of contract claim alleging that NYS and OCA

> entered into a contract of employment with Plaintiff which
> carried with it express and implied promises that Plaintiff
> would be protected under the terms of the contract, that

---

[227]    *Sumner v. United States Postal Serv.*, 899 F.2d 203, 210 (2d Cir. 1990) (identifying provocation by the employer as a factor supporting the finding of pretext).

> these Defendants would honor the terms of the contract,
> and that they would not discriminate against her because of
> her National Origin, race or color during the course of her
> employment with the Defendants State and OCA.[228]

Plaintiff further alleges that NYS and OCA breached the contract of employment

by: (1) discriminating against her on the basis of race, color and national origin;

(2) summarily discharging her without a hearing; and (3) punishing her for

adhering to and upholding the ethical rules of the legal profession.[229]

Plaintiff's breach of contract claim fails as a matter of law for several

reasons. *First*, I have already found that plaintiff has failed to offer proof that the

relevant decision makers discriminated against Anderson when they terminated

her employment. Nor has plaintiff shown that she was subjected to a hostile work

environment for purposes of Title VII. This lack of discrimination under Title VII

also dooms plaintiff's allegation that defendants NYS and OCA willfully and

intentionally breached the contract of employment by discriminating against her.[230]

---

[228]    Cmpl. ¶ 129.

[229]    *See id.* ¶¶ 131-133.

[230]    *Cf. Brzostowski v. Laidlaw Waste Sys., Inc.*, 49 F3d 337, 339 (7th Cir.
1995) ("If the plaintiff here had had an employment contract which protected her
from being fired without cause, and she claimed that she was fired in violation
both of the contract and of Title VII, these two claims would be the same claim for
purposes of res judicata because, although they would not have the identical
elements, the central factual issue would be the same in the trial of each of them.

*Second,* plaintiff alleges that "Article 12.1 of the Union Agreement states that an

attorney in Plaintiff's position 'shall not be removed or otherwise subjected to any

disciplinary penalty . . . except for incompetency or misconduct shown *after a*

*hearing* upon stated charges . . . .'"[231] Defendants argue that as a Principal

Attorney at the DDC, plaintiff was a "confidential employee" not covered by the

Union Agreement's hearing requirement.[232] Anderson has failed to refute

defendants' argument. Accordingly, the hearing requirement does not apply to

Anderson who was an "at-will" employee. Failing to hold a hearing prior to the

discharge of a confidential, at-will employee cannot, as a matter of law, support a

claim for breach of an employment contract. Finally, plaintiff's third ground in

support of her breach of contract claim relies on an alleged agreement – implicit

in every employment relationship among lawyers according to Anderson – "that

---

It would be whether she had been fired for cause, in which event the employer would be guilty neither of a breach of the employment contract nor of discrimination, or because of her [protected class], in which event the employer would be guilty of both a breach of contract and discrimination . . . .") (quotation marks and citation omitted).

[231]     *Id.* ¶ 132 (emphasis in original).

[232]     *See* Union Agreement, Article 12(c) (exempting confidential employees, including Principal Attorneys, from the Article's hearing requirement); *Murphy v. Rosenblatt,* 140 Misc. 2d 450, 453 n.1 (N.Y. Co. 1988) (employees designated as confidential "serve at the pleasure of the appointing authority and are ordinarily subject to termination at any time without a hearing).

all lawyers shall conduct themselves in accordance with the prevailing legal codes of conduct and ethical standards applicable to all lawyers."[233]  Plaintiff alleges that she was punished for reporting ethical misconduct in violation of this implicit requirement.[234]  But this claim is duplicative of plaintiff's First Amendment retaliation claim and must be dismissed.[235]  In sum, plaintiff's state law breach of contract claim is dismissed.

---

[233]     Cmpl. ¶ 133 ("Indeed, implied in her employment relationship with Defendants State and OCA was the understanding that violating the prevailing rules and ethical standards of the legal profession would frustrate the very purpose of the employment relationship between the parties.").

[234]     *See id.* ("Defendants State and OCA breached their contract with Plaintiff by subjecting her (through their agents and employees) to a campaign of harassment, culminating in her constructive demotion and retaliatory discharge for adhering to and upholding the ethical rules of the legal profession.").

[235]     *Cf. Hamdy v. County of Niagara*, No. 00-CV-0708A, 2007 WL 295325, at *2 (W.D.N.Y. Jan. 30, 2007) ("Because the plaintiff's breach of contract claim is duplicative of his retaliation claims and affords him no greater relief than he would get under those claims, the Court declines to exercise supplemental jurisdiction over the breach of contract claim at this juncture.  It would be cumulative, a waste of time and too confusing to submit essentially the same claim to the jury based upon two different theories. Accordingly, the Court will not submit the breach of contract claim . . . to the jury.") (citing *Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 241 F. Supp. 2d 1123, 1147 n.13 (D. Kan. 2002) (dismissing claim alleging breach of employment agreement as duplicative of retaliation claim)).

## IV.   CONCLUSION

For the foregoing reasons, plaintiff's discrimination claims are

dismissed, as is her breach of contract claim. Plaintiff's First Amendment

retaliation claim remains. The Clerk of the Court is directed to close defendants'

motion for summary judgment (Document # 63). A status conference is scheduled

for May 8, 2009, at 5:30 p.m., in Courtroom 15C.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 27, 2009

## - Appearances -

**For Plaintiff:**

John A. Beranbaum, Esq.
Beranbaum Menken Ben-Asher
 & Bierman LLP
80 Pine Street, 32nd Floor
New York, NY 10005
(212) 509-1616

**For Defendants:**

Lee A. Adlerstein
Wesley E. Bauman
Assistant Attorneys General
Attorney General for the State of New York
120 Broadway, 24th Floor
New York, NY 10271
(212) 416-6035